US TAX COURT
RECEIVED

MAR 17 2017
8:06 PM

US TAX COURT
eFILED

MAR 17 2017

PA



FILED
CLERK, U.S. DISTRICT COURT
MAR 30 2017
CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

CV17-2485-R (JCx)

GEORGE B. DENGIN,
    Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE,
    Respondent

ELECTRONICALLY FILED

Docket No.  5822-17

Date: May 1, 2017
Time: 10:00 am
Crt: 880

# PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION FOR REVIEW OF JEOPARDY ASSESSMENT OR JEOPARDY LEVY PURSUANT TO RULE 56

**SERVED Mar 17 2017**

UNITED STATES TAX COURT

| | |
|---|---|
| GEORGE B. DENGIN, ) | |
| ) | Docket No. 5822-17 |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | Electronically Filed |
| COMMISSIONER OF INTERNAL REVENUE, ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

**MOTION FOR REVIEW OF JEOPARDY ASSESSMENT**

Petitioner George Dengin hereby submits the following Memorandum of Points And Authorities in support of his Motion For Review of Jeopardy Assessment (the "Motion") filed concurrently with this Memorandum, as follows:

**I.     Preliminary Statement**

A jeopardy assessment is "an *extraordinary* measure, intended for *exigent* circumstances (hence the name 'jeopardy assessment')." *Penner v. United States*, 582 F.Supp. 432, 434 (S.D. Fla. 1984) (emphasis added). Although no "exigent" circumstances were present in Petitioner's audit, which had been pending for a number of years, on November 4, 2016 Respondent took the "extraordinary" step of imposing a jeopardy assessment against Petitioner, recording a Notice of Federal Tax Lien against real property owned by the Petitioner's wife, Inessa Dengin ("Inessa") on Fernald Point in Santa Barbara, California, and a Nominee Lien against a partnership owned

1

by Inessa (hereafter the "Jeopardy Assessment"). Petitioner now seeks the full abatement of the Jeopardy Assessment and the vacating of Respondent's liens. As explained in more detail below, the Jeopardy Assessment was and is improper under Treas.Reg. §301.6861-1

## II. Legal Standard For Review Of The Jeopardy Assessment

"'Jeopardy assessments pursuant to *§6861* are extraordinary measures which bypass the established preassessment procedures the government uses to collect its revenues. *Section 6861* is usually employed to prevent persons operating outside the law from laundering or concealing large amounts of cash in order to escape their tax liabilities.' *George F. Harding Museum v. U.S.*, 674 F. Supp. 1323, 1326 (N.D. Ill. 1987). The Internal Revenue Manual states that '[j]eopardy assessments should be used sparingly and care should be taken to avoid excessive and unreasonable assessments . . . .' See id. (citing Internal Revenue Manual Section 4584.2); see also *Lindholm v. U.S.*, 808 F. Supp. 3, 6 (D.D.C. 1992)." *Fumo v. United States*, 2014 U.S. Dist. Lexis 77082 @18 (E.D. Pa. 2014).

A jeopardy assessment is appropriate only where one of the following conditions is present:

> "(1) the taxpayer is or appears to be designing quickly to depart from the United States to conceal himself;
>
> "(2) the taxpayer is or appears to be designing quickly to place his property beyond the reach of the government by removing it from the United States, or by concealing it, or by transferring it to another person, or by dissipating it; or
>
> "(3) the taxpayer's financial solvency appears to be imperiled."[1]

Tres.Reg. 1.6851-1(a)(1), incorporated by reference in Tres.Reg. §301.6861-1.

---

[1] Only subpart (2) is asserted by Respondent as a basis for the Jeopardy Assessment.

After a jeopardy assessment has been made, the Court, upon a taxpayer's request, will review, *de novo*, the making of the jeopardy assessment to determine whether the jeopardy assessment is reasonable under the circumstances. See: IRC §7429(b)(3)(A) and *Golden ADA, Inc. v. United States*, 934 F.Supp 341, 344 (N.D.C.A. 1996). "The burden of proving reasonableness of the assessment falls on the government." *Francis v. U.S.*, 2010 U.S. Dist. LEXIS 145769. See also: *Stebco, Inc. v. U.S.*, 733 F. Supp. 1387 (S.D. Cal. 1990), and *Miller v. U.S.*, 615 F. Supp. 781, 785 (D.C. Ohio 1985). If the Court determines that the making of a jeopardy assessment was unreasonable, the Court may order the jeopardy assessment to be abated and may grant other appropriate relief. See: IRC §7429(b)(3). That "other" relief includes ordering the release of any liens asserted by Respondent. *Penner v. United States, supra*, 582 F.Supp at 437. In conducting its *de novo* review, the Court may consider information obtained after the date of the assessment. See: *Stebco, Inc. v. U.S.*, 733 F.Supp. 1387, 1390 (S.D. Cal. 1990).

### III. Background

Petitioner, who was born in the United States, moved with his family to Canada in 1965 when he was only *ten* years old. For about the past five years Petitioner has been under examination with respect to his personal income tax returns for the years ending December 31, 2006 through December 31, 2011. Prior to the commencement of that examination, Petitioner was not aware that he had any United States tax filing requirement. In addition to timely filing all of his required Canadian tax returns, since learning of his United States tax filing obligations, Petitioner has filed all required United States tax returns. (Petitioner's wife, Inessa, is a Canadian citizen and has no United States tax filing requirement.) On November 4, 2016 Respondent

3

made the Jeopardy Assessment and recorded both a Notice of Federal Tax lien in Petitioner's name and a nominee lien in the name of Fernald Point Limited Partnership, an entity in which Petitioner owns no actual or beneficial interest. See: Exhibits 1, 2, 3 and 4 to the Motion.

Respondent's stated basis for the issuance of the Jeopardy Assessment is:

"1. The house located at 1813 Fernald Point Lane, Santa Barbara, CA in the name of Fernald Point Limited Partnership, which is directly and indirectly owned and/or controlled by …[Taxpayer] …is on the market for sale.

"2. All other known assets are in Canada, mostly under nominee names."

See: Exhibit 1 to the Motion.

On December 5, 2016, Petitioner timely submitted a protest of the Jeopardy Assessment in accordance with IRC §7429(a)(2). On February 13, 2017, Respondent's Appeals Office issued a letter sustaining the Jeopardy Assessment. See Exhibits 5 and 6 to the Motion.

As is demonstrated below, the property at 1813 Fernald Point Lane, Santa Barbara, California (the "Fernald Point Property") is not owned, either directly or indirectly, by Petitioner. It is owned by Fernald Point Limited Partnership, a British Columbia limited partnership ("FPLP"), which is wholly owned by Inessa. In addition, the sales listing for the Fernald Point Property was terminated *before* the Jeopardy Assessment was made and the only purchase offer that was ever received for the Fernald Point Property was summarily rejected by FPLP.

4

## IV. Argument

### A. Petitioner Has No Direct Or Indirect Ownership Or Other Beneficial Interest In The Fernald Point Property

Respondent has incorrectly determined that Petitioner is the true and/or beneficial owner of the Fernald Point Property. The true facts are that (i) Inessa is the sole owner of FPLP, which owns the Fernald Point Property, (ii) 99% of the funds originally used for the purchase of the Fernald Point Property, $5.1 million dollars, came entirely from Inessa's stock trading activities and other pre-marriage assets, and (iii) Petitioner's 1% interest in FPLP was gifted to Inessa at the end of 2012 as part of Petitioner's estate planning.2 See Paragraph 3 of the Affidavit of George Dengin (the "*George Affidavit*") filed concurrently herewith.

Inessa's ownership of FPLP is established by the organizational and ownership documents for FPLP. When it was initially formed in 2010, FPLP was, based on the advice of Inessa's Canadian lawyers and accountants, owned 99% by Inessa and 1% by Petitioner.3 See Paragraphs 27 through 30 of the Affidavit of Inessa Dengin (the "*Inessa Affidavit*"), Exhibits "H", "I", "J", "K" and "L" thereto, and Exhibit "1" to the *George Affidavit*. In 2012, Petitioner transferred his 1% interest in FPLP to Inessa as a gift, for which gift Petitioner has filed a United States gift tax return. See Exhibit "2" to the *George Affidavit*. Petitioner made the gift to Inessa at the end of 2012 for estate planning purposes, specifically to use up part of his lifetime exemption in that year. From that time on, Inessa was the sole owner of the Fernald Point Property.

---

2 Except when denominated as Canadian Dollars - "CN $" - all amounts referred to are in U.S. Dollars.
3 Inessa's ownership consisted of a 98% limited partnership interest held in her name and a 1% general partnership interest held in the name of her wholly owned corporation 0885303 B.C. Ltd.

5

A tracing of the funds for the purchase of the Fernald Point Property confirms that Inessa has always been the owner of at least 99% of the Fernald Point Property, and of 100% of that property after 2012. Inessa's funds for the purchase of the Fernald Point Property were derived by Inessa as follows:

(a)   In connection with her divorce from her prior husband, Inessa disposed of interests in four pieces of real property that she had owned prior to her marriage to Petitioner for a total of about CN $720,000. Three of those sales were:

> (i)   CN $375,000 from the sale of the property located at 2095 Queens Avenue, West Vancouver, British Columbia, Canada - See *Inessa Affidavit,* paragraphs 7, 14, 15 and 16, and Exhibits "A" and "B" thereto;
>
> (ii)  CN $205,000 from the sale of property generally known as Lot G, located in West Vancouver, British Columbia, Canada - See *Inessa Affidavit*, paragraphs 16 and 17 and Exhibits "C" and "D" thereto; and
>
> (iii) CN $140,000 from the sale of an interest that Inessa owned in an apartment located at 1621 St. Gorges Street, North Vancouver, British Columbia, Canada - See *Inessa Affidavit*, paragraphs 18 to 20, and Exhibits "B", "E" and "F" thereto.

(b)   Including the above amounts from the sales of real property, in connection with her divorce Inessa received in excess of CN $1,000,000 in assets. (See *Inessa Affidavit*, paragraphs 6 and 17.) Inessa also received CN $203,231 from the sale of her interest in the Hudson Street condominiums, which she acquired shortly after her divorce - the fourth sale.

(c)   Using the funds from her divorce, including her above listed real estate sales, Inessa opened new, non-registered, brokerage trading account(s). See *Inessa Affidavit*, paragraphs 22 and 23, and Exhibit "G" thereto. No one other than Inessa was authorized to place

trades on those accounts. See *Inessa Affidavit*, paragraph 44 and Exhibit "AA" thereto. This was not Inessa's first experience in trading securities. Prior to opening these accounts, Inessa had securities trading accounts with IPO Capital, Royal Bank of Canada and First Associates/Blackmont Capital. See *Inessa Affidavit*, paragraph 22. Inessa also had substantial other experience in business and real estate. See: *Inessa Affidavit*, paragraph 47.

(d)     In addition to the funds from her sales of real estate and her divorce settlement, Inessa borrowed funds from her joint line of credit with Petitioner and used those funds for the purchase of securities. See: *Inessa Affidavit*, paragraph 25, and the *George Affidavit*, paragraphs 8 and 9, Exhibit "3" thereto. As provided in the agreements for the line of credit, although it was secured by a mortgage on the family home at 1939 Drummond Drive (the "Drummond Drive Property"), Inessa was personally responsible for the repayment of that loan. Also significant here is the fact that Inessa had lent the Drummond Drive Trust, which initially purchased the Drummond Drive property, CN $580,000 in cash for the purchase of that property from funds that she had from before her marriage to Petitioner. In other words, in drawing against the joint credit line Inessa was really doing nothing more than accessing her own premarital assets.

(e)     Starting in 2006, Petitioner and Inessa made a reasonable allocation of interest paid on their joint line of credit for tax reporting purchases. That allocation was based on the total amount each of them had borrowed during the year. For example, in 2006 and 2007 Inessa claimed 70% of the line of credit interest for Canadian tax purposes, and in 2008 Inessa claimed only about 30% of the line of credit interest for Canadian tax purposes. See: *George Affidavit*, paragraphs 8 and 9.

7

(f) From 2005 through 2007, Inessa' trading activity in her securities account generated substantial gains. And while Inessa suffered trading losses in 2008, those losses did not eliminate her prior gains. See *Inessa Affidavit,* paragraph 24, and Exhibits "X" and "Y" thereto. While Petitioner may have advised Inessa regarding some of her trading activities, Inessa was the legal and beneficial owner of each of her securities accounts and Petitioner did not have any trading authority over any of Inessa's non-registered accounts from which the funds for the purchase of the Fernald Point Property were derived.4 See *Inessa Affidavit*, paragraphs 26 and 47.

(g). Inessa's Canadian tax filings support the proposition that Inessa, and not Petitioner, was and is the legal and beneficial owner of the securities in her trading accounts:

(i) Inessa reported her stock trading activities on her tax returns and paid the resulting income taxes; See Exhibit "Y" to the *Inessa Affidavit*

(ii) None of Inessa's stock trading gains were attributed to Petitioner under the Canadian "spousal attribution" rules. See: *Inessa Affidavit*, Paragraph 24.

(iii) The separate nature of Inessa's and Petitioner's stock trading activities and, thus, Inessa's legal and beneficial ownership of the securities in her accounts, can be easily seen in an examination of their respective trading activities during 2006. In 2006, Inessa reported stock trading gains of about CN $1.4 million and paid income taxes of about CN $250,000. Petitioner, on the other hand, reported a tax loss of approximately CN $2.4 million in his tax filings. While Inessa could have entirely eliminated the tax bill on her 2006 trading activities by taking the position advocated by Respondent - i.e. that her trading gains were actually Petitioner's gains (and thus offset by his losses) - she did not do so. The simple reason for

---

4 From 2009 to 2012 Petitioner had trading authority on two unrelated accounts owned by Inessa.

      this, of course, is that Inessa, and not Petitioner, was the legal and beneficial owner of the securities in her brokerage accounts.

See *Inessa Affidavit*, paragraphs 41 and 42, and Exhibits "X" and "Y" thereto.

To further corroborate that Inessa's 99% of the funds used to acquire the Fernald Point property came from accounts owned by Inessa:

    (a)    In April 2007, a CN $7.8 million loan on a property owned by the Dengin Family Limited Partnership ("DFLP") (through its interest in Chandler & Co. LP), the El Dorado Hotel, was coming due. To pay off the loan, DFLP borrowed CN $3,855,527 from Inessa, which funds were subsequently repaid to her. The repayment of that loan was documented as follows:

        (i)    On October 12, 2006 The Beedie Group, the manager of the lending entity, BCC Mortgage Investment Corp., confirmed the amount of the loan and its due date - See *Inessa Affidavit*, Exhibit "M";

        (ii)    A summary schedule showing the principal and interest payments on the loan, including the fact that the final two payments are the advances from Inessa - See *Inessa Affidavit*, Exhibit N;

        (iii)    Inessa's Union Securities account statement for April 2007 showing the two checks issued to BCC Mortgage Investment Corp. - See *Inessa Affidavit*, Exhibit "O";

        (iv)    Balance sheet for DFLP showing the loan payable to Inessa as a liability at the end of 2007 and 2008 - See *Inessa Affidavit*, Exhibit "P";

        (v)    Documentation showing that DFLP transferred CN $3,855,138.37 to Inessa's joint account with Petitioner at Vancouver City Savings Credit Union ("VanCity") on December 17, 2009, in full payment of Inessa's loan to DFLP - See *Inessa Affidavit*, Exhibit "Q";

        (vi)    A March 4, 2010, check from Inessa's account at Union Securities in the amount of CN $669,875 payable to Inessa and a VanCity statement

9

              showing that the check was deposited in the Dengins' joint account - See *Inessa Affidavit,* Exhibit "R";

(vii)   A June 25, 2010, check from Inessa's account at Union Securities in the amount of CN $775,175 payable to Inessa and a VanCity statement showing that the check was deposited in the Dengins' joint account (together with a CN $22,941 check from Petitioner) - See *Inessa Affidavit,* Exhibit "S";

(viii)  A schedule showing how the above transfers by Inessa were sufficient for Inessa's entire deposit into escrow for the July 16, 2010, purchase of the Fernald Point property - See *Inessa Affidavit,* Exhibit "T";

(ix)    Printouts of activity in the VanCity accounts of FPLP and 0885303 B.C. Ltd. (the corporate general partner of FPLP) for the month of July 2010. See *Inessa Affidavit,* Exhibit; these printouts have been annotated to show that the account for 0885303 B.C. Ltd. (the "Corporate Account") was used as a collection point for the funds used for FPLP's acquisition of the Fernald Point Property:

        a.   On July 9, 2010, $3,536,000 was transferred to the Corporate Account from the Dengins' joint account.

        b.   On July 13, 2010, $51,000 was transferred to the Corporate Account from the Dengins' joint account, to cover the amount needed for the corporation's 1% interest in FPLP.

        c.   On July 14, 2010, $51,000 was transferred to the Corporate Account from the Dengin Family Trust #2 account for the benefit of the Dengin Family Trust (i.e., from Petitioner) to cover the amount needed for Petitioner's 1% interest in FPLP.

        d.   On July 14, 2010, an additional $148,000 was transferred to the Corporate Account from the Dengins' joint account.

      e.      On July 14, 2010, $3,786,000 was transferred from the Corporate Account to the FPLP account.

      f.      On July 15, 2010, $1,295,707 was transferred to the FPLP account from the Dengins' joint account.

      g.      On July 15, 2010, $5,082,460 was wire transferred from the FPLP account to escrow for completion of the Fernald Point Property acquisition.[5]

In purchasing the Fernald Point Property, Inessa relied on her Canadian attorneys and accountants for advice on how to structure the purchase, and it was those lawyers and accountants that recommended the limited partnership structure that was subsequently implemented by Inessa. See *Inessa Affidavit*, paragraph 30.

In regards to Inessa's 2012 affidavit from her legal dispute with ex-husband (the "2012 Affidavit"), (a) Inessa's statement that she borrowed funds from her joint line of credit to invest in securities is consistent with her Canadian tax filings; and (b) Inessa's statements that Petitioner purchased the Fernald Point Property is in error as demonstrated by the above information and documents. See *Inessa Affidavit*, paragraphs 5 and 27 to 32.

---

[5] The escrow closing statement, Exhibit "5" to the *George Affidavit*, shows that Petitioner's initial escrow deposit of $162,000 was refunded to him at the close of escrow.

B.  <u>The Fernald Point Property Was Not For Sale At The Time Of The Jeopardy Assessment And There Was, And Is, No Credible Evidence To Show That It Is Being Placed Beyond The Reach Of Respondent</u>

In addition to the fact that Petitioner does not own an actual or beneficial interest in the Fernald Point Property, and thus that property is not subject to any U.S. tax obligations which Petitioner may have, there is no credible evidence to establish that any change in the ownership or status of the Fernald Point Property was imminent at the time of the Jeopardy Assessment.

While the Fernald Point Property was at one time listed for sale, that listing ended prior to the imposition of the Jeopardy Assessment. On February 8, 2016 Fernald Point Limited Partnership entered into a Residential Listing Agreement with Sotheby's International Realty for the sale of Fernald Point Property at a price of $8.25 million. See *Inessa Affidavit,* paragraph 45 and Exhibit "BB" thereto. The listing agreement for the Fernald Point Property originally expired on July 8, 2016, and was extended several times to November 1, 2016, when it was not renewed and it finally expired. See *Inessa Affidavit*, paragraph 43 and Exhibit "Z" thereto. A December 1, 2016 Property Profile for the Fernald Point Property shows the expiration of the sales listing (prior to the issuance of the Jeopardy Assessment, it should be noted) and that the property is still owned by FPLP. See *Inessa Affidavit*, Paragraph 46 and Exhibit "CC thereto.

As the Fernald Point Property was not and is not actively being listed or marketed for sale, there is no credible evidence to show that, even if it were subject to any U.S. tax liability that Petitioner might have, it is being placed beyond the reach of Respondent. The Jeopardy Assessment is, therefore, not required to maintain the status quo during Respondent's examination of Petitioner.

12

C.  Respondent's Justifications For The Jeopardy Assessment, As Outlined In Its Jeopardy Recommendation Report, Are Replete With Errors And Do Not Support The Jeopardy Assessment

It is clear from the introductory paragraphs and the overall tenor of the Jeopardy Recommendation Report (the "Report"), Exhibit "6" to the Motion, that the revenue agent handling Petitioner's audit has been driven from day one by inflammatory rhetoric from Inessa's former husband Ammi Tepper. However, as documented in the *Inessa Affidavit*, Mr. Tepper is an angry ex-spouse who has been unsuccessful in his actions against Inessa for relief from default in his child support obligations. In that action, the judge found Mr. Tepper's claims to be "vexatious" and an "abuse of process" intended to "harass Mr. and Mrs. Dengin." In short, the credibility of any information coming from Mr. Tepper is highly suspect and Respondent should not have given it any consideration in a serious matter such as a jeopardy assessment.

Perhaps the most glaring example of the biased nature of the Report is its inclusion of a section on "Illegal Activities" as an "Activity Giving Rise to Jeopardy." While it is true that there were allegations against Petitioner in 1985, those allegations were ultimately found not to be supportable and the matter was resolved in 1990 with what amounts to a regulatory slap on the wrist for Petitioner. Without any factual support, Petitioner's reliance on unsupported allegations from more than 30 years ago is grossly abusive and an attempt by Respondent to shoehorn Petitioner into a "box" that was never intended for law abiding citizens like him. As explained by the *Fumo* Court: "The Internal Revenue Manual urges examiners to be alert to conditions where a jeopardy assessment may be necessary to protect the government's interest, including but not limited to narcotics cases, cases involving taxpayers involved in organized

13

crime, wagering cases, strike force cases, cases involving taxpayers who are reasonably believed to be receiving income from an illegal activity ..." *Fumo v. United States, supra* @18. In contrast to *Fumo* and most of the other cases which have considered requests for abatement of a jeopardy assessment, in this case Petitioner's income is derived from entirely legal and legitimate investment activities. Furthermore, and also in contrast to the vast majority of taxpayers that seek relief from a jeopardy assessment, Petitioner has fully participated in the ongoing audit for some five years, extensively answering questions by Respondent, both orally and in writing, and producing thousands and thousands of pages of documents requested by Respondent.

Another flaw in the Report is its reliance on the very general statements found in the 2012 Affidavit, a document prepared in connection with Inessa's wholly separate child support dispute with Mr. Tepper, rather than reference to the actual underlying transactional documents. This is particularly true in the section labeled "Transfer of property to put out of the reach of the government," which relates to the Fernald Point Property. In particular:

(a) The Report cites the statement in the 2012 Affidavit that Petitioner purchased the Fernald Point Property and established FPLP to hold title to it. While it is true that Petitioner opened the escrow to acquire the property, the purchase contract clearly indicates that the buyer will be "George Dengin, or assignee." See Exhibit "4" to the *George Affidavit*. And while it may also be true that Petitioner made the initial arrangements for professional advisors to form FPLP and its corporate general partner, it was ultimately Inessa (who also participated in the discussions with the professional advisors) who signed those documents and acquired the rights and responsibilities they specify. In doing those tasks, Petitioner was simply acting as Inessa's agent. See: *Inessa Affidavit*, paragraph 38.

14

(b)     The Report substantially relies on the following sentence included in Paragraph 38 of the 23-page 2012 Affidavit: "The funds used to acquire the properties owned by the 2005 Lake Placid Trust, the Jameson House Trust, and the Fernald LP came primarily from George, and George directly and indirectly pays for the expenses associated with these properties from our joint VanCity line of credit, which is the account that George and I utilize for our day to day expenses." This sentence, which relates to three properties, while accurate as to two of them, the 2005 Lake Placid Trust and the Jameson House Trust, is not entirely accurate as to the Fernald Point Property. As demonstrated above, while Petitioner may have acted as Inessa's agent in many aspects of the purchase of the Fernald Point Property, 99% of the funds used to acquire that property *came from Inessa*. Likewise, the expenses for the Fernald Point Property have been paid by FPLP, with Inessa contributing her pro rata share from her own funds. See: *Inessa Affidavit*, paragraph 36, and Exhibit "V" thereto, which is a copy of the FPLP trial balance for 2012. It shows, by way of example, that FPLP's expenses for 2012 were CN $73,234 and that the partners, in proportion to their partnership interests, contributed CN $69,000 toward these expenses.

(c)     The Report, citing the history of listing prices on the Fernald Point Property, concludes that, "Petitioner appears to be very motivated to sell his only U.S. holding." Apart from the fact that the Fernald Point Property is not Petitioner's to sell, the conclusion as to the seller's motivation is unfounded. In June 2016, Inessa received an offer for the property from an unrelated third party. See *Inessa Affidavit*, paragraph 37, and Exhibit "W" thereto. This offer, which proposed to close escrow in 30 days with no financing contingency - i.e. a quick and easy sale, was rejected without a counter-offer. Clearly, a motivated seller intending to move assets

15

outside of the reach of Respondent would have tried to reach a deal with a well-financed buyer showing active interest in the property, or simply accepted that offer. Inessa, however, did no such thing. A similar situation was considered by the Court in *Penner v. United States, supra.* In *Penner* the Court, in abating a jeopardy assessment, considered as significant the fact that while the taxpayer had, for a time, listed a property for sale, there was no evidence that he had sought to sell it quickly regardless of the price. So too in this case, there is no evidence to establish that Inessa was attempting to sell the Fernald Point Property regardless of the price. The facts of the instant action are the direct opposite of cases such as *Revis v. United States*, 558 F.Supp. 1071 (D.C. RI 1983), in that Petitioner has provided substantial and credible evidence to establish not only is he not the owner of the Fernald Point Property, but also that no effort is being made to conceal that property from Respondent.

(d)     Another mischaracterization in the Report is the entire section labeled "Concealed Assets." As an individual with substantial holdings, Petitioner relies on professional advice for the optimal way in which his assets should be held. To the extent assets are held in trust, the trust was established to put estate-planning goals into effect. To the extent assets are held in the names of corporations acting as nominees, this is a common practice in Canada for Canadian legal and tax reasons. See: *George Affidavit*, Paragraph 9. Furthermore, none of these ownership arrangements have been "concealed" in any way. Any transactions involving these entities that generate tax consequences have been reported and all of the nominee relationships were fully disclosed during the audit. And finally, as to the Fernald Point Property, there was never anything for Petitioner to "conceal" because, as demonstrated above, the ownership of FPLP was always a matter of public record and Petitioner's gifting to Inessa of his 1% interest in FPLP was

16

fully reported on his 2012 gift tax return.

V. **Conclusion**

For all of the foregoing reasons, Petitioner respectfully submits that (i) there is no legal or factual basis for the Jeopardy Assessment, and (ii) that the amount of the Jeopardy Assessment is excessive. Petitioner requests, therefore, that the Jeopardy Assessment be abated and that related liens be vacated.

DATED: March 17, 2017

*Michael C. Cohen*
Michael C. Cohen
T.C. Bar No. CM 0402
De Castro, West, Chodorow, Mendler, Glickfeld & Nass, Inc.
10960 Wilshire Boulevard, Fourteenth Floor
Los Angeles, CA 90024-3881
Telephone: (310) 478-2541

*Jonathan I. Reich*
Jonathan I. Reich
T.C. Bar No. RJ 1066
De Castro, West, Chodorow, Mendler, Glickfeld & Nass, Inc.
10960 Wilshire Boulevard, Fourteenth Floor
Los Angeles, CA 90024-3881
Telephone: (310) 478-2541