US TAX COURT
RECEIVED

MAR 17 2017
8:12 PM

PA



FILED
CLERK, U.S. DISTRICT COURT

MAR 3 0 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

US TAX COURT
eFILED

MAR 17 2017

CV17-2485-R (JCx)

GEORGE B. DENGIN,

      Petitioner,

      v.

COMMISSIONER OF INTERNAL REVENUE,

      Respondent

ELECTRONICALLY FILED

Docket No.   5822-17

Date: MAY 1, 2017
Time: 10:00 am
CRT: 880

# PETITIONER'S AFFIDAVIT OF INESSA DENGIN IN SUPPORT OF MOTION FOR REVIEW OF JEOPARDY ASSESSMENT OR JEOPARDY LEVY PURSUANT TO RULE 56

**SERVED Mar 17 2017**

UNITED STATES TAX COURT

GEORGE B. DENGIN,                          )
                                           )        Docket No. 5822-17
                        Petitioner,        )
                                           )
          v.                               )
                                           )        Electronically Filed
COMMISSIONER OF INTERNAL REVENUE,          )
                                           )
                        Respondent.        )
_____)

## AFFIDAVIT OF INESSA DENGIN IN SUPPORT OF

## MOTION FOR REVIEW OF JEOPARDY ASSESSMENT

I, INESSA DENGIN, also known as INESSA TEPPER, of 1939 Drummond Drive, Vancouver, British Columbia, SWEAR THAT:

1.      I have personal knowledge of the matters stated herein, except where stated to be on information and belief, and where so stated, I believe the same to be true. I am giving this Affidavit in support of the Motion for Review of Jeopardy Assessment which has been filed in this matter by my husband, George Dengin ("Petitioner"), and which seeks to vacate the liens which Respondent has recorded against real property that I own in Santa Barbara, California, USA.

2.      I am a Canadian citizen. I was born in Russia, immigrated to Canada in the 1970s, when I was eleven years old, and obtained my Canadian citizenship soon after.

3.      I am the spouse of George Dengin, the Petitioner herein. We were married on November 22, 2003. We reside in Vancouver, British Columbia, Canada.

4.      I am the former spouse of Ammi Tepper. Mr. Tepper and I were married on May 3, 1992. We separated on July 2, 2002, and were divorced by order of the Supreme Court of British Columbia on October 20, 2003.

5.      The details of my divorce from Mr. Tepper, our settlement agreement, and the subsequent court proceedings brought against me and George by Mr. Tepper (the "Tepper Actions") are set out in the Reasons for Judgment of Madam Justice Linda Loo dated February 24, 2014 (the "Loo Reasons"), a true and correct copy of which is attached as **Exhibit "A"** to this Affidavit.  I want to highlight the following excerpts because they relate to the matters raised by Respondent regarding an Affidavit that I swore in the Tepper Actions on June 29, 2012 (the "2012 Affidavit").

6.      At paragraph 39 of the Loo Reasons, there is an excerpt from an affidavit sworn by Mr. Tepper on May 12, 2003 in support of our divorce. Mr. Tepper deposed:

> "While the Plaintiff has a minimal annual income at this time, our settlement
>
> provides that she retains assets and capital of a value of more than $1,000,000."

The settlement to which Mr. Tepper referred was the settlement agreement we reached regarding our respective claims arising from the breakdown of our marriage.

7.      At paragraph 45 of the Loo Reasons, Justice Loo stated that as part of our divorce settlement, Mr. Tepper paid me $375,000 from the sale of our matrimonial home.

8.      The Tepper Actions were started after November 2011.  Around that time, I enrolled in British Columbia's Family Maintenance Enforcement Program to enforce Mr. Tepper's child support obligations because Mr. Tepper was in arrears for his child support payments. This is stated at paragraph 52 of the Loo Reasons.

9.      The Tepper Actions were three separate British Columbia Supreme Court actions where Mr. Tepper named me as a Defendant or Respondent.  Mr. Tepper applied to have our settlement agreement set aside, among other things.  Mr. Tepper alleged that I had acted

fraudulently and had misrepresented my financial position when we negotiated our settlement agreement. See paragraphs 1 and 5 of the Loo Reasons.

10.    The Court dismissed the Tepper Actions. At paragraph 122 of the Loo Reasons, Justice Loo said the following about Mr. Tepper's application for me to disclose information regarding my financial interests at the time of our divorce: "those demands are vexatious and amount to an abuse of process."

11.    At paragraph 127 of the Loo Reasons, Justice Loo said the following about the Tepper Actions: "the proceedings are brought to harass Ms. Dengin and Mr. Dengin. As Mr. Tepper stated in his October 19, 2011 e-mail to Ms. Dengin, he promised an ugly fight that would involve her parents, her brother, and her husband. I find the proceedings are vexatious."

12.    After Mr. Tepper started the three court actions, and up to the date we received the Loo Reasons, I was under significant stress. During this period, I felt intimated, harassed and threatened by Mr. Tepper. I did the best that I could to provide the court with truthful and correct information about my financial circumstances from the time I entered into the divorce settlement to the date of the hearing of Mr. Tepper's actions in November 2013.

13.    One aspect of the divorce settlement that is not mentioned in the Loo Reasons or in my 2012 Affidavit is the subdivision of the matrimonial home property at 2095 Queens Avenue in West Vancouver, British Columbia, Canada (the "Queens Avenue Property").

14.    Attached to this Affidavit as **Exhibit "B"** is a true and correct copy of the final Order dated June 10, 2003 (the "Order"), incorporating the terms of my settlement agreement with Mr. Tepper. Beginning at paragraph 9 of the Order are the terms pertaining to the sale of the Queens Avenue Property. The paragraph states, "The Queens Avenue home (now in process for sub-division)..."

15.     Paragraph 14 of the Order states, "In the event that Queens Ave is in fact subdivided and sold as two separate lots, the proceeds of sale from either lot shall be divided between the parties as set out in clauses 10, 11, 12 and 13 herein."

16.     In fact, the Queens Avenue Property had been subdivided. I therefore received the CN $375,000 payment from Mr. Tepper for land legally described as "Lot G, Except part of Highway Plan 99, District Lot 1091" and a further amount of approximately CN $205,000 for my interest for land legally described as "Balance of Lot G, Except part of Highway Plan 99, District Lot 1091". Attached to this Affidavit as **Exhibit "C"** is a true and correct copy of a Contract of Purchase and Sale dated July 14, 2003 under which Mr. Tepper purchased my interest in the property described as "Balance of Lot G, Except part of Highway Plan 99, District Lot 1091, Plan 11018" for CN $205,000.

17.     Attached to this Affidavit as **Exhibit "D"** is a true and correct copy of a letter dated September 22, 2003 from my former lawyer, Jack Adelaar, regarding the sale of the "Balance of Lot G" as described in Paragraph 16, above. Mr. Adelaar advised that he received CN $260,270.53 from Mr. Tepper's lawyer, which included the CN $205,000 for the "Balance of Lot G" and the additional amount of approximately CN $55,000 which was in satisfaction of other amounts owed to me by Mr. Tepper as part of our divorce settlement.

18.     As part of my divorce settlement, I retained my interest in 602565 B.C. Ltd. See Exhibit "B", the Order at paragraph 16.

19.     602565 B.C. Ltd. held an interest in property located at 1621 St. Georges Street, North Vancouver, British Columbia, Canada (the "St. Georges Property").

20.     In March 2004, the St. Georges Property and my shares of 602565 B.C. Ltd. were sold. The net sale price was CN $801,260.62. I received CN $140,000 from the net sale proceeds.

-4-

Attached to this Affidavit as **Exhibit "E"** is a true and correct copy of the Seller's Statement of Adjustments, with an adjustment date of March 1, 2004. Attached to this Affidavit as **Exhibit "F"** is a true and correct copy of a Statement of Trust Monies pertaining to the sale of the St. Georges Property.

21. I wish to explain and clarify certain statements that I made in my 2012 Affidavit.

22. Attached to this Affidavit as **Exhibit "G"** is a true and correct copy of a Graydon Elliott Capital New Client Application Form dated January 28, 2004. The Form is signed by me. Also included as part of **Exhibit "G"** is a true and correct copy of my Graydon Elliott Capital account statement for December 31, 2004, showing the assets in that account at that time. Prior to opening the Graydon Elliot account, I also had trading accounts at IPO Capital, Royal Bank of Canada and First Associates/Blackmont Capital.

23. The funds to purchase securities in 2004 in my Graydon Elliot account came from my divorce settlement, my father and the net sales proceeds from the St. Georges Property sale and the Hudson condominium assignment sales.

24. During the tax years 2005, 2006, and 2007, I realized significant capital gains, through trading securities and paid the resulting income taxes. None of my stock trading activities were attributed to Petitioner under the Canadian "spousal attribution" rules.

25. Additional funds to purchase my securities came from a joint line of credit which Petitioner and I opened at Vancouver City Savings Credit Union ("VanCity"). This joint line of credit was secured with a mortgage on our family home at 1939 Drummond Drive, Vancouver, British Columbia, Canada. When the Drummond Drive Property was originally purchased, I had loaned the sum of CN $580,000 to assist in that purchase, and by using this credit line I was able to access those funds when I needed to.

26.     Attached to this Affidavit as **Exhibit "H"** is a true and correct copy of a financial statement sworn by me on June 29, 2012. The financial statement correctly describes ownership of 1813 Fernald Point, Santa Barbara, California (the "Fernald Point Property").

27.     Attached to this Affidavit as **Exhibit "I"** is a true and correct copy of a B.C. Company Summary dated November 29, 2016 for 0885303 B.C. Ltd. showing that I am the sole director and officer of the company.

28.     Attached to this Affidavit as **Exhibit "J"** is a true and correct copy of the Fernald Point Limited Partnership Agreement, dated July 8, 2010, in which 0885303 B.C. Ltd. is named as the General Partner, and I am named as a Limited Partner.

29.     Attached to this Affidavit as **Exhibit "K"** is a true and correct copy of a Solicitor's Certificate endorsed on July 14, 2010 by Mark W. Hilton attaching a copy of the Certificate of Registration for the Fernald Point Limited Partnership ("FPLP").

30.     Attached to this Affidavit as **Exhibit "L"** is a true and correct copy of the title insurance policy for the purchase of the Fernald Point Property, dated August 20, 2010. The buyer, in whose name title was taken, is listed as the Fernald Point Limited Partnership, a British Columbia Limited Partnership ("FPLP"). In determining how to structure the purchase of the Fernald Point Property, I relied on my Canadian attorneys and accountants for advice, and it was those lawyers and accountants that recommended the limited partnership structure described above that was used for that purchase.

31.     The purchase of the Fernald Point Property was affected by way of transfers of US $5.1 million from a joint bank account that Petitioner and I had at VanCity, to the bank account of FPLP, which was also at VanCity. Those funds were, however, entirely mine. The funds were

then transferred from FPLP's VanCity account to complete the purchase transaction of the Fernald Point Property.

32.     The funds that I used for the purchase of the Fernald Point Property came from (i) the payoff of a loan that I had made to the Dengin Family Limited Partnership ("DFLP"), in the amount of about CN $3.85 million, and (ii) about CN $1.45 million from my account at Union Securities.

33.     In April 2007, a CN $7.8 million loan on a property owned by the DFLP (through its interest in Chandler & Co. LP), the El Dorado Hotel, was coming due. To pay off the loan, DFLP borrowed CN $3,855,527 from me, which funds were subsequently repaid. The documentation for this loan and repayment are as follows:

(a)     Attached as **Exhibit "M"** is a letter from The Beedie Group (manager of the lending entity, BCC Mortgage Investment Corp.) confirming the amount of the loan and its due date;

(b)     Attached as **Exhibit "N"** is a summary schedule showing the principal and interest payments on the loan; note that the final two payments are the advances which I made;

(c)     Attached as **Exhibit "O"** is a true and correct copy of a portion of my Union Securities account statement for April 2007 showing the two checks issued to BCC Mortgage Investment Corp. in payment of this loan;

(d)     Attached as **Exhibit "P"** is a true and correct copy of the balance sheet for DFLP showing the loan payable to me as a liability at the end of 2007 and 2008;

(e)     Attached as **Exhibit "Q"** is a true and correct copy of a portion of the statement from my joint account with Petitioner at VanCity showing that DFLP transferred

CN $3,855,138.37 (as part of a larger transfer) to that account on December 17, 2009, in full payment of my loan to DFLP.

34.     Attached as **Exhibit "R"** are copies of a March 4, 2010, check from my account at Union Securities in the amount of CN $669,875 and a portion of my VanCity statement showing that the check was deposited in my joint account with Petitioner.

35.     Attached as **Exhibit "S"** are copies of a June 25, 2010, check from my account at Union Securities in the amount of CN $775,175 and a portion of my VanCity statement showing that the check was deposited to my joint account with Petitioner (together with a CN $22,941 check from Petitioner).

36.     Attached as **Exhibit "T"** is a schedule showing how the above which I made to my joint account with Petitioner at VanCity were sufficient for the entire deposit into escrow for the July 16, 2010, purchase of the Fernald Point property.  (The escrow closing statement is attached as Exhibit "5" to Petitioner's Affidavit.)

37.     Attached as **Exhibit "U"** are printouts of activity in the VanCity accounts of FPLP and 0885303 B.C. Ltd., the corporate general partner of FPLP, for the month of July 2010 that have been annotated to show that the account for 0885303 B.C. Ltd. (the "Corporate Account") was used as a collection point for the funds used for FPLP's acquisition of the Fernald Point Property, as follows: (i) on July 9, 2010, $3,536,000 was transferred to the Corporate Account from my joint account with Petitioner, (ii) on July 13, 2010, $51,000 was transferred to the Corporate Account from my joint account with Petitioner joint account, to cover the amount needed for the corporation's 1% interest in FPLP, (iii) on July 14, 2010, $51,000 was transferred to the Corporate Account from the Dengin Family Trust #2 account for the benefit of the Dengin Family Trust (i.e., from Petitioner) to cover the amount needed for Petitioner's 1% interest in

FPLP; (iv) on July 14, 2010, an additional $148,000 in funds belonging to me was transferred to the Corporate Account from my joint account with Petitioner, (v) on July 14, 2010, $3,786,000 was transferred from the Corporate Account to the FPLP account, (vi) on July 15, 2010, $1,295,707 of funds belonging to me was transferred to the FPLP account from the my joint account with Petitioner, and (vii) on July 15, 2010, $5,082,460 was wire transferred from the FPLP account to escrow for completion of the Fernald Point Property acquisition.

38.     Although the original purchase agreement for the Fernald Point Property was signed by Petitioner, that agreement provided that the buyer would be "George Dengin or assignee". That purchase agreement was later assigned to FPLP, which completed the purchase. A copy of the initial Purchase Agreement and the Assignment to FPLP is attached as Exhibit "6" of Petitioner's Affidavit. In entering into the initial Purchase Agreement, and in all other aspects of my purchase of the Fernald Point Property, Petitioner was merely acting as my agent, and I relied on my professional advisors as to how FPLP and the purchase of the Fernald Point Property was structured.

39.     In addition to providing 99% of the funds for the purchase of the Fernald Point Property, I have also provided the funds for the ongoing expenses associated with the Fernald Point Property. For example, attached hereto as **Exhibit "V"** is a true and correct copy of the December 31, 2012 Trial Balance for FPLP which shows that the partnerships expenses for the year totalled $73,234 and that the partners contributed $69,000 *in proportion to our partnership interests* to pay this expense. The same contributions have been made in other years, with each of the partners of FPLP contributing their pro-rata share of the expenses of the Fernald Point Property.

40.     In June 2016 FPLP received an offer from a third party to purchase the Fernald Point Property for $5.75 million, with a thirty day escrow and no financing contingency. In other

words, an all cash offer with a quick closing. A true and correct copy of that offer is attached hereto as **Exhibit "W"**. This offer was rejected by FPLP without any counter-offer being made.

41.     Attached hereto as **Exhibit "X"** are copies of the statements from my trading accounts which show the gains and losses from my trading activities in 2005, 2006 and 2007.

42.     Attached hereto as **Exhibit "Y"** are copies of the Canadian income tax returns that I filed for the years 2004, 2005, 2006 and 2007, and on which I reported the gains and losses from my stock trading activities and other income for those years.

43.     Attached hereto as **Exhibit "Z"** is a true and correct copy of a December 1, 2016 Property Profile which I obtained for the Fernald Point Property. This Property Profile shows that the listing for the sale of the Fernald Point Property has expired on November 1, 2016, i.e. before Respondent made its jeopardy assessment or recorded its liens against my property, and that the Fernald Point Property is still owned by FPLP.

44.     Attached hereto as **Exhibit "AA"** is a true and correct copy of the new account application for my trading accounts at Union Securities, Ltd. This application shows that no one other than myself had trading authority over my Union Securities accounts.

45.     Attached hereto as **Exhibit "BB"** is a true and correct copy of the February 8, 2016 Listing Agreement for the sale of the Fernald Point Property by FPLP.

46.     Attached hereto as **Exhibit "CC"** is a true and correct copy of the December 1, 2016 Property Profile which I obtained for the Fernald Point Property which shows that FPLP is still the owner of the Fernald Point Property.

47.     Although Respondent, in its Jeopardy Assessment Report (Exhibit "6" to the Motion) seems to imply otherwise, I have substantial business and securities trading experience which I have developed over many years. After graduating from college with a degree in business

management, I (i) started and helped run several very successful businesses either with other family members or on my own, (ii) developed a number of profitable real estate projects, and (iii) have profitably traded in securities for many years.

SWORN AND AFFIRMED BEFORE ME )
at Vancouver, British Columbia, on )
17/March/2017 )
_____ )
A Commissioner for taking Affidavits )
for British Columbia. )

**INESSA DENGIN**

AMANDA WINTERS
*Barrister & Solicitor*
FARRIS, VAUGHAN, WILLS & MURPHY LLP
2500-700 West Georgia Street
P.O. Box 10026, Pacific Centre
Vancouver, BC V7Y 1B3

# EXHIBIT A

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation: *Tepper v. Dengin,*
2014 BCSC 288

Date: 20140224
Docket: E122365
Registry: Vancouver

Between:

## Ammi Tepper

Claimant

And

## Inessa Dengin a.k.a. Inessa Tepper
## a.k.a. Inessa Tsemakhovich

Respondent

- and -

Docket: S124644
Registry: Vancouver

Between:

## Ammi Tepper

Plaintiff

And

## Inessa Dengin a.k.a. Inessa Tepper
## a.k.a. Inessa Tsemakhovich

Defendant

Before: The Honourable Madam Justice Loo

## Reasons for Judgment

Counsel for the Claimant/Plaintiff:

F. Lamer

Counsel for the Respondent/Defendant:

R.J.R. Hordo Q.C.
M.P. Good

Counsel for George Dengin:

I.G. Nathanson Q.C.

2014 BCSC 288 (CanLII)

*Tepper v. Dengin*                                                          **Page 2**

Place and Dates of Trial/Hearing:

                                                              Vancouver, B.C.
                                                      November 25 and 26, 2013

Place and Date of Judgment:

                                                              Vancouver, B.C.
                                                          February 24, 2014

2014 BCSC 288 (CanLII)

I.    **OVERVIEW**

[1]    There are three competing applications and three proceedings arising out of the marriage breakdown between Ammi Tepper and Inessa Dengin (formerly known as Inessa Tepper). They were married in May 1992, had two children born in 1993 and 1998, and separated in July 2002. Later that year, Ms. Dengin commenced a family law proceeding against Mr. Tepper and they entered into minutes of settlement that were incorporated into a consent order on June 10, 2003. Both parties were represented by counsel. The minutes of settlement and consent order settled and resolved all matters between them, including sole custody of the children to Ms. Dengin, child support of $4,000 a month payable by Mr. Tepper, and division of the family assets.

[2]    During the marriage, Mr. Tepper knew that his wife had an interest in the Tsemakhovich family business (her maiden name is Tsemakhovich), and an interest in a rental property in North Vancouver.

[3]    The parties were divorced on October 10, 2003. Ms. Dengin married George Dengin in November 2003. He brought substantial wealth into their marriage. They lived in a multi-million dollar house on Drummond Drive in Vancouver and in 2004 began enjoying a home on Lake Placid Road in Whistler. All of this was known to Mr. Tepper because he started picking up the children from the Drummond Drive residence shortly after Ms. Dengin and the children moved there and he visited them at the Lake Placid Road property shortly after it was acquired.

[4]    Mr. Tepper was in arrears in child support and in November 2011 Ms. Dengin took steps to enforce his child support payments through the British Columbia Family Maintenance Enforcement Program. As a result, Mr. Tepper "caused some searches to be conducted in order to determine her true financial circumstances." He claims that all he knew of Ms. Dengin's financial affairs at the time of the settlement and consent order was based on her October 8, 2002 handwritten note to him. He claims that the searches disclose that: Ms. Dengin had equity in the North Vancouver rental property at the time of their separation; the Drummond Drive

2014 BCSC 288 (CanLII)

property was purchased on July 24, 2003 by a trustee for the Drummond Drive
Property Trust; Ms. Dengin was replaced as the trustee of the Drummond Drive
Property Trust on January 14, 2008; and on July 19, 2004 the Lake Placid Road
property was purchased and transferred to Ms. Dengin in trust.

[5]     As a consequence of what he has learned from the searches, Mr. Tepper now
seeks an order setting aside the settlement and consent orders – more than 10
years after they were made – on the basis of fraud and fraudulent misrepresentation.
He alleges that Ms. Dengin failed to properly disclose her interests in the North
Vancouver property, the Tsemakhovich family business, the Drummond Drive
property, the Lake Placid Road property, and in particular, failed to make proper and
continuous financial disclosure that was required of her under the former *Supreme
Court Rule* 60D.

[6]     Mr. Tepper seeks extensive document production from Ms. Dengin, including
not only all documents relating to her financial interests as of June 2003, but all
documents relating to the value and financial results of the operations of the
Tsemakhovich family business, the acquisition of her interest in the Drummond Drive
and Whistler properties, and all documents relating to the value and financial results
of the operations of those properties.

[7]     Mr. Tepper also seeks extensive document production from George Dengin,
who is not a party to any of the proceedings, including all documents relating to the
nature and extent of his assets, financial interests, and entitlements, whether held
directly, indirectly, or beneficially as at June 2003.

[8]     Ms. Dengin seeks an order that the proceedings and all further proceedings
relating to the validity of the consent order be struck or stayed; alternatively, that this
proceeding be joined with the original family law proceeding commenced in 2002
(Vancouver Registry No. E023112) "the original family law proceeding".

[9]     In support of the orders he seeks, Mr. Tepper relies primarily on Ms. Dengin's
handwritten note to him dated October 8, 2002. He provided no copies of any of the

2014 BCSC 288 (CanLII)

correspondence between their respective lawyers, but relies primarily on his rather vague recollection of events that occurred almost a decade ago. In response, Ms. Dengin has managed to locate some of the relevant correspondence between their lawyers, although she has been unable to retrieve all of the records from her former counsel in the original family law proceeding for the period between August 2002 and August 2003. Given the passage of time, there is no doubt that documents are missing and may have been destroyed. I intend to refer at length to the correspondence between counsel relating to the negotiations and Mr. Tepper's affidavit in the original family law proceeding as they are relevant to what I consider to be the primary issue: whether the settlement agreement and consent order should be set aside.

2014 BCSC 288 (CanLII)

## II. THE EVIDENCE

[10] During the marriage Mr. Tepper operated a car dealership in Squamish known as Sea To Sky Ford Sales. He knew that Ms. Dengin had a 25 percent interest in Perestroika Products Ltd. ("Perestroika"), which operated the Tsemakhovich's family business. Ms. Dengin owned Perestroika with her parents, and her brother and sister-in-law. The company produced baked goods under the label "Red Square". In the early years of their marriage, Ms. Dengin worked for Perestroika, but she often took no salary because her family was using any profits to pay down the mortgage on a warehouse in Burnaby — the company's main asset — and in some years, Mr. Tepper asked her not to draw a salary as there were tax benefits for him, such as income splitting.

[11] Perestroika also provided catering services through a related company, Babushka's Kitchen, which was set up around 1993 and operated a small food concession stand at Granville Island Market. Mr. Tepper assisted his wife in contributing her one-third of the $100,000 start-up costs from their joint line of credit. When Babushka's Kitchen was sold around 1998, Ms. Dengin's share of the proceeds of approximately $95,000 went into their joint account, on Mr. Tepper's directions.

*Tepper v. Dengin*            **Page 6**

[12]    Mr. Tepper did not control the finances of Perestroika, but he controlled the parties' finances during their marriage and he arranged to have their income tax returns prepared by his accountant.

[13]    For the last few years before their separation, Ms. Dengin was not actively involved in the day-to-day operations of Perestroika and was, for the most part, a homemaker raising their two children. When they were still living together, she introduced Mr. Tepper to George Dengin, who would help her with an investment in rental property at 1621 St. Georges Avenue, North Vancouver. The property was owned by 602565 B.C. Ltd., a company affiliated with or controlled by Mr. Dengin.

[14]    The parties separated in July 2002 when Ms. Dengin and the children left the former matrimonial home on Queens Avenue, West Vancouver.

[15]    Beginning in July 2002 both parties were represented by counsel. Ms. Dengin was initially represented by Peter Brown from the law offices of Georgialee Lang & Associates and Mr. Tepper was represented by Randall Levine of the law firm Jabour Sudeyko. Between August 2002 and June 2003, Ms. Dengin was represented by other lawyers, including Ean Maxwell Q.C. and Trudy Hopman of the firm Maxwell Bulmer Hopman, and later, she was represented by Sandra Polinsky.

[16]    Mr. Tepper was at all times represented by counsel, including Mr. Levine, and later, Howard Rubin Q.C. Mr. Tepper also had legal advice from his lawyer Ron Kornfeld and his firm.

[17]    On August 16, 2002 Mr. Kornfeld attended at the offices of Bernard & Partners, a law firm where the corporate records of 602565 B.C. Ltd. are maintained. Mr. Kornfeld asked if he could review and make copies of the numbered company's corporate records. Several days later, Mark Hilton, a lawyer with Bernard & Partners, informed Mr. Kornfeld that he would be allowed to do so.

[18]    On August 20, 2002 Mr. Kornfeld inspected and made copies of the minute book and other records of 602565 B.C. Ltd.

2014 BCSC 288 (CanLII)

[19]   On September 9, 2002 Mr. Levine wrote to Mr. Maxwell:

> I confirm our telephone conversation of August 30[th], 2002 wherein you advised that you have been retained to act on behalf of Inessa Tepper in relation to the issues that have arisen as a result of her marital breakdown with my client, Ammi Tepper. ...
>
> In our conversation you indicated that it might be a good plan for us to get together relatively soon to discuss the issues that our respective clients have in order to see if we can arrive at an early settlement or alternatively, narrow down the issues to be resolved. I endorse this process.

[20]   On September 9, 2002 Mr. Maxwell wrote to Mr. Levine:

> As you were made aware by telephone and separate correspondence, I act for Inessa Tepper. Ms. Tepper has advised that she would prefer to settle, either by negotiation or mediation, rather than litigating outstanding issues between herself and her estranged husband.
>
> In the interim, please consider the following a proposal that we have been instructed by our client would be acceptable:
>
> 1.  The children be in the ordinary care of Ms. Tepper.
>
> 2.  Your client have access to the children alternate weekends with details of same to be worked out.
>
> 3.  I would recommend that Ms. Tepper enter into a joint guardianship arrangement respecting the children which would be predicated upon the Joyce Model.
>
> 4.  Respecting assets, Ms. Tepper would retain the following:
>
>     a.  Her 25 percent interest in the Perestroika business.
>     b.  Her interest in 602565BC Ltd.
>     c.  One-half of the proceeds of sale from the matrimonial home after $200,000 is applied to the line of credit.
>     d.  One-half of the proceeds of the boat.
>     e.  One-half of the household goods.
>     f.  $75,000 for a motor vehicle and to re-pay Simon Tsemakovich.
>     g.  The RRSP currently in her name.
>
> 5.  Except for the foregoing, Ms. Tepper would forego future claims with respect to real property.
>
> 6.  With respect to maintenance, our client would require fiscal disclosure. Copies of the financial statements for the corporations for which Mr. Tepper has had an interest for the past three (3) years, copies of tax returns for the corporations for the past three (3) years and copies of his personal T1 General Returns for the past three (3) years.

2014 BCSC 288 (CanLII)

> Failure to agree upon support and maintenance, each party would have liberty to apply to court in order that a Judge may determine appropriate maintenance.

The foregoing offer is predicated upon each parties understanding of assets, the parties respective interests therein and their values for which there would need to be agreement.

You can see that the offer does not embrace a true 50:50 division of assets. Therefore, I think that should we litigate the matter, the result would no doubt be an equal division of assets having regard to the circumstances of the parties, the children and the contributions that are made on behalf of each of the parties in relation thereto.

[21] On September 18, 2002 Mr. Levine wrote Mr. Maxwell:

> Thank you for your letter dated September 9[th] 2002 (received September 12[th]) with enclosed offer. I have forwarded the offer on to my client together with your request for financial information. Mr. Tepper has responded by providing me with financial statements for Sea to Sky Ford Sales Ltd. for 2000 and 2001. The 2000 statement reflects the 1999 statement, which I do not have. Mr. Tepper is in the process of providing me with additional information. He has also provided me with an indication of his position with respect to your offer. Unfortunately, I have not been able to have a full discussion with Mr. Tepper in order to obtain his instructions to respond to the offer. The parties are not far apart in terms of settlement and I anticipate that we will reach an agreement. ...
>
> In the meantime, I would request that Ms. Tepper provide us with financial disclosure in relation to her holdings and income. My understanding is that Ms. Tepper currently earns approximately $2,500 per month employment income plus she earns income from her corporate holdings. In addition, my understanding is that Ms. Tepper received an interest in [sic] Mr. Tepper is also anxious to conclude a final settlement rather than an interim agreement that must be renegotiated at a future date.

[22] On September 19, 2002 Ms. Hopman wrote to Mr. Levine:

> We have been advised over the past three days that the party's joint line of credit has been drawn to its maximum by Mr. Tepper without Mrs. Tepper's knowledge or consent.
>
> We expect that Mr. Tepper will forthwith provide an accounting of the funds withdrawn.

[23] On September 27, 2002 Mr. Levine wrote to Mr. Maxwell:

> Thank you for your recent correspondence. I sincerely apologize for not getting back to you sooner with respect to Mr. Tepper's position regarding your settlement offer. I have received instructions from my client but I wish to

2014 BCSC 288 (CanLII)

2014 BCSC 288 (CanLII)

discuss this matter further with him prior to conveying to you his position as that position could change upon our discussion. I do anticipate that this matter will resolve itself in an agreement between the parties and suspect that any delay that has taken place over the past week, which has been entirely due to myself rather than Mr. Tepper, will hopefully be worth the wait.

[24]    On September 30, 2002 Ms. Dengin commenced a family law proceeding against Mr. Tepper by filing a writ of summons and statement of claim in the original family law proceeding.

[25]    On October 3, 2002 Mr. Levine wrote to Ms. Hopman:

I have been trying to get ahold of you this week to hopefully arrange a meeting between us in order to identify the outstanding issues with a view to reaching a resolution. As I have not heard back from you, I am writing to advise of our concerns with your client's offer as contained in Mr. Maxwell's letter of September 9th, 2002.

...

The proposal with respect to assets is agreeable except that Mr. Tepper informs me that the mortgage is outstanding in the amount of $300,000 and not $200,000 as you indicated so that the home would be divided equally after $300,000 is applied to the line of credit. Mr. Tepper will agree to provide Ms. Tepper with $55,000 for a vehicle.

Paragraph 5 is agreed.

As Mr. Tepper is looking for a final settlement rather than dealing with these issues piecemeal, he would like to conclude a deal in respect to support. I understand that Mr. Tepper has increased the amount that he is providing to Ms. Tepper to $2,500, which when added to Ms. Tepper's net income of $1,200 provides her with an equivalent of $5,000 gross income. We do not know of what other income Ms. Tepper may have. Prior to Ms. Tepper retaining your firm's services, I did have a telephone conversation with her in which she indicated that she would he receiving a salary commencing September 2002. Further, my instructions are that when Ms. Tepper received her shares of the numbered company, the real estate owned by the company was free and clear. There is now apparently over $1,000,000 in mortgage financing on the real estate. We do not know what the funds from the mortgages were used for. The real estate is composed of rental apartments that presumably are generating substantial income.

[26]    By letter dated October 7, 2002 Ms. Hopman wrote to Mr. Levine:

We enclose the following for service upon the Defendants:

1.  Writ of Summons and Statement of Claim filed at the Supreme Court of British Columbia, Vancouver Registry on September 30, 2002; .

*Tepper v. Dengin*                                                                          **Page 10**

2014 BCSC 288 (CanLII)

    2.  Demand for Discovery of Documents;
    3.  Notice to Produce;
    4.  Notice to File a Form 89 Financial Statement; ...

[27]    On October 8, 2002, Mr. Tepper and Ms. Dengin met and discussed settlement and she prepared the following handwritten document:

> Oct 8, 02
>
> As per our <u>civil</u> conversation that you and I had last night, I feel we are again on the same wave length in regards to our separation agreement and hopefully in regards to <u>our</u> children. I am writing you this letter without my lawyer's consent. I had informed my lawyer about the assets that we have together. He informed me that I am entitled to ½. I am prepared to take roughly 1/3. Please review with Ron [Kornfeld] the previous document [Ean] Maxwell [Q.C.] has sent you dated Sept 9, 2002. In regards to your last letter which you were not happy with either, I think you better read all your lawyers letters from now on. It was nothing that we discussed for 1½ hours on the phone. I feel with the little assets you and I have, we are going around in circles.
>
> 1) Joyce Model is standard for divorce these days.
>
> 2) The line of credit is 300,000 but 100,000 or more <u>by now</u> (Ford) has been used for your business (dealership) and we agreed that it will be put back in to the house.
>
> 3) In regards to the vehicle in my proposal I lumped it together with the debt - my father Simon Tsemakovich. $30,000 for a vehicle and $35,000 for dad. (The car you gave him has been subtracted from his debt.) I added about 2 to 3 thousand for interest in 2 years. I think that fair. In regards to the monthly support there is a simple formula which adds up the income of all your companies subtracts your mortgages & expenses and the figure will for sure be more than $2500/month. As to the confusion regarding my income, I met with the accountants last week and they informed me that due to the intense renovations and that the investors on two occasions had to put more money into the company, there will be no income and the cash flow is not there. As far as Perestroika Products, I told Mark I will not be drawing money that I do not deserve for Michelle is no longer going to full day school. I have to pick her up and there is not enough time for me to go to work.
>
> As a final comment my offer is very simple and very favorable to you. It doesn't help to fight over jewellery or ½ a boat when you are forgetting about Shlomo's money and the interest in the 2 private companies of Shlomo's and the Royal Vancouver Membership. [Ean] Maxwell's very easy and concise letter can easily be put in an agreement which I am prepared to do.
>
> | Perestroika Products | |
> | --- | --- |
> | Appraised value of land | $460,000 |
> | Market value of land | $560,000 |
> | Debt | $270,000 |
> | Estimated value of business | $500,000 |

*Tepper v. Dengin*                                                                **Page 11**

|  |  |
|---|---|
| 400-500 ?? | |
| Maybe 500-600 ?? | $500,000 |
| Total is approx | $800,000 |
| My equity is = 25% approx. | ($200,000 |
| 602565 BC Ltd. | |
| Appraised value | $828,000 |
| Market value | $1,100,000 |
| $78,000/unit | |
| Debt (investors + bank) | $1,040,000 |

Possibility of more debt due to carpets and old boilers to be replaced this year
*Please note the debt has been in place from the purchase date of the building. It was funded by a debt instrument. Let me make it clear to you again. I did not invest any money in this project or any other projects of any kind.

[Emphasis in original]

[28]    At about the same time, Ms. Dengin prepared the following handwritten separation agreement setting out what she and Mr. Tepper had agreed to:

Separation Agreement

As per our discussion, we had agreed to the following:

1)    Joint custody and joint guardianship of our children. Primary residence with me. Number of days and which days will be decided between us.

2)    I will receive half the proceeds from the sale of the family residence minus the exact amount of money that was borrowed for the dealership.

3)    Money from the boat will also be divided equally.

4)    $80,000 was lent to us by Simon Tsemakovich. I will repay him $45,000 (40,000 + interest in 2 years. You owe him 40,000 plus whatever you think is reasonable for the interest.

5)    As far as jewellery is concerned you'll keep your watch, I will keep mine. I would like to keep the diamond earrings. You can have the diamond & ruby necklace.

6)    You promised to buy the children and I car in the sum of $30,000.

7)    In regards to support obligations, there are specific Federal Child Support Guidelines established by B.C. Government.

*Each of us will retain our own interests in our businesses and investments.

I would really like to keep the agreement as simple as possible. Money and reserves will be spent if you and I have little obstacles along the way. I would like to keep lawyers out of it if at all possible.

2014 BCSC 288 (CanLII)

[29]    Ms. Dengin believes that she provided the handwritten separation agreement to her counsel Trudy Hopman or Ean Maxwell, Q.C. shortly after she prepared it.

[30]    On October 10, 2002 Ms. Hopman wrote to Mr. Levine:

> I have your letter dated October 4, 2002. My understanding is that parties have met and made an arrangement with respect to the division of assets, essentially as set out in Mr. Maxwell's letter to you dated September 9, 2002.
>
> I will be drafting minutes of settlement in that regard and forwarding them to you for your review with your client. In the meantime, I enclose herewith a copy of what I understand to be the Joyce Model regarding joint guardianship.

[31]    On October 16, 2002 Mr. Levine faxed Ms. Hopman with the following letter:

> Thank you for your letter of October 10th, 2002 indicating that you are drafting Minutes of Settlement in relation to this matter. I look forward to receipt of same. Kindly email the Minutes of Settlement to me. ...
>
> I confirm that as the parties appear to be in agreement I will not be filing a Statement of Defence or Counterclaim at this time. Please confirm that you will not be taking any further action in relation to the Court process that you commenced on behalf of your client without first providing me with reasonable notice of same, which shall not be less than 14 days notice save and except in the case of an emergency application (in which case I would expect you to provide such notice as you can).

[32]    On October 25, 2002 Mr. Levine faxed Ms. Hopman and stated that he was continuing to wait for her to provide him with a form of agreement or other response to his letter of October 16, 2002.

[33]    On October 28, 2002 Mr. Tepper entered an appearance to the original family law proceeding and filed his statement of defence.

[34]    On November 20, 2002 a notice of change of solicitor was filed indicating that Sandra L. Polinsky had been appointed to act in the place of Ms. Hopman.

[35]    On January 29, 2003 Ms. Polinsky filed a praecipe and notice of judicial case conference that was scheduled for February 18, 2003. However, no judicial case conference ever took place.

2014 BCSC 288 (CanLII)

[36]    Mr. Tepper also changed lawyers. On February 24, 2003 a notice of change of solicitor was filed indicating that Howard Rubin was appointed to act in the place of Mr. Levine.

[37]    Despite Ms. Dengin's demand for discovery of documents, notice to produce, and notice to file a Form 89 financial statement, neither party filed a Form 89 financial statement. From all of the evidence, the parties resolved their differences without resorting to exchanging lists of documents, examinations for discovery, or any of the disclosure requirements or obligations provided by Rule 60D of the former *Supreme Court Rules* - Family Law Proceeding Disclosure.

[38]    There has been no correspondence produced from the time of Mr. Levine's letter of October 25, 2002, but sometime between then and May 12, 2003, the parties signed undated minutes of settlement. Ms. Dengin's recollection is that they signed the minutes of settlement in the spring of 2003.

[39]    On May 12, 2003 Mr. Tepper swore an affidavit in which he deposed in part:

...

4.    The Plaintiff and I separated on July 2, 2002. There is no possibility of reconciliation.

5.    The Plaintiff commenced these family law proceedings on September 30, 2002. My Statement of Defence was filed October 28, 2002.

6.    Since our separation, the children have resided primarily with the Plaintiff and I have had access. I have voluntarily paid child support in accordance with the *Child Support Guidelines* since our separation.

7.    With the assistance of our counsel, the Plaintiff and I have negotiated a settlement all matters at issue including custody and access, the division of family assets and spousal and child support.

8.    The Plaintiff and I have executed Minutes of Settlement. Attached to this my Affidavit and marked Exhibit "A" is a true copy of the Minutes of Settlement.

9.    While the Plaintiff has a minimal annual income at this time, our settlement provides that she retains assets and capital of a value of more than $1,000,000. I verily believe she does not require support from me.

2014 BCSC 288 (CanLII)

[40]    Mr. Tepper's affidavit of May 12, 2003 was filed on October 10, 2003 in support of his application dated May 12, 2003 for an order in terms of the minutes of settlement.

[41]    On June 10, 2003 Ms. Polinsky and Mr. Rubin appeared before Mr. Justice Burnyeat, and a consent order was granted in the terms sought by Mr. Tepper. The consent order incorporates the terms of the minutes of settlement.

[42]    Paragraph 1 of the consent order is a s. 57 declaration by the court under s. 57 of the *Family Relations Act*, R.S.B.C. 1996, c. 128; paragraphs 2 to 7 deal with the children and Mr. Tepper's child support payment obligations of $4,000 a month. Paragraph 8 dismisses any claim either of them might have for spousal support; paragraphs 9 to 15 deal with the sale of the Queens Avenue home, the proceeds of sale, and how the net proceeds of sale and the household contents were to be divided equally between them. Paragraphs 16 to 23 provide as follows:

> 16.    The Plaintiff shall retain the following assets for her sole use absolutely free and clear from any claims by the Defendant:
>
> > a.    Her entire interest in Peristroika [sic] Products;
> >
> > b.    Her entire interest in 602565 BC Ltd.;
> >
> > c.    RRSP currently in her sole name;
> >
> > d.    Her personal jewellery;
> >
> > e.    Life insurance Policy on her life;
> >
> > f.    One half of the household chattels and goods;
> >
> > g.    Her Canada Pension Plan.
>
> 17.    The Defendant will provide the Plaintiff with a motor vehicle equivalent in value to $30,000 on or before the closing date of the sale of Queens Ave or alternatively provide her with the sum of $30,000 from his portion of the proceeds of sale from Queens Ave and will execute an authority to pay to this effect. The Defendant will continue to lease the current vehicle provided to the Plaintiff until ownership of the vehicle is transferred into the Plaintiff's name, or the Defendant provides the Plaintiff with the sum of $30,000.
>
> 18.    The Defendant shall pay to the Defendant's [sic] father Simon Tsemakhovich the sum of $35,000 from his share of the net proceeds of sale of Queens Ave, and shall execute an authority to pay to this effect, and the Plaintiff shall pay to Simon Tsemakhovich the sum of $43,000

2014 BCSC 288 (CanLII)

from her share of the net proceeds of sale of Queens Ave. and will execute an authority to pay to this effect.

19. The Defendant shall retain the following assets for his sole use absolutely free and clear from any claims by the Plaintiff :

    a.    His entire interest in Sea to Sky Ford Sales Ltd.;

    b.    His entire interest in Amiable Industries Inc.

    c.    His entire interest in Empty Holdings Ltd.;

    d.    His entire interest in Digital Capital Inc. and Mobile Capital Inc.;

    e.    RRSP currently registered in his sole name;

    f.    His personal jewellery;

    g.    One half of the household chattels and goods;

    h.    Royal Vancouver Yacht Club Membership;

    i.    Life Insurance Policy on his life;

    j.    His Canada Pension Plan;

    k.    His interest in Tepper Hotels Ltd.

20. The Defendant shall be solely responsible for the following debts, and the Defendant shall save the Plaintiff harmless and indemnify her from any liabilities relating to these debts

    a.    Any amount over her $100,000 portion owing on the Royal Bank Mortgage referred to in paragraph 12 herein.

    b.    The total amount owing on the Royal Bank Line of Credit secured by Queens Avenue.

    c.    Any income tax liabilities, penalties, assessments or re-assessments, GST, source deductions or claims outstanding including but not limited to capital gains tax on the sale of personal or corporate assets owned or controlled by the Defendant, or arising out of corporations owned or controlled by the Defendant, including Amiable Industries Inc. Empty Holdings Ltd. and Sea to Sky Ford Sales Ltd, or personal income taxes of the Plaintiff in relation to income received from the aforesaid companies.

    d.    credit card balances in his name.

    e.    his portion of the debt owing to Simon Tsemakovich.

21. Any other debts and/or liabilities not specifically referred to herein shall be the sole responsibility of the person who neglected to include that debt and/or liability herein and that person shall save the other harmless and indemnify him or her from those debts owing and/or liabilities.

22. Either the Plaintiff or the Defendant may have liberty to apply to the Supreme Court of British Columbia for further direction with regard to selling the Queens Avenue home as set in paragraph 9 herein, and with

2014 BCSC 288 (CanLII)

> regard to the discharge of liabilities as set out in paragraphs 10, 11, 12, 13 14 and 18, herein, including the right of either party to ask the Supreme Court for sole conduct of sale of Queens Avenue.
>
> 23.   Any other asset not specifically referred to herein shall remain the sole property of the party who is in possession of that asset.

[43]   On July 9, 2003 Mr. Rubin, on behalf of Mr. Tepper, filed a notice and withdrew his statement of defence filed on October 28, 2002.

[44]   On October 10, 2003 Mr. Tepper and Ms. Dengin were divorced by desk order divorce that was entered on October 20, 2003.

[45]   At some point – it is not clear when – Mr. Tepper paid to Ms. Dengin approximately $375,000 from the sale of the Queens Avenue home.

[46]   Mr. Tepper alleges that based on what Ms. Dengin represented to him in her October 8, 2002 note – and consistent with her verbal representations to him – she "required that I settle her property claims on the basis of an equal division."

[47]   In September 2003 Ms. Dengin and the children began residing at the Drummond Drive residence with Mr. Dengin. The children took Mr. Tepper on a tour of the property shortly after they moved in and since then he has been to the property on hundreds of occasions.

[48]   On November 22, 2003, Ms. Dengin married George Dengin. In 2004 Mr. Dengin arranged for the purchase of a "cabin" on Lake Placid Road in Whistler. Mr. Tepper was aware of the property because he was there to attend a birthday party for one of their children in April 2005, and they showed him around the property. He and Ms. Dengin have also discussed the property on many occasions over the years.

[49]   In 2009 Mr. Tepper sold his Sea to Sky Ford dealership.

[50]   When Ms. Dengin sought child support arrears from Mr. Tepper, he sent her the following e-mail on October 19, 2011:

2014 BCSC 288 (CanLII)

There are two options here. Life is short.

1. **We try to resolve this matter amicably and move on.**

Provide me with the documents I requested and I will pay what I said I will pay.

2. **Enter into a court battle involving time, money and all financial records of all parties.**

I will not be threatened by you but I promise you a very good fight.

I do not like to be put in a corner. And by threatening me you are picking on the wrong guy.

I will spend all I need to spend to defend myself from your accusations and any attacks. Even if means involving your parents, brother and husband.

I will demand an audit of all of [name of child]'s financial accounts past and present and same for your family. Remember, I know how much cash you took from Red square and Perestroika over the years. This will be ugly I promise.

You were the one in Urban Fair last year telling me you had millions to invest. I am sure forensic accounting will show your income and net worth. I feel I offered you what I feel is fair and what I am willing and able to pay.

I will not shy away from a fight, even to the extent of Revenue Canada.

Provide me with the documents I requested and I will pay what I said I will pay and stop this email nonsense.

[Emphasis in original]

[51]   Mr. Tepper promised Ms. Dengin a good fight; he has followed through on his promise.

[52]   In November 2011 Ms. Dengin enrolled with the Family Maintenance Enforcement Program to enforce Mr. Tepper's obligation to pay child support; as a result, he caused searches to be conducted in order to determine Ms. Dengin's "true financial circumstances".

[53]   Mr. Tepper relies on the following documents that were disclosed to him following the searches he caused to be made in 2012:

1.   copy of a mortgage no. BTO52793A registered against the St. Georges property on February 15, 2002 in the amount of $567,154.50 granted by 602565 B.C. Ltd.;

2014 BCSC 288 (CanLII)

2. copy of the Form A transfer relating to the purchase of 1939 Drummond Drive on July 24, 2003 to Ton Fei Fred Tham "in trust" for $3,400,000 and filed in the Land Title Office on September 18, 2003, and attaching the Drummond Drive Property Trust Indenture - Drummond Drive Property Trust - made September 17, 2003 between Jack A. Adelaar, barrister and solicitor as the "Settlor" and Ton Fei Fred Tham as the "Trustee";

3. copy of a form A transfer relating to the purchase of 2215 Lake Placid Road, Whistler on July 19, 2004 for $2,700,000 to Inessa Dengin "in trust", and Trust Indenture - Lake Placid Property Trust - between Jack A. Adelaar, barrister and solicitor, the "Settlor", and Inessa Dengin, the "Trustee";

4. copy of BC Assessment online assessment inventory report showing 2215 Lake Placid Road property, Whistler, with a 2011 assessment value of $2,994,000.

[54]    On February 15, 2012 Mr. Tepper filed a petition in the Victoria Registry (No. 12-0587) seeking to vary the June 2003 consent order by varying his obligation to pay, and to cancel the arrears. When he was challenged on the propriety of varying the consent order by petition, he filed a notice of intention to proceed in the original family law proceeding, and on May 18, 2012 he filed a notice of application seeking an order varying the consent order by cancelling or reducing his child support obligations retroactively and prospectively. By consent, the June 10, 2003 consent order was varied with respect to child support.

[55]    On June 29, 2012 Mr. Tepper then filed a notice of civil claim against Ms. Dengin (Vancouver Reg. No. S124644) ("the civil proceeding") for an order setting aside the consent order of June 10, 2003 on the basis of fraudulent misrepresentation, deceit, negligent misrepresentation, duress, an accounting of all of Ms. Dengin's assets at the date of the consent order, and a reapportionment of all of those assets in his favour. He also claims an interest in Perestroika, including a

2014 BCSC 288 (CanLII)

value of the trade names "Red Square" and "Babushka's Kitchen", Ms. Dengin's real and beneficial interest in 602565 B.C. Ltd., or the St. Georges Avenue property, Drummond Drive property, and Lake Placid Road property. Alternatively, he seeks a compensation order instead of an interest in those properties.

[56]  In the civil proceeding Mr. Tepper alleges that Ms. Dengin made fraudulent misrepresentations in her October 8, 2002 handwritten note relating to Perestroika and the St. Georges Avenue property. He further alleges that in the original family law proceeding Ms. Dengin failed to disclose any interest in the Drummond Drive property, Lake Placid Road property, or any financial resources that would have reasonably enabled her to purchase the property on July 22, 2004 for approximately $2,700,000. He further alleges that she made the fraudulent misrepresentations with the intention that he would act on them and enter into the terms of the separation agreement and consent order.

[57]  Ms. Dengin's lawyer advised Mr. Tepper's lawyer that the matters alleged in the civil proceeding fit the definition of a "family law case" within the *Supreme Court Civil Rules* and *Supreme Court Family Rules*, as opposed to a civil case.

[58]  On August 17, 2012 Mr. Tepper then filed a notice of family claim (Vancouver Reg. No. E122365) ("the second family law proceeding") essentially seeking the same relief he sought in the civil proceeding: an order setting aside the settlement agreement and consent order.

[59]  On November 7, 2012 the proceeding that Mr. Tepper commenced by petition (Victoria Registry No. 12-0587) was dismissed by consent.

[60]  On November 19, 2012, in the original family law proceeding, it was ordered that there were no arrears of child support payable by Mr. Tepper and the consent order of June 10, 2003 was varied by consent with respect to child support.

2014 BCSC 288 (CanLII)

*Tepper v. Dengin*                                                                **Page 20**

### III.    THE APPLICATIONS

[61]    On September 12, 2013 Mr. Tepper filed a notice of application in the second
family law proceeding seeking an order that Ms. Dengin and/or her current husband
George Dengin provide the following documents:

> a.      All documents pertaining to the nature and extent of her assets,
> financial interests and entitlements, whether held directly or indirectly or
> beneficially, as at June 2003;
>
> b.      all documents pertaining to the value and financial results of operation
> of the businesses known as "Red Square", "Babushka's Kitchen" and
> "Perestroika Products Ltd.";
>
> c.      all documents pertaining to [Ms. Dengin's] real and beneficial interest
> in 602565 B.C. Ltd. and/or, directly or indirectly, in the property located at
> 1621 St. George's [sic] Avenue, North Vancouver, British Columbia and
> pertaining to the value and financial results of operation of this real estate
> venture/investment;
>
> d.      all documents pertaining to [Ms. Dengin's] acquisition of any real or
> beneficial interest in the property located 1939 Drummond Drive, Vancouver,
> British Columbia and pertaining to the value and financial results of operation
> of this property;
>
> e.      all documents pertaining to [Ms. Dengin's] acquisition of any real or
> beneficial interest in the property located 2215 Lake Placid Road, Whistler,
> British Columbia and pertaining to the value and financial results of operation
> of this property;
>
> f.      all documents pertaining to the George Dengin Family Trust No. 2.

[62]    On October 22, 2013 Ms. Dengin filed a notice of application in the second
family law proceeding seeking the following orders:

> 1.      [The second family law proceeding] and all further proceedings
> related to the validity of the Consent Order pronounced June 10, 2003 in the
> [original family law proceeding], and [the civil claim] are stayed generally.
>
> 2.      In the alternative, [the second family law proceeding] and [the civil
> claim] are struck out.
>
> 3.      In the further alternative, joinder of [the second family law proceeding]
> with [the original family law proceeding], and a stay of the joined action,
> except for any claim that the Court, on application by [Mr. Tepper], exercises
> its discretion to grant leave to proceed. If such leave is granted, then those
> claims granted leave must be advanced in the re-evaluation of the entirety of
> the property division that was done at June 10, 2003, with the Court giving
> directions as to the manner in which the claim is to be prosecuted.

2014 BCSC 288 (CanLII)

[63]    On the same day, October 22, 2013 Ms. Dengin filed a notice of application in
the civil action seeking similar relief. She relies on Rules 1-3 and 11-2 of the
*Supreme Court Family Rules*, B.C. Reg. 169/2009, Rules 1-3 and 9-5 of the
*Supreme Court Civil Rules*, B.C. Reg. 168/2009 and sections 8 and 10 of the *Law
and Equity Act*, R.S.B.C. 1996, c. 253.

## IV.    ARGUMENT

### A.    Argument of Mr. Tepper

#### (1)    His claims against Ms. Dengin

[64]    Mr. Tepper claims that the settlement agreement and consent order should
be set aside on the basis of fraud or fraudulent non-disclosure: *International Corona
Resources Ltd. v. LAC Minerals Ltd.* (1988), 66 O.R. (2d) 610 (H.C.J.); *Lawyers'
Professional Indemnity Co. v. Geto Investments Ltd.*, [2007] O.J. No. 2793 (Sup. Ct.
J.). He further contends that "the first step, and the only relevant issue" in the second
family law proceeding, is whether the settlement and consent order should be set
aside. Once the settlement and consent order is set aside on the basis of fraud, then
the parties can essentially resume the original family law proceeding to argue the
division of family assets based on full and complete disclosure by both parties.

[65]    Mr. Tepper also maintains the consent order should be set aside in the
second family law proceeding, rather than the original family law proceeding: *Racz v.
Mission (District)*, 1988 CarswellBC 13 (C.A.) at paras. 8, 12-14; *Walji v. Walji
Estate*, 1995 CarswellBC 1565 (S.C.) at paras. 10-11. Ms. Dengin contends that the
consent order should be set aside in the original family law proceeding. However, I
do not find it necessary to decide that issue.

[66]    Mr. Tepper contends that "negotiation of the terms of the consent order was
informal in nature." By her October 8, 2002 note, Ms. Dengin disclosed to him that
there were "investors" and bank debt of $1,040,000 against a market value of $1.1
million, and thus indicated to him that there was little or no equity in the St. Georges
Avenue property. Her note was also consistent with what she verbally told him – that
she had little or no equity in the property – and required him to settle her claims on

2014 BCSC 288 (CanLII)

the basis of an equal division. Accordingly, pursuant to the terms of the minutes of settlement and the consent order, he paid her approximately $375,000 from the proceeds of the sale of their former matrimonial home – or half of the net proceeds.

[67]    Mr. Tepper claims that the $567,154.50 mortgage against the St. Georges property disclosed to him by the search means – without further document production from Ms. Dengin at this time – that there was equity in 602565 B.C. Ltd. at the time of the consent order. He argues that there is therefore "a discrepancy" between what she represented to him in her note of October 8, 2002 – that there was "debt (investors + bank)" of $1,040,000 – so what she disclosed to him at that time was false.

[68]    There are other discrepancies: the October 3, 2002 letter from Mr. Levine (Mr. Tepper's counsel) to Ms. Hopman (Ms. Dengin's counsel) states, "... my instructions are that when Ms. Tepper received her shares of the numbered company, the real estate owned by the company was free and clear." However, Ms. Dengin now claims that she was not a shareholder in the numbered company and never invested money in the numbered company.

[69]    I pause to note that we do not know if Ms. Hopman ever replied to the letter of October 3, 2002, because if she did, her reply has not been produced. However, Ms. Hopman did send a letter to Mr. Levine dated October 7, 2002, enclosing a number of documents for service upon Mr. Tepper. Ms. Dengin states that she has been unable to retrieve all the documents from her former counsel – and I do not fault her given the passage of time.

[70]    However, Mr. Tepper argues that unless Ms. Dengin – and Mr. Dengin – now produce the documents he seeks, he will not know what the true state of her finances was at the time of the agreement and consent order. The second family law proceeding claims that the consent order was obtained by fraudulent misrepresentation and deceit. As Ms. Dengin has filed a response and joined issue on all of the allegations, the documents he seeks must be produced.

2014 BCSC 288 (CanLII)

[71]     Mr. Tepper argues that he does not know and did not know Ms. Dengin's true financial circumstances at the time they were negotiating their settlement and entered into the consent order because Ms. Dengin failed to disclose and failed to make continuous disclosure as she was obliged to do under Rule 60D of the former *Supreme Court Rules* during the original family law proceeding. He argues that Ms. Dengin made disclosure by her handwritten note of October 8, 2002 and as her financial circumstances changed, she was required to make continuous disclosure under Rule 60D(20). The parties may not have exchanged financial statements during the original family law proceedings, but many persons exchange information informally. It cannot be that simply because there was an informal exchange of information, the exchange is subject to "laxer terms" than Rule 60D because that would be inconsistent with the spirit of the *Supreme Court Rules*, and in particular Rule 60D(20): if there is a material change to whatever you have stated or not stated, it must be disclosed.

[72]     Mr. Tepper complains that the "most egregious form of non-disclosure" is Ms. Dengin's failure to disclose her interest in the Drummond Drive "mansion" that was acquired just two weeks after the consent order. She "did *not* disclose the existence of this interest or any interest in the trusts formed to acquire this multi-million dollar property, of which she is now the trustee". He does not know who is, or was, the beneficiary of the Dengin Family Trust No. 2, or why there is a layer of trusts. He seeks production of documents so that he can determine whether Ms. Dengin is a beneficiary, when the document was created, and what interest she had at the time of the consent order.

[73]     Mr. Tepper contends that a settlement is like any other contract. A contract entered into on the basis of false statements that go to the root of the contract, may be rescinded on the basis of fraud, fraudulent statements, fraudulent non-disclosure, or deceit. He argues that had he known that his ex-wife was going to receive a lot of money, "say $10 million" from Mr. Dengin, he (Mr. Tepper) should not have had to pay her what he paid her under the settlement — which he claims amounted to $1 million. Instead most, if not all of the family assets should have been reapportioned

2014 BCSC 288 (CanLII)

in his favour because Ms. Dengin was going to marry a rich man and receive a lot of money. The consent order was "predicated upon the assumption that the disclosure made in 2002 by Ms. Dengin had been accurate and complete"; but it was not.

### (2)     Order for production of documents by Mr. Dengin

[74]     Mr. Tepper seeks an order for the production of documents from Mr. Dengin who is not a party to the litigation and relies on the following Rule 9-1(15) of the *Supreme Court Family Rules* which says:

> If a document is in the possession or control of a person who is not a party, the court, on an application under Part 10 brought on notice to the person and the parties, may make an order for one or both of the following:
>
> (a)     production, inspection and copying of the document;
>
> (b)     preparation of a certified copy that may be used instead of the original.

[75]     Mr. Tepper relies on the following passages from the seminal Court of Appeal decision in *Dufault v. Stevens*, [1978] B.C.J. No. 1219 (C.A.) which considered the former Rule 26(11) which mirrors Rule 9-1(15):

> 10     The intent of Rule 26(11) is to provide any party to an action with the means of obtaining the production and inspection of a document if the applicant is able to satisfy the Judge that the document contains information which may relate to a matter in issue and of obtaining a copy of the document to use in lieu of the original in the event that a document does contain information which may relate to a matter in issue. **No party has priority to an order for production and inspection over any other party nor any paramount right to an order for production and inspection.** A party applying for an order under Rule 26(11) must satisfy the Court that the application is not in the nature of a "fishing expedition": Rhoades v. Occidental Life Ins. Co. of California, supra. **He must show that a person who is not a party to the action has a "document" or "documents" in his possession which relates to a matter in issue.** The comments of Brett, L.J., in Compagnie Financiere et Commerciale du Pacifique v. Peruvian Guano Co. (1882), 11 Q.B.D. 55 at p. 63, as to what constitutes a document relating to a matter in question, have been quoted by this Court on several occasions:
>
> > It seems to me that every document relates to the matters in question in the action, which not only would be evidence upon any issue, but also which, it is reasonable to suppose, contains information which "may - not which must - either directly or indirectly enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary. I have put in the words "either directly or

2014 BCSC 288 (CanLII)

2014 BCSC 288 (CanLII)

indirectly," because, as it seems to me, a document can properly be said to contain information which may enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary, if it is a document which may fairly lead him to a train of inquiry, which may have either of these two consequences ...

11   It follows from this that <u>an applicant need not show that a document is admissible in evidence at the trial as the condition of his obtaining an order under this Rule. If a party seeking the order is able to satisfy the Judge that the document, or information in a document, may relate to a matter in issue, the Judge should make the order unless there are compelling reasons why he should not make it, e.g., the document is privileged or - "grounds exist for refusing the application in the interest of persons, not parties to the action, who might be embarrassed or affected adversely by an order for production"</u> - per McFarlane, J.A., in Rhoades v. Occidental Life Ins. Co. of California, supra, at p. 630, including the custodian of the document.

12   It seems to me, however, before a Judge refuses an application for production and inspection on the grounds that it may embarrass or adversely affect a person who is not a party to the action he should be satisfied that (1) the probative value of the document, or the information in the document, would be slight, and (2) the production and inspection of the document would cause so much embarrassment to the non-party, or have such an adverse affect on him, that it would be unjust to require him to produce it for the inspection of the parties to the action.

13   In determining whether he should make an order under this Rule, a Judge may require that the document be produced for his inspection.

14   <u>Subject to these considerations, any party is entitled to an order for production and inspection of a document which may relate to an issue in a trial notwithstanding the fact that the document may contain some information which is irrelevant or which may contain information which might be embarrassing to one of the parties.</u>

[Emphasis added by Mr. Tepper.]

[76]   Mr. Tepper argues that as a matter of law, he is entitled to production of documents in Mr. Dengin's possession to the extent that they may be used by him to prove or disprove a material fact at trial, and that relevance and materiality is defined by the scope of the pleadings. He also argues that he is not required to exhaust all procedures relating to the production of documents before seeking them from Mr. Dengin: *Belitchev v. Grigorov*, [1998] B.C.J. No. 1967 (S.C.) at para. 15. However, that case is distinguishable. There, it was argued that discovery of documents and examinations for discovery had to be completed before an application could be made under the former Rule 26(11). That is not the case here.

*Tepper v. Dengin*                                                               **Page 26**

[77]   In response to Mr. Dengin's contention that Mr. Tepper has not demonstrated that the relevant documents cannot be obtained by a party to the action: *Bachmann v. Sandoz (Canada) Limited*, [1978] B.C.J. No. 1361 (S.C.); Mr. Tepper submits that the *Bachmann* decision is "inconsistent with modern authority and contemporary principles of disclosure and the desire to avoid litigation by ambush. Rather, the modern approach to issue of disclosure and proportionality make it clear that it is not necessary to establish" that the documents cannot be obtained by a party to the action.

### B.     Argument of Ms. Dengin

[78]   Ms. Dengin argues that the settlement agreement is not a commercial contract or ordinary commercial dispute, but an agreement fairly negotiated in a family law case dispute. As such, the agreement brings into play the relevant provisions of the *Family Relations Act*, R.S.B.C. 1996, c. 128 and the *Divorce Act*, R.S.C. 1985, c. 3 (2d Supp.), in force during the negotiations leading to the settlement agreement and the consent order. The *Family Relations Act* and the *Divorce Act*, together with the relevant *Supreme Court Rules* are a complete code for dealing with marriage breakdowns, including the support arrangements and division of property. Courts should be reluctant to second-guess an agreement reached between the parties, particularly where there has been independent legal advice. It has long been settled that courts respect a separation agreement reached between the parties unless it is found to be unfair or for other grounds based on the court's inherent jurisdiction: *Miglin v. Miglin*, 2003 SCC 24 at paras. 40, 43, 45-46, 51, 54-55, 74, 84-85, 88-89, and 91; *Hartshorne v. Hartshorne*, 2004 SCC 22 at paras. 8-14, 34-42, 46-47, 60-61, 65, and 67; and *Or v. Leung*, 2006 BCSC 57 at paras. 92-95.

[79]   With respect to the title searches that Mr. Tepper relies on, Ms. Dengin emphasizes that the searches reveal the following:

2014 BCSC 288 (CanLII)

### The Drummond Drive Property

(a)    The sale of the Drummond Drive Property was registered in the Land Title Office on September 18, 2003, <u>after</u> the consent order was pronounced;

(b)    Ms. Dengin was <u>not</u> the buyer: Fred Tham was the buyer, in trust;

(c)    The trust indenture shows that Ms. Dengin was not the trustee (Fred Tham) or the settlor (Jack Adelaar).

### The Lake Placid Road, Whistler Property

(a)    The purchase of the Lake Placid Property was registered in the Land Title Office on July 22, 2004, more than a year <u>after</u> the consent order was pronounced;

(b)    Ms. Dengin appears on title as the trustee, for the beneficiary, the Lake Placid Property Trust;

(c)    Ms. Dengin was not the settlor of the Lake Placid Property Trust: Jack Adelaar was the settlor; and

(d)    Ms. Dengin was not the beneficiary of the Lake Placid Property Trust.

[80]    With respect to the $567,154.50 mortgage against the St. Georges Avenue property, Ms. Dengin contends that there is no discrepancy, but rather an ordinary business or financing structure that Mr. Tepper as a businessman should recognize. Investors put up the money by way of a loan or debt to the company through bridge financing after obtaining a commitment letter from a financial institution; once the mortgage funds are advanced, the funds are paid out to the investors.

[81]    Ms. Dengin argues that Mr. Tepper fails to particularize how any of the information she provided him in 2002 relating to Perestroika was incorrect; he acknowledges that he knew about the St. Georges Avenue property, he was aware

2014 BCSC 288 (CanLII)

of the Drummond Drive property in 2003, and the Lake Placid Road property in 2004. The fact that he may not recall Mr. Kornfeld reviewing the records and minute book of 602565 B.C. Ltd. – or the results of his lawyer's review of the records and minute book – does not mean that he was misled.

[82]    She argues that Mr. Tepper's assertion that the negotiations were "informal" is belied by the correspondence between counsel, her demand for a Form 89 financial statement – which Mr. Tepper never provided – his May 12, 2003 affidavit in which he swore that with the assistance of their counsel he and Ms. Dengin had negotiated a settlement of all matters including the division of family assets, and executed minutes of settlement.

[83]    More to the point, Ms. Dengin rightly contends that "it strains belief", that any financial benefit, property, or interest that she might have obtained from her relationship with Mr. Dengin – whom she married following her divorce from Mr. Tepper – could somehow form the basis for "family property" divisible in the original family law proceeding.

[84]    Ms. Dengin relies on Rule 11-2 of the *Supreme Court Family Rules* and Rule 9-5 of the *Supreme Court Civil Rules*, which codify the court's inherent jurisdiction to dismiss an action that is vexatious or an abuse of process:

> **Rule 11-2 — Striking Documents**
>
> **Scandalous, frivolous or vexatious matters**
>
> (1)  At any stage of a family law case, the court may order to be struck out or amended the whole or any part of a pleading, petition or other document on the ground that
>
> ...
>
> (b) it is unnecessary, scandalous, frivolous or vexatious,
>
> ...
>
> (d) it is otherwise an abuse of the process of the court,
>
> and the court may pronounce judgment or order the family law case to be stayed or dismissed and may order the costs of the application to be paid as special costs.
>
> **Rule 9-5 — Scandalous, frivolous or vexatious matters**

2014 BCSC 288 (CanLII)

> (1) At any stage of a proceeding, the court may order to be struck out or amended the whole or any part of a pleading, petition or other document on the ground that
>
> ...
>
> (b) it is unnecessary, scandalous, frivolous or vexatious,
>
> ...
>
> (d) it is otherwise an abuse of the process of the court,
>
> and the court may pronounce judgment or order the proceeding to be stayed or dismissed and may order the costs of the application to be paid as special costs.

[85]   Ms. Dengin also relies on the finality of a consent order as discussed by

Mr. Justice Preston who reviewed a number of authorities in *Schlenker v. Schlenker*

(1999), 1 R.F.L. (5th) 436, [1999] B.C.J. No. 2930 as follows:

> **25** Section 65 of the *Family Relations Act* sets marriage agreements apart from the general body of law governing contract. The section grants a specific power to the court to vary a contract relating to the division of property in a matrimonial proceeding if it is unfair. This power to review for substantive fairness extends the court's power to modify a contract arrived at by the parties beyond the established categories of circumstances in which a court may intervene to alter or set aside contracts.
>
> **26** The court has the undoubted jurisdiction to make an order embodying the terms of an agreement between parties to litigation that brings the litigation to an end. In the context of the *Family Relations Act*, this judicial discretion has legislative sanction.
>
> **27** When the courts of this province have considered the issue of the court's power to vary matrimonial agreements that have been embodied in an order of the court, they have concluded that the effect of a consent order is to render the matter *res judicata* and to remove from the court the power to vary marriage agreements extended by the provisions of Rule 65 of the *Family Relations Act*.
>
> **28** The context in which this issue typically arises is in matrimonial agreements dealing with the division of family assets. The governing statutes permit the other common terms in matrimonial agreements; custody, access, and support, to be varied on application if proper grounds can be shown. If the agreement dealing with property division is embodied in a separation agreement that qualifies as a marriage agreement under s. 65 of the *Family Relations Act* it is reviewable by the court: if the agreement is embodied in a court order it is not.
>
> **29** The statutory provisions and the provisions of the *Supreme Court Rules* that empower the court to make orders by consent confer that power in the form of a discretionary power. The doctrine of *res judicata* implies a judicial rather than an administrative act.

2014 BCSC 288 (CanLII)

[86]    Ms. Dengin also relies on the doctrine of laches: *Chancery Estate Holdings Corp. v. Sahara Real Estate Investment Inc.*, 2011 BCSC 1067 at paras. 93 to 94, aff'd 2013 BCCA 145, leave to appeal to S.C.C. refused, [2013] S.C.C.A. No. 237, and argues that delay – here, a delay between nine and ten years – is a factor in determining whether a proceeding is an abuse of process. Delay alone can constitute abuse of process where there is serious prejudice: *Blencoe v. British Columbia (Human Rights Commission)*, 2000 SCC 44 at paras. 101-121. Ms. Dengin will be prejudiced by the unavailability of relevant documents to support her case and counterclaim. Her own lawyers' files are unavailable and may have been destroyed. Mr. Tepper has provided his list of documents in the second family law proceeding and it fails to include his own financial records from 2002 to 2003.

### C.    Argument of Mr. Dengin

[87]    From Mr. Dengin's application response, he argues:

    (a)    Mr. Tepper has failed to establish that an order for the production of documents in the possession of a person not a party to the action should be made on the basis of relevance, as defined by the pleadings: *K.L.V. v. D.G.R.*, [1993] B.C.J. No. 1917 (S.C.).

    (b)    Mr. Tepper's pleadings for a claim for an interest in the St. Georges property, Drummond Drive property, and Whistler property is not sufficient of itself to require disclosure: *Kaladjian v. Jose*, 2012 BCSC 357;

    (c)    Mr. Tepper has not demonstrated that the documents are in the possession of Mr. Dengin or cannot be obtained from Ms. Dengin; the demand lacks specificity and is a broad dragnet demand for production of "all" documents: *Lacker v. Lacker* (1982), 42 B.C.L.R. 188, [1982] B.C.J. No. 1514 (S.C.); *Bachmann v. Sandoz (Canada) Ltd.* (1978), 6 B.C.L.R. 57, [1978] B.C.J. No. 1361 (S.C.).

2014 BCSC 288 (CanLII)

Case 2:17-cv-02485-R-JC Document 4 Filed 03/30/17 Page 44 of 100 Page ID #:120

[88]   In response to Mr. Tepper's argument that it is not necessary for him to establish that he cannot obtain the documents from Ms. Dengin, Mr. Dengin relies on *Wong v. Antunes*, 2008 BCSC 1739, rev'd 2009 BCCA 278 but the legal principle on this point was not altered, where Mr. Justice Pitfield stated:

> [13]   At the outset, I think it appropriate to address the question of whether, in the circumstances, Rule 26(11) can or should be invoked in present circumstances. The rule is intended to facilitate the production of documents in the possession of a non-party and not in the possession of a party: see *Lacker v. Lacker* (1982), 42 B.C.L.R. 188 (S.C.), citing *Bachman v. Sandoz (Can.) Ltd.* (1978), 6 B.C.L.R. 57 (S.C.).

## V.    ANALYSIS

[89]   It is all too easy to fling around allegations of fraud and misrepresentation which are very serious allegations. In this case, Mr. Tepper has provided no particulars of the allegations. At most, he argues that the searches raise suspicions and that in order for him to determine whether Ms. Dengin provided him with false information in her handwritten note of October 8, 2002, she and Mr. Dengin are obliged to comply with his demand for discovery of documents.

[90]   I agree with Mr. Tepper that the primary issue for determination is whether the settlement agreement and consent order should be set aside. This issue includes consideration of the relevant provisions of the former *Family Relations Act* dealing with the division and reapportionment of family assets, Rule 60D of the former *Supreme Court Rules*, and the elements of the tort of civil fraud.

[91]   Courts are generally reluctant to set aside a negotiated settlement reached in a family law matter. In *Miglin*, the Supreme Court of Canada set out the test to be applied by a court when determining whether a negotiated settlement agreement should be set aside. As summarized in the introduction to the lengthy judgment, the majority stated:

> [4]   ... we believe that a fairly negotiated agreement that represents the intentions and expectations of the parties and that complies substantially with the objectives of the *Divorce Act* as a whole should receive considerable weight. In an originating application for spousal support, where the parties have executed a pre-existing agreement, the court should look first to the circumstances of negotiation and execution to determine whether the

2014 BCSC 288 (CanLII)

applicant has established a reason to discount the agreement. The court would inquire whether one party was vulnerable and the other party took advantage of that vulnerability. The court also examines whether the substance of the agreement, at formation, complied substantially with the general objectives of the Act.

[92]    *Miglin* was applied by the Supreme Court of Canada in *Rick v. Brandsema*, 2009 SCC 10, which restored a decision of this Court that found a separation agreement unconscionable for a number of reasons, including the fact that the division of assets departed significantly from the legislative objectives set out in the *Family Relations Act* of an equal division, and the parties' intention that they have an equal division. The husband had filed a sworn Form 89 in 2001 that failed to list funds of almost a quarter of a million dollars. (The Form 89 would have been filed in accordance with Rule 60D in force at the time that Mr. Tepper and Ms. Dengin were negotiating their settlement agreement). The husband also never disclosed the existence of the funds during the course of negotiations. This resulted in the wife receiving $649,680 less than her presumptive entitlement under the legislation. The trial judge also found that the husband had deliberately exploited his wife's fragile mental state.

[93]    Abella J. for the Supreme Court of Canada stated (at para. 39) that while *Miglin* dealt with spousal support agreements, the decision nevertheless "offers guidance for the conduct of negotiations for separation agreements generally, including negotiations for the division of matrimonial assets." She further stated:

> 47 In my view, it flows from the observations and principles set out in *Miglin* that a duty to make full and honest disclosure of all relevant financial information is required to protect the integrity of the result of negotiations undertaken in these uniquely vulnerable circumstances. The deliberate failure to make such disclosure may render the agreement vulnerable to judicial intervention where the result is a negotiated settlement that is substantially at variance from the objectives of the governing legislation.
>
> 48 Such a duty in matrimonial negotiations anchors the ability of separating spouses to genuinely decide for themselves what constitutes an acceptable bargain. It also helps protect the possibility of finality in agreements. An agreement based on full and honest disclosure is an agreement that, *prima facie*, is based on the informed consent of both parties. It is, as a result, an agreement that courts are more likely to respect. Where, on the other hand, an agreement is based on misinformation, it cannot be said to be a true bargain which is entitled to judicial deference.

2014 BCSC 288 (CanLII)

**49** Whether a court will, in fact, intervene will clearly depend on the circumstances of each case, including the extent of the defective disclosure and the degree to which it is found to have been deliberately generated. It will also depend on the extent to which the resulting negotiated terms are at variance from the goals of the relevant legislation. As *Miglin* confirmed, the more an agreement complies with the statutory objectives, the less the risk that it will be interfered with. Imposing a duty on separating spouses to provide full and honest disclosure of all assets, therefore, helps ensure that each spouse is able to assess the extent to which his or her bargain is consistent with the equitable goals in modern matrimonial legislation, as well as the extent to which he or she may be genuinely prepared to deviate from them.

**50** In other words, the best way to protect the finality of any negotiated agreement in family law is to ensure both its procedural and substantive integrity in accordance with the relevant legislative scheme.

**51** In British Columbia, the operative legislative presumption for the division of family assets is an equal division, as set out in s. 56 of the *Family Relations Act*.

[94]    From *Miglin* and *Rick*, the following principles or factors should be considered in deciding whether the court should intervene and set aside the minutes of settlement that were reached between Mr. Tepper and Ms. Dengin:

1.  family law agreements between separating spouses on marriage breakdown are not subject to the same rules as commercial agreements;

2.  parties have the right to decide for themselves what bargain they are prepared to make but contractual autonomy is dependent on the integrity of the bargaining process;

3.  the court must consider the circumstances surrounding the negotiation and making of the agreement;

4.  the court should examine the agreement to determine whether it substantially complies with the governing legislation;

5.  the court should consider whether there were circumstances of oppression, pressure, or other vulnerabilities;

2014 BCSC 288 (CanLII)

6. if one spouse took advantage of the other spouse's vulnerability, where there
   is independent legal advice or "professional assistance" that *may* "effectively
   compensate for vulnerabilities";

7. "...an acceptable bargain can only authoritatively be made if both parties
   come to the negotiating table with the information needed to consider what
   concessions to accept or offer." (*Rick* at para. 46);

8. in accordance with Rule 60D, there is a duty to make full and honest
   disclosure of all relevant financial information.

[95]     The relevant provisions of the former *Family Relations Act* provide:

**Equality of entitlement to family assets on marriage breakup**

56 (1) Subject to this Part and Part 6, each spouse is entitled to an interest in
each family asset on or after March 31, 1979 when

> (a) a separation agreement,
>
> (b) a declaratory judgment under section 57,
>
> (c) an order for dissolution of marriage or judicial separation, or
>
> (d) an order declaring the marriage null and void

respecting the marriage is first made.

(2) The interest under subsection (1) is an undivided half interest in the family
asset as a tenant in common.

(3) An interest under subsection (1) is subject to

> (a) an order under this Part or Part 6, or
>
> (b) a marriage agreement or a separation agreement.

(4) This section applies to a marriage entered into before or after March 31,
1979.

...

**Family asset defined**

58 (1) Subject to section 59, this section defines family asset for the purposes
of this Act.

(2) Property owned by one or both spouses and ordinarily used by a spouse
or a minor child of either spouse for a family purpose is a family asset.

(3) Without restricting subsection (2), the definition of family asset includes
the following:

> (a) if a corporation or trust owns property that would be a family asset
> if owned by a spouse,

2014 BCSC 288 (CanLII)

> (i) a share in the corporation, or
>
> (ii) an interest in the trust

owned by the spouse;

> (b) if property would be a family asset if owned by a spouse, property
>
> > (i) over which the spouse has, either alone or with another person, a power of appointment exercisable in favour of himself or herself, or
> >
> > (ii) disposed of by the spouse but over which the spouse has, either alone or with another person a power to revoke the disposition or a power to use or dispose of the property;
>
> (c) money of a spouse in an account with a savings institution if that account is ordinarily used for a family purpose;
>
> (d) a right of a spouse under an annuity or a pension, home ownership or retirement savings plan;
>
> (e) a right, share or an interest of a spouse in a venture to which money or money's worth was, directly or indirectly, contributed by or on behalf of the other spouse.

(4) The definition of family asset applies to marriages entered into and property acquired before or after March 31, 1979.

**Excluded business assets**

**59** (1) If property is owned by one spouse to the exclusion of the other and is used primarily for business purposes and if the spouse who does not own the property made no direct or indirect contribution to the acquisition of the property by the other spouse or to the operation of the business, the property is not a family asset.

(2) In section 58 (3) (e) or subsection (1) of this section, an indirect contribution includes savings through effective management of household or child rearing responsibilities by the spouse who holds no interest in the property.

**Onus of proof**

**60** The onus is on the spouse opposing a claim under section 56 to prove that the property in question is not ordinarily used for a family purpose.

...

**Judicial reapportionment on basis of fairness**

**65** (1) If the provisions for division of property between spouses under section 56, Part 6 or their marriage agreement, as the case may be, would be unfair having regard to

> (a) the duration of the marriage,
>
> (b) the duration of the period during which the spouses have lived separate and apart,
>
> (c) the date when property was acquired or disposed of,

2014 BCSC 288 (CanLII)

*Tepper v. Dengin*                                                                 **Page 36**

(d) the extent to which property was acquired by one spouse through inheritance or gift,

(e) the needs of each spouse to become or remain economically independent and self sufficient, or

(f) any other circumstances relating to the acquisition, preservation, maintenance, improvement or use of property or the capacity or liabilities of a spouse,

the Supreme Court, on application, may order that the property covered by section 56, Part 6 or the marriage agreement, as the case may be, be divided into shares fixed by the court.

(2) Additionally or alternatively, the court may order that other property not covered by section 56, Part 6 or the marriage agreement, as the case may be, of one spouse be vested in the other spouse.

(3) If the division of a pension under Part 6 would be unfair having regard to the exclusion from division of the portion of a pension earned before the marriage and it is inconvenient to adjust the division by reapportioning entitlement to another asset, the Supreme Court, on application, may divide the excluded portion between the spouse and member into shares fixed by the court.

[96]    The minutes of settlement agreed to between Mr. Tepper and Ms. Dengin – and subsequently, the terms of the consent order – generally provide that each of them would retain his or her business interests and they would divide equally between them, the net proceeds from the sale of the former matrimonial home and the household contents. The settlement appears to substantially comply with the legislative objectives of an equal division of the family assets.

[97]    As I understand Mr. Tepper's complaint, it is this: had he known at the time that they were negotiating the terms of their settlement that Ms. Dengin was going to marry a rich man and acquire an interest in the Drummond Drive and Lake Placid Road properties – he would not have agreed to an equal division as she requested, but would have sought a reapportionment in his favour. He does not seek to disturb any of the settlement terms that provided him with his business interests or other assets. He only seeks more from Ms. Tepper on the basis that she failed to disclose what she ought to have disclosed: she made disclosure when she provided her handwritten note of October 8, 2002 and after that, she was required to make continuous disclosure of any interests she acquired after October 8, 2002 in accordance with Rule 60D(20).

2014 BCSC 288 (CanLII)

[98]   Echoing Ms. Dengin's argument – how any benefit that she may have obtained from Mr. Dengin whom she married after her divorce from Mr. Tepper – somehow forms a "family asset" or "family property" capable of being subject to an equal division under s. 56 or a judicial reapportionment under s. 65 in favour of Mr. Tepper strains belief. Mr. Tepper has not argued – and I fail to see under what subsections of s. 65 he can argue – that because Ms. Dengin may benefit from marrying a wealthy man, the "family assets" or "property" that he and Ms. Dengin had while they were married, should be reapportioned in his favour rather than divided on the basis of an equal division.

[99]   Mr. Tepper claims that the settlement agreement and consent order should be set aside on the basis of fraud or fraudulent misrepresentation.

[100]   The elements of the tort of civil fraud were recently discussed by the Supreme of Canada in *Bruno Appliance and Furniture, Inc. v. Hryniak*, 2014 SCC 8, where Karakatsanis J., for the Court, stated:

> A. *The Tort of Civil Fraud*
>
> **17** The parties disagree as to the elements of the tort of civil fraud, in particular whether proof is required that Hryniak induced Bruno Appliance to part with its funds.
>
> **18** The classic statement of the elements of civil fraud stems from an 1889 decision of the House of Lords, *Derry v. Peek* (1889), 14 App. Cas. 337, where Lord Herschell conducted a thorough review of the history of the tort of deceit and put forward the following three propositions, at p. 374:
>
>> First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. ... Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement was made.
>
> **19** This Court adopted Lord Herschell's formulation in *Parna v. G. & S. Properties Ltd.*, [1971] S.C.R. 306, adding that the false statement must "actually [induce the plaintiff] to act upon it" (p. 316, quoting *Anson on Contract*). Requiring the plaintiff to prove inducement is consistent with this Court's later recognition in *Snell v. Farrell*, [1990] 2 S.C.R. 311, at pp. 319-20, that tort law requires proof that "but for the tortious conduct of the defendant, the plaintiff would not have sustained the injury complained of".

2014 BCSC 288 (CanLII)

**20** Finally, this Court has recognized that proof of loss is also required. As Taschereau C.J. held in *Angers v. Mutual Reserve Fund Life Assn.* (1904), 35 S.C.R. 330 "fraud without damage gives ... no cause of action" (p. 340).

**21** From this jurisprudential history, I summarize the following four elements of the tort of civil fraud: (1) a false representation made by the defendant; (2) some level of knowledge of the falsehood of the representation on the part of the defendant (whether through knowledge or recklessness); (3) the false representation caused the plaintiff to act; and (4) <u>the plaintiff's actions resulted in a loss</u>.

[Emphasis added.]

[101]   I find it difficult to accept that Mr. Tepper can establish the fourth element: a loss on the basis that Ms. Dengin failed to disclose any interest she may have had in Drummond Drive or Lake Placid Road. Any interest – assuming she had an interest at the material time – is not a family asset capable of being divided or reapportioned as between Mr. Tepper and Ms. Dengin – or for that matter, a factor that could somehow lead to a reapportionment of the family assets in Mr. Tepper's favour. I also find it difficult to accept that Mr. Tepper can establish any loss on the basis that Ms. Dengin failed to disclose her interest in Perestroika or the numbered company when he clearly knew she had an interest in those companies at the time that they were negotiating the terms of settlement, and he chose not to seek financial disclosure or documents from her in respect of her business interests.

[102]   The contention that her handwritten note of October 8, 2002 made her subject to continuous disclosure under Rule 60D(20) also strains belief and is a strained interpretation of the rules relating to financial disclosure.

[103]   The rules relating to disclosure in family law proceedings, including the original family law proceeding are governed by former Rule 60D. They are lengthy, but I find it necessary to set out what I consider relevant.

[104]   The relevant provisions of Rule 60D provide:

RULE 60D - FAMILY LAW PROCEEDING - DISCLOSURE
*Interpretation*
60D(1) In this rule:
"applicable income documents" means, in respect of a person,

2014 BCSC 288 (CanLII)

*Tepper v. Dengin*                                                                    *Page 39*

(a)   a copy of every personal income tax return filed by the person for each of the 3 most recent taxation years,

(b)   a copy of every notice of income tax assessment or reassessment issued to the person for each of the 3 most recent taxation years,

...

(f)   if the person owns or has an interest in real property, a copy of the most recent assessment notice issued from an assessment authority for each property,

(g)   if the person is an employee,

    (i)   the most recent statement of earnings indicating the total earnings paid to the person in the year to date, including overtime, or

    (ii)   if that statement is not provided by the employer, a letter from the person's employer setting out the information referred to in subparagraph (i) and including the person's rate of annual salary or remuneration,

(h)   if the person is self-employed, the following information for the 3 most recent taxation years:

    (i)   the financial statements of the person's business or professional practice, other than a partnership;

    (ii)   a statement showing a breakdown of all salaries, wages, management fees or other payments or benefits paid to, or on behalf of, persons or corporations with whom the person does not deal at arm's length,

...

(j)   if the person controls a corporation, the following information for the corporation's 3 most recent taxation years:

    (i)   the financial statements of the corporation and its subsidiaries;

    (ii)   a statement showing a breakdown of all salaries, wages, management fees or other payments or benefits paid to, or on behalf of, persons or corporations with whom the corporation and every related corporation does not deal at arm's length, and

(k)   if the person is a beneficiary under a trust, a copy of the trust settlement agreement and copies of the trust's 3 most recent financial statements;

...

"Form 89 financial statement" means a statement in Form 89;

...

2014 BCSC 288 (CanLII)

### APPLICATIONS FOR DIVISION OF ASSETS

*Who must provide Part 3 of a Form 89 financial statement*

(11)    Each party who is making a claim under Part 5 of the *Family Relations Act* or against whom such a claim is being made, if not otherwise obliged under this rule to provide any portion of a Form 89 financial statement to the other party, must provide to the other party Part 3 of a Form 89 financial statement.

*When parties must serve documents*

(12)    Each party who is obliged to provide documents under subrule (11) must serve those documents on the other party as follows:

    (a)    if the party is obliged to provide the documents in respect of a claim made by that party in a pleading or in application materials, within 30 days after serving that pleading or those application materials on the other party;

    (b)    if the party is obliged to provide the documents in respect of a claim made by the other party in a pleading or in application materials and is served with a notice in Form 91 in accordance with subrule (15),

        (i)    within 30 days after service if the party resides in Canada or the United States of America, or

        (ii)    within 60 days after service if the party resides elsewhere;

    (c)    within such time as the court may order.

### FORM 89 FINANCIAL STATEMENT

*Assessment notice to be included*

(13)    Part 3 of a Form 89 financial statement must have attached to it or have accompanying it a copy of the notice that is, at the time that the statement is provided to a party under this rule, the most recent assessment notice provided by an assessment authority for any real property that the party owns or has an interest in unless that assessment notice has already been provided.

*When documents must be filed*

(14)    A party who is obliged under this rule to serve a Form 89 financial statement on any other party must file a copy of that document with the court before the end of the period within which that service must be completed.

### NOTICE TO FILE A FORM 89 FINANCIAL STATEMENT

*Service of notice to file financial statement*

(15)    Each party who, under this rule, is entitled to receive documents from another party, including a Form 89 financial statement and applicable income documents, must serve on the other party a Notice to File a Form 89 Financial Statement in Form 91 along with the pleading or application materials referred to in subrule (7), (10) or (12), as the case may be.

2014 BCSC 288 (CanLII)

Case 2:17-cv-02485-R-JC Document 4 Filed 03/30/17 Page 54 of 100 Page ID #:130

...

2014 BCSC 288 (CanLII)

## PARTICULARS OF FORM 89 FINANCIAL STATEMENTS

*Particulars may be demanded*

(17) If a Form 89 financial statement lacks particularity, the other party may demand particulars.

*Court may order particulars*

(18) If the party from whom particulars are demanded under subrule (17) fails to provide those particulars within 7 days after receipt of the demand, the court may, on terms it considers appropriate,

    (a) order particulars to be delivered within a specified time, or

    (b) order that a new Form 89 financial statement be delivered within a specified time.

*Cross-examination on Form 89 financial statements*

(19) A party may be cross-examined on his or her Form 89 financial statement at any time before the trial or hearing, and Rules 27 and 40(27), (29), (31) and (32) apply to the cross-examination.

## CHANGES IN FINANCIAL CIRCUMSTANCES

*Information must be kept current*

(20) Whenever a material change in circumstances renders information provided by a party inaccurate or incomplete, the party must, whether the inaccurate or incomplete information is contained in a Form 89 financial statement, in particulars provided under subrule (17) or (18)(a), in the party's applicable income documents or in a statement provided under this subrule, promptly after that change, deliver to the other party

    (a) a written statement setting out particulars of the accurate or complete information, or

    (b) a revised Form 89 financial statement containing the correct current information.

*Additional documents*

(21) If the change in circumstances referred to in subrule (20) is such that the party becomes obliged to provide documents under this rule that are additional to the documents previously provided by that party, the party must

    (a) provide those additional documents, and

    (b) comply with subrule (20) in relation to the previously provided documents.

*If written statement or particulars provided*

(22) If a party provides a written statement under subrule (20) or particulars under subrule (17) or (18)(a),

    (a) the statement or particulars may be treated at a trial or hearing as if they formed part of the original Form 89 financial statement of the party, and

(b)   the other party may, with leave of the court, require that the statement or particulars be

      (i)   verified by an affidavit of the party providing the statement or particulars, or

      (ii)   the subject of further cross-examination.

...

## DISCLOSURE OF BUSINESS INTERESTS

*Production of documents*

(24)   If a party discloses business or corporate interests in a Form 89 financial statement delivered under this rule, the party receiving the statement may, in writing, request the disclosing party to produce for inspection and copying specified documents or classes of documents in the disclosing party's possession or control that might reasonably be required to verify the valuation of the disclosing party's interest or to determine the disclosing party's income.

...

## ENFORCEMENT OF THIS RULE

*Relief*

(34)   If a party fails to comply with a requirement under this rule to file or serve a Form 89 financial statement, particulars if ordered or any applicable income document, or fails to comply with a notice under subrule (15), the court may do any or all of the following:

      (a)   order that the Form 89 financial statement, particulars or applicable income document, as the case may be, be delivered on terms the court considers appropriate;

      (b)   dismiss the application or strike out a party's responding document;

      (c)   proceed under Rule 56 to punish the party for contempt of court;

      (d)   draw an adverse inference against the party;

      (e)   attribute income to that party in an amount the court considers appropriate.

[105]  Rule 60D sets out detailed obligations to make full and complete financial disclosure upon certain demands having been made. There are serious consequences for failing to file a Form 89 financial statement: it may lead to a finding of contempt.

[106]  Both Mr. Tepper and Ms. Dengin were, at the material times, represented by counsel who are competent and who, I might add, are well known.

2014 BCSC 288 (CanLII)

[107] On September 9, 2002 Mr. Maxwell wrote to Mr. Levine, informing him of the terms on which Ms. Dengin was willing to settle all matters between her and Mr. Tepper. Her proposed settlement included terms that she would retain her 25 percent interest in Perestroika, her interest in 602565 B.C. Ltd., half of the family assets, including half of the net proceeds from the sale of the former matrimonial home, household goods, and the boat. She also sought financial disclosure – although no family law proceeding had yet been commenced – and asked for copies of Mr. Tepper's personal T1 General Returns and his corporate returns for the past three years.

[108] Mr. Levine replied to Mr. Maxwell by letter dated September 18, 2002 and stated that the parties "are not far apart in terms of settlement", and likewise sought financial disclosure from Ms. Dengin.

[109] On October 3, 2002 Mr. Levine wrote to Ms. Hopman (who is at the same firm as Mr. Maxwell), indicating that Ms. Dengin's settlement proposal with respect to the division of assets was acceptable, and set out questions that Mr. Tepper had regarding the rental apartments owned by 602565 B.C. Ltd., including any mortgage encumbrances, and how the mortgage proceeds were being used.

[110] There is no reply to the letter; or if there was one, it has not been produced. I only mention this to emphasize that due to the passage of time, it is no longer possible to produce all of the documents that were available at the time the parties were negotiating the separation agreement.

[111] By letter dated October 7, 2002 Ms. Hopman wrote to Mr. Levine enclosing the writ of summons and statement of claim in the original family law proceedings, a demand for discovery of documents, and notice to file a Form 89 financial statement.

[112] On October 8, 2002 Ms. Dengin wrote her handwritten note to Mr. Tepper. She set out her estimated values of her interests in Perestroika and 602565 B.C. Ltd. Her handwritten separation agreement written at or around the same time

2014 BCSC 288 (CanLII)

included a term that each of them would retain their own interests in their businesses and investments.

[113]   It cannot be said that Ms. Dengin's handwritten note is a Form 89 financial statement, particulars of a Form 89, or a written statement provided under Rule 60D(20), such that Ms. Dengin was required to comply with Rule 60D(20) and to keep Mr. Tepper informed of any changes in her financial circumstances as a result of her relationship with Mr. Dengin.

[114]   On October 10, 2002 Ms. Hopman wrote to Mr. Levine stating that the parties had met and agreed to the division of assets essentially as set out in Mr. Maxwell's letter of September 9, and that she would be drafting minutes of settlement.

[115]   On October 16, 2002 Mr. Levine replied to Ms. Hopman and confirmed that the parties appeared to be in agreement on the terms of settlement, and he was awaiting the minutes of settlement.

[116]   As indicated earlier, there has been no correspondence produced between Mr. Levine's letter of October 25, 2002 (stating that he was waiting for the minutes of settlement) and May 12, 2003 when Mr. Tepper swore his affidavit in support of the consent order and attached to his affidavit the signed minutes of settlement.

[117]   The copy of the minutes of settlement, attached to Ms. Dengin's affidavit sworn October 16, 2013 and filed in these proceedings, is signed by both parties and by Sandra Polinsky who filed a notice of change of solicitor on behalf of Ms. Dengin on November 20, 2002. The minutes of settlement are undated but I may infer that they were agreed to and signed by the parties sometime after Ms. Polinsky began representing Ms. Dengin, and before May 12, 2003.

[118]   The minutes of settlement were agreed to when both parties were represented by counsel and understood that they were entitled to financial disclosure pursuant to Rule 60D. Mr. Tepper knew that Ms. Dengin had an interest in Perestroika and the numbered company and he could have demanded production of documents relating to her business interests in accordance with Rule 60D(24).

2014 BCSC 288 (CanLII)

Both chose not to avail themselves of the detailed Rules relating to financial disclosure under Rule 60D, and chose to rely on what they knew or understood at the time. They chose to arrive at an early settlement.

[119]  Mr. Tepper is a businessman. That is reflected in his October 19, 2011 e-mail to Ms. Dengin. It was written more than eight years after they settled; but he must be taken to have known in 2002 and 2003: they could settle amicably and move on with their lives, or they could enter a court battle involving time, money, and all financial records of the parties.

[120]  They chose to settle amicably and moved on with their lives.

[121]  There is no suggestion or at least no reasonable suggestion that Mr. Tepper was somehow oppressed or pressured by Ms. Dengin or that he was somehow vulnerable. He was a successful businessman who had the advice of lawyers and accountants; if he was in any way vulnerable (which I do not find), the independent legal advice and professional assistance he obtained effectively compensated for any vulnerabilities.

[122]  Mr. Tepper knew that he was entitled to financial disclosure under Rule 60D in the original family law proceeding before he executed the minutes of settlement and applied for a court order incorporating the terms of the settlement. However, he chose not to demand financial disclosure in accordance with the Rule. He now makes those demands in this second family law proceeding over 10 years later, when it is clear from the record that the relevant documents that existed in 2002 and 2003 are missing and are likely destroyed. In my view, it is now too late, and those demands are vexatious and amount to an abuse of process.

[123]  Ms. Dengin seeks an order that the second family law proceeding and the civil proceeding should be struck pursuant to *Supreme Court Family Rules*, Rule 11-2(1)(b) and (d), and *Supreme Court Civil Rules*, Rule 9-5(1)(b) and (d) as vexatious and an abuse of process of this Court. The two rules are similar, and essentially mirror the former Rule 19(24)(b) and (d) and provide that at any stage of a family law

2014 BCSC 288 (CanLII)

case or civil proceeding, the court may order to be struck out the whole or any part of a pleading, petition, or other document on the ground that it is vexatious, or otherwise an abuse of the process of the court. I deal first with the law on abuse of process and second with matters that are vexatious.

[124]   The doctrine of abuse of process is a flexible doctrine that has no specific requirements. The Supreme Court of Canada recently stated in *Behn v. Moulton Contracting Ltd.*, 2013 SCC 26:

> 39 In *Toronto (City) v. C.U.P.E., Local 79*, 2003 SCC 63, [2003] 3 S.C.R. 77, Arbour J. wrote for the majority of this Court that the doctrine of abuse of process has its roots in a judge's inherent and residual discretion to prevent abuse of the court's process: para. 35; see also P. M. Perell, "A Survey of Abuse of Process", in T. L. Archibald and R. S. Echlin, eds., *Annual Review of Civil Litigation 2007* (2007), 243. Abuse of process was described in *R. v. Power*, [1994] 1 S.C.R. 601, at p. 616, as the bringing of proceedings that are "unfair to the point that they are contrary to the interest of justice", and in *R. v. Conway*, [1989] 1 S.C.R. 1659, at p. 1667, as "oppressive treatment." In addition to proceedings that are oppressive or vexatious and that violate the principles of justice, McLachlin J. (as she then was) said in her dissent in *R. v. Scott*, [1990] 3 S.C.R. 979, at p. 1007, that the doctrine of abuse of process evokes the "public interest in a fair and just trial process and the proper administration of justice". Arbour J. observed in *C.U.P.E.* that the doctrine is not limited to criminal law, but applies in a variety of legal contexts: para. 36.
>
> 40 The doctrine of abuse of process is characterized by its flexibility. Unlike the concepts of *res judicata* and issue estoppel, abuse of process is unencumbered by specific requirements. In *Canam Enterprises Inc. v. Coles* (2000), 51 O.R. (3d) 481 (C.A.), Goudge J.A., who was dissenting, but whose reasons this Court subsequently approved (2002 SCC 63, [2002] 3 S.C.R. 307), stated at paras. 55-56 that the doctrine of abuse of process
>
> > engages the inherent power of the court <u>to prevent the misuse of its procedure, in a way that would be manifestly unfair to a party to the litigation before it or would in some other way bring the administration of justice into disrepute</u>. It is a flexible doctrine unencumbered by the specific requirements of concepts such as issue estoppel. See *House of Spring Gardens Ltd. v. Waite*, [1990] 3 W.L.R. 347 [C.A.], at p. 358.
> >
> > One circumstance in which abuse of process has been applied is where the litigation before the court is found to be in essence an attempt to relitigate a claim which the court has already determined. See *Solomon v. Smith, supra*. It is on that basis that Nordheimer J. found that this third party claim ought to be terminated as an abuse of process. [Emphasis added.]

2014 BCSC 288 (CanLII)

41 As can be seen from the case law, the administration of justice and fairness are at the heart of the doctrine of abuse of process. In *Canam Enterprises* and in *C.U.P.E.*, the doctrine was used to preclude relitigation of an issue in circumstances in which the requirements for issue estoppel were not met. But it is not limited to preventing relitigation. For example, in *Blencoe v. British Columbia (Human Rights Commission)*, 2000 SCC 44, [2000] 2 S.C.R. 307, the Court held that an unreasonable delay that causes serious prejudice could amount to an abuse of process: paras. 101-21. The doctrine of abuse of process is flexible, and it exists to ensure that the administration of justice is not brought into disrepute.

[Emphasis in *Behn*]

[125]  Mr. Tepper has brought these proceedings seeking financial disclosure when he failed to do so almost 10 years after he could have obtained financial disclosure in the original family law proceeding. It is not only unfair to make those demands now; it is too late and amounts to an abuse of process.

[126]  In *Ebrahim v. Ebrahim*, 2002 BCSC 466, aff'd 2003 BCCA 94, Madam Justice Gill considered whether the statement of claim and action should be struck out on the basis that the matter was vexatious. She stated:

[15] In *Law Society of Upper Canada v. Chavali* (1998), 21 C.P.C. (4th) 20 (Ont. Gen. Div.) aff'd (1998), 31 C.P.C. (4th) 221 (Ont. C.A.), Cummings J., considered the meaning of vexatious. He stated, at 25-26:

20 The adjective "vexatious" is defined by the *Concise Oxford Dictionary*, 9th ed. (Oxford: Clarendon Press, 1995) as:

1. such as to cause vexation.

2. *Law* not having sufficient grounds for action and seeking only to annoy the defendant.

To "vex" is defined as "to anger by a slight or a petty annoyance; irritate".

21 In *Lang Michener Lash Johnston v. Fabian* (1987), 59 O.R. (2d) 353 (Ont. H.C.), the Honourable Mr. Justice Henry summarized the salient charcteristics [sic] and principles relating to vexatious proceedings and conduct as follows (at 358-359) :

(a) the bringing of one or more actions to determine an issue which has already been determined by a court of competent jurisdiction constitutes a vexatious proceeding;

(b) where it is obvious that an action cannot succeed, or if the action would lead to no possible good, or if no reasonable person can reasonably expect to obtain relief, the action is vexatious;

Case 2:17-cv-02485-R-JC Document 4 Filed 03/30/17 Page 61 of 100 Page ID #:137

(c) vexatious actions include those brought for an improper purpose, including the harassment and oppression of other parties by multifarious proceedings brought for purposes other than the assertion of legitimate rights;

(d) it is a general characteristic of vexatious proceedings that grounds and issues raised tend to be rolled forward into subsequent actions and repeated and supplemented, often with actions brought against the lawyers who have acted for or against the litigant in earlier proceedings;

(e) in determining whether proceedings are vexatious, the court must look at the whole history of the matter and not just whether there was originally a good cause of action;

(f) the failure of the person instituting the proceedings to pay the costs of unsuccessful proceedings is one factor to be considered in determining whether proceedings are vexatious;

(g) the respondent's conduct in persistently taking unsuccessful appeals from judicial decisions can be considered vexatious conduct of legal proceedings.

The matter of "vexatious" must be determined by an objective standard. See, for example: *Mascan Corp. v. French* (1988), 64 O.R. (2d) 1 (C.A.) at 7; *Children's Aid Society of Ottawa-Carleton v. M. B.*, [1997] O.J. No. 1964 (Ont. Ct. (Gen. Div.)) at para. 22.

[127] Mr. Tepper makes these allegations in the civil proceeding and in the second family law proceeding when it is obvious that the actions will not succeed. Rather the proceedings are brought to harass Ms. Dengin and Mr. Dengin. As Mr. Tepper stated in his October 19, 2011 e-mail to Ms. Dengin, he promised an ugly fight that would involve her parents, her brother, and her husband. I find the proceedings are vexatious.

[128] Ms. Dengin also relies on ss. 8 and 10 of the *Law and Equity Act* which preserve the jurisdiction of the court to direct a stay of proceedings. However, in my view it would be improper to allow the second family law proceeding and the civil proceeding to continue when it is clear and obvious that Mr. Tepper's claims are intended to harass Ms. and Mr. Dengin and are bound to fail. Mr. Tepper has not

2014 BCSC 288 (CanLII)

satisfied me that the settlement agreement and consent order in the original family law proceeding should be set aside.

## VI. CONCLUSION

[129]  There will be an order that action numbers E122365 and S124644 are struck out as an abuse of process under Rule 11-2 of the *Supreme Court Family Rules* and Rule 9-5 of the *Supreme Court Civil Rules*.

[130]  It is unnecessary for me to deal with Mr. Tepper's application for the production of documents from Mr. Dengin. I only mention that the demand is far too broad, lacks specificity, amounts to a fishing expedition, and is also bound to fail.

[131]  Ms. Tepper and Mr. Dengin are entitled to their costs.

"Loo J."

_____

The Honourable Madam Justice Loo

2014 BCSC 288 (CanLII)

# EXHIBIT B

No. E023112
Vancouver Registry



**SUPREME COURT OF BRITISH COLUMBIA**

**SEAL**
**BETWEEN:**
**VANCOUVER**
**REGISTRY**

IN THE SUPREME COURT OF BRITISH COLUMBIA

INESSA TEPPER

PLAINTIFF

ANMI TEPPER,
AMIABLE INDUSTRIES INC., EMPTY HOLDINGS LTD.
AND SEA TO SKY FORD SALES LTD.

DEFENDANTS

O R D E R

BEFORE THE HONOURABLE          )    TUES day, the 10th
mR. JUSTICE                    )
BURNYEAT                       )    day of   June, 2003

THE APPLICATION of the Defendant, Ammi Tepper, coming on for hearing at
Vancouver, British Columbia, on the 10th day of June 2003, and on hearing Sandra
Polinsky, counsel for the Plaintiff Inessa Tepper, and Howard Rubin, counsel for the
Defendant, AND BY CONSENT RE COROLLARY RELIEF:

AND UPON THE COURT being advised that the name and birth date of each child is as
follows:

Name                                   Date of Birth

Adelle Tepper                          July 22, 1993
Michelle Tepper                        April 15, 1998

(the "children")

AND UPON The Defendant, Anmi Tepper, ( Payor) having been found to have a *Guideline* income from all sources, including income available to him through his corporate interests, of $233,000 per annum, and the Plaintiff Inessa Tepper,( Recipient) having been found to have a *Guideline* income for the purposes of support of $14,400 per annum.

This Court Declares that

1.    The Plaintiff and the Defendant have no reasonable prospect of reconciliation with each other, pursuant to Section 57 of the Family Relations Act, R.S.B.C. 1996, C 128 and amendments thereto.

THIS COURT ORDERS that:

2.    The Plaintiff shall have sole custody of the children, namely: Adelle Tepper, born July 22, 1993, and Michelle Tepper, born April 15, 1998 (the "children"), pursuant to the Divorce Act.

3.    The Plaintiff and Defendant shall share joint guardianship of the children, as follows:

   a.    the plaintiff and defendant are the joint guardians of the estates of the children and in the event of the death of either parent the remaining parent will be the sole guardian of the persons of the children;

   b.    the custodial parent will have the primary responsibility for the day to day care of the children, will have the obligation to advise the other parent of any matters of a significant nature affecting the children;

   c.    the custodial parent will have the obligation to discuss with the other parent any significant decisions which have to be made concerning the children, including significant decisions concerning the health (except emergency decisions), education, religious instruction and general welfare of the children;

   d.    the parent who does not have custody will have the obligation to discuss the foregoing issues with the custodial parent and each parent shall have the obligation to try to reach agreement on those major decisions;

   e.    in the event that the parents cannot reach agreement with respect to any major decision despite their best efforts the custodial parent shall have the right to make such decision;

    f.    the non-custodial parent shall have the right, under s. 32 of the *Family Relations Act*, to seek a review of any decision which that parent considers contrary to the best interests of the children;

    g.    each parent will have the right to obtain information concerning the children directly from third parties, including teachers, counsellors, medical professionals and third party care givers;

    h.    both parents may take the children out of British Columbia or Canada on vacation, for reasonable periods of time, and on reasonable notice to each other, and both parents will sign and provide to each other such written consents to travel that are required from time to time.

4.    The Defendant shall have reasonable access to the children, including, but not limited to, alternate weekends.

5.    The Defendant Anmi Tepper ( Payor) shall pay to the Plaintiff, Inessa Tepper, ( Recipient) the sum of $4,000 per month, for the support of the two children of the marriage, Adelle Tepper born July 22, 1993, and Michelle Tepper, born April 15, 1998, commencing December 01st 2002, and payable as long as the children are children of the marriage, pursuant to the Divorce Act (Canada) RSC 1985.

6.    The Defendant, Anmi Tepper, the payor, shall provide medical and dental insurance coverage for the children for so long as it is available to him through his employment,

7.    The Defendant shall provide medical and dental insurance coverage for the Plaintiff for so long as it is available to him through his employment.

8.    Any claim which either the Plaintiff or Defendant may have against each other for interim or permanent spousal support or maintenance, pursuant to the Divorce Act ( Canada) RSC1985, or the Family Relations Act, RSBC c. 128 is dismissed as if heard upon the merits at trial.

9.    The Queens Avenue home ( now in process for sub-division) and hereinafter referred to as Queens Ave, located at 2095 Queens Avenue, West Vancouver, British Columbia, and being more particularly known and described as

PID 009-182-942

3

Lot G, except part of Highway Plan 99, District Lot 1091, Plan 11018

shall continue to be listed for sale with the parties having joint conduct of sale.

10. The Defendant shall be solely responsible for satisfying the Line of Credit secured by Queens Ave, estimated to be $260,000, and must apply any proceeds from his share of the sale proceeds of Queens Avenue to retire that debt as set out in this order and paragraph 13 herein.

11. The Defendant and the Plaintiff shall be equally responsible for satisfying the amount of $200,000 of the Royal Bank of Canada Mortgage registered against Queens Ave, and the Plaintiff and Defendant must each apply $100,000 of their respective proceeds of sale from Queens Ave, to retire that portion of the mortgage as set out in the order herein and paragraph 13 herein.

12. The Defendant shall be solely responsible for satisfying the balance required to discharge the mortgage with Royal Bank of Canada, and the Defendant must apply proceeds from his share of the sale proceeds of Queens Avenue to retire this portion of that debt as set out in the order herein and paragraph 13 herein.

13. The Plaintiff and Defendant will pay the following expenses from the proceeds of sale of Queens Avenue:

a) the real estate's agent's commission;

b) adjustments for taxes, utilities, municipal fees, or levies;

c) legal fees and disbursements in relation to the sale of the property;

d) all other adjustments on sale;

and the balance of the proceeds ( the "Sale Proceeds") will be divided equally between the parties and applied as follows:

e) the sum of $100,000 ( one hundred thousand dollars) shall be paid from the Plaintiff's one-half portion of the proceeds of sale  and  applied to discharge the Royal Bank of Canada mortgage registered against the Queens Ave, and the remainder of the Plaintiff's portion of the Sale Proceeds shall be paid out to the Plaintiff.

f)    the balance of the sum required to discharge the Royal Bank of Canada mortgage shall be paid from the Defendant's one-half portion of the Sale Proceeds, and applied to discharge the balance of mortgage with the Royal Bank of Canada;

g)    the sum required to discharge the Line of Credit with the Royal Bank of Canada, secured by Queens Ave , shall be paid from the Defendant's half of the Sale Proceeds, and the Royal Bank Line of Credit shall be discharged and closed.

h)    In the event that the Defendant's one-half portion of the proceeds of sale is not sufficient to discharge the Royal Bank Mortgage and Royal Bank Line of Credit set out herein at 13 (f) and (g) and paragraphs 10,11 and 12 after the application of the Plaintiff's $100,000 contribution in paragraph 13 (e), the Defendant will pay the balance owing from his own funds in order to discharge the Royal Bank Mortgage and Royal Bank Line of Credit and deliver clear title to the purchaser.

14.    In the event that Queens Ave is in fact subdivided and sold as two separate lots, the proceeds of sale from either lot shall be divided between the parties as set out in clauses 10, 11, 12 and 13 herein. If there are insufficient funds to discharge the financial obligations from the proceeds of sale of the first lot sold, then the parties will endeavour to obtain a partial discharge of the financial encumbrances upon sale of the first lot. If there are insufficient funds to obtain a partial discharge upon the sale of the first lot sold, then the Defendant will pay the balance owing from his own funds in order to discharge the Royal Bank Mortgage and Royal Bank Line of Credit and deliver clear title to the purchaser. If there are insufficient funds to discharge the obligations as set out in paragraphs,10,11, 12 and 13 herein after the second lot is sold, then it shall be the responsibility of the Defendant to pay the balance owing from his own funds in order to discharge the Royal Bank Mortgage and Royal Bank Line of Credit and deliver clear title to the purchaser.

15.    The household contents of Queens Ave will be divided equally between the Plaintiff and the Defendant.

16.    The Plaintiff shall retain the following assets for her sole use absolutely free and clear from any claims by the Defendant :

a.    Her entire interest in Peristroika Products;

b.    Her entire interest in 602565 BC Ltd.;

    c.     RRSP currently in her sole name;

    d.     Her personal jewellery;

    e.     Life insurance Policy on her life;

    f.     One half of the household chattels and goods;

    g.     Her Canada Pension Plan.

17.    The Defendant will provide the Plaintiff with a motor vehicle equivalent in value to $30,000 on or before the closing date of the sale of Queens Ave or alternatively provide her with the sum of $30,000 from his portion of the proceeds of sale from Queens Ave and will execute an authority to pay to this effect. The Defendant will continue to lease the current vehicle provided to the Plaintiff until ownership of the vehicle is transferred into the Plaintiff's name, or the Defendant provides the Plaintiff with the sum of $30,000.

18    The Defendant shall pay to the Defendant's father Simon Tsemakhovich the sum of $35,000 from his share of the net proceeds of sale of Queens Ave, and shall execute an authority to pay to this effect, and the Plaintiff shall pay to Simon Tsemakhovich the sum of $43,000 from her share of the net proceeds of sale of Queens Ave. and will execute an authority to pay to this effect.

19.    The Defendant shall retain the following assets for his sole use absolutely free and clear from any claims by the Plaintiff :

    a.    His entire interest in Sea to Sky Ford Sales Ltd.;

    b.    His entire interest in Amiable Industries Inc.

    c.    His entire interest in Empty Holdings Ltd.;

    d.    His entire interest in Digital Capital Inc. and Mobile Capital Inc.

    e.    RRSP currently registered in his sole name;

    f.    His personal jewellery;

    g.    One half of the household chattels and goods;

    h.    Royal Vancouver Yacht Club Membership;

    i.    Life Insurance Policy on his life;

j.     His Canada Pension Plan;

k.    His interest in Tepper Hotels Ltd.

20.    The Defendant shall be solely responsible for the following debts, and the Defendant shall save the Plaintiff harmless and indemnify her from any liabilities relating to these debts

a.    Any amount over her $100,000 portion owing on the Royal Bank Mortgage referred to in paragraph 12 herein.

b.    The total amount owing on the Royal Bank Line of Credit secured by Queens Avenue;

c.    Any income tax liabilities, penalties, assessments or re-assessments, GST, source deductions or claims outstanding including but not limited to capital gains tax on the sale of personal or corporate assets owned or controlled by the Defendant,  or arising out of corporations owned or controlled by the Defendant, including Amiable Industries Inc. Empty Holdings Ltd. and Sea to Sky Ford Sales Ltd, or personal income taxes of the Plaintiff in relation to income received from the aforesaid companies.

d.    credit card balances in his name.

e.    his portion of the debt owing to Simon Tsemakovich .

21.    Any other debts and/or liabilities not specifically referred to herein shall be the sole responsibility of the person who neglected to include that debt and/or liability herein and that person shall save the other harmless and indemnify him or her from those debts owing and/or liabilities.

22.    Either the Plaintiff or the Defendant   may   have liberty to apply to the Supreme Court of British Columbia   for further direction with regard to selling the Queens Avenue home as set in paragraph 9 herein, and with regard to the discharge of liabilities as set out in paragraphs  10, 11, 12,  13 14 and 18, herein, including the right  of either party to ask the Supreme Court for sole conduct of sale of Queens Avenue.

23.    Any other asset not specifically referred to herein shall remain the sole property of the party who is in possession of that asset.

7

24.     The parties shall bear their own costs of these proceedings.

25.     Except for the granting of a divorce order, or any action required to enforce, give effect to, or clarify the terms of this court order, the balance of the relief claimed in the statement of claim is dismissed.

26.     Either party is at liberty to apply to the Court for further direction regarding the enforcement, efficacy, or clarification of the Order herein.

BY THE COURT

BY THE COURT

BURNYEAT, J.

DEPUTY DISTRICT REGISTRAR

CONSENTED TO:

Sandra L. Polinsky
Solicitor for the Plaintiff

Howard Rubin
Solicitor for the Defendant

ENTERED

VANCOUVER REGISTRY
VOL D321 FOL 127

8

# EXHIBIT C

07/21/2003 10:33 FAX 604 8    3          SEA TO SKY FORD                                    Ø001
Jul 14 03 12:59p    S...ER                        000-b...                          P.1

# CONTRACT OF PURCHASE AND

**REAL ESTATE BOARD**
OF GREATER VANCOUVER



PAGE 1 of __3__ PAGES

PREPARED BY: _____ DATE: __July__ , 2003

ADDRESS: _____ (AGENCY - PLEASE PRINT) _____ PC: _____ PHONE: _____

PER: _____ MLS# No.: _____

| SELLER: Inessa Tepper | BUYER: Ammi Tepper |
|---|---|
| SELLER: | BUYER: |
| ADDRESS: 4469 Arbutus Street | ADDRESS: 2095 Queens Avenue |
| Vancouver, BC, | West Vancouver, BC |
| PC: V7V 2X8 | PC: V7V 2X8 |
| PHONE: | PHONE: |
| RESIDENT OF CANADA ☒   NON-RESIDENT OF CANADA ☐ as defined under the *Income Tax Act.* | OCCUPATION: |

PROPERTY: Address: __2095 Queens Avenue__  Municipality: __West Vancouver__ PC: __V7V 2X8__

Legal Description: **Balance of Lot G, Except part of Highway Plan 99, District Lot 1091 Plan 11018**  (Property) PID# __009-182-942__

The Buyer agrees to purchase the Property from the Seller on the following terms and subject to the following conditions:

1. **PURCHASE PRICE:** The purchase price of the Property will be __two hundred & five thousand dollars and such further sum as set out in addendum one__ DOLLARS $ _____ (Purchase Price)

2. **DEPOSIT:** A deposit of $ __1.00__ _____ which will form part of the Purchase Price, will be paid on the following terms:

All monies paid pursuant to this section (Deposit) will be delivered in trust to __the seller's lawyer__ and held in trust in accordance with the provisions of the *Real Estate Act.* In the event the Buyer fails to pay the Deposit as required by this Contract, the Seller may, at the Sellers option, terminate this Contract. The party who receives the Deposit is authorized to pay all or any portion of the Deposit to the Buyer's or Seller's conveyancer (the "Conveyancer") without further written direction of the Buyer or Seller, provided that: (a) the Conveyancer is a Lawyer or Notary; (b) such money is to be held in trust by the Conveyancer as stakeholder pursuant to the provisions of the *Real Estate Act* pending the completion of the transaction and not on behalf of any of the principals to the transaction; and (c) if the sale does not complete the money should be returned to such party as stakeholder or paid into Court.

3. **TERMS AND CONDITIONS:** The purchase and sale of the Property includes the following terms and is subject to the following conditions:

   1. That the balance of the property is subdivided from Lot G and capable of being transmitted.
   2. That the prior transfer of a portion of the property is completed on August 28/2003.

Each condition, if so indicated, is for the sole benefit of the party indicated. Unless each condition is waived or declared fulfilled by written notice given by the benefiting party to the other party on or before the date specified for each condition, this Contract will be terminated thereupon and the Deposit returnable in accordance with the *Real Estate Act.*

4. **COMPLETION:** The sale will be completed on or before __September 5, 2003__ , yr. _____ (Completion Date) at the appropriate Land Title Office.

5. **POSSESSION:** The Buyer will have vacant possession of the Property at 12 noon __September 5, 2003__ , yr. _____ (Possession Date)
OR, subject to the following existing tenancies, if any:

6. **ADJUSTMENTS:** The Buyer will assume and pay all taxes, rates, local improvement assessments, fuel, utilities and other charges from, and including, the date set for adjustments, and all adjustments both incoming and outgoing of whatsoever nature will be made as __September 5, 2003__ , yr. _____ (Adjustment Date)

7. **INCLUDED ITEMS:** The Purchase Price includes any buildings, improvements, fixtures, appurtenances and attachments thereto, and all blinds, awnings, screen doors and windows, curtain rods, tracks and valances, fixed mirrors, fixed carpeting, electric, plumbing, heating and air conditioning fixtures and all appurtenances and attachments thereto as viewed by the Buyer at the date of inspection, INCLUDING:

N/A

BUT EXCLUDING:

8. **VIEWED:** The Property and all included items will be in substantially the same condition at the Possession Date as when viewed by the Buyer on _____ , yr. _____         N/A

A035 - REV. MAR/00          COPYRIGHT - BC REAL ESTATE ASSOCIATION AND CANADIAN BAR ASSOCIATION (BC BRANCH)
Printed using WaveForms By Viper Software Inc.

07/21/2003 10:33 FAX 804 8   3   SEA TO SKY FORD          ☒002
Jul 14 03 01:00p   SENDER     000-00        p.2

PAGE 2 of **3** PAGES

RE: PROPERTY ADDRESS balance of 2095 Queens Avenue, West Vancouver, BC

9. **TITLE:** Free and clear of all encumbrances except subsisting conditions, provisos, restrictions, exceptions and reservations, including royalties, contained in the original grant or contained in any other grant or disposition from the Crown, registered or pending restrictive covenants and rights-of-way in favour of utilities and public authorities, existing tenancies set out in Clause 5, if any, and except as otherwise set out herein.

10. **TENDER:** Tender or payment of monies by the Buyer to the Seller will be by certified cheque, bank draft, cash or Lawyer's/Notary's trust cheque.

11. **DOCUMENTS:** All documents required to give effect to this Contract will be delivered in registrable form where necessary and will be lodged for registration in the appropriate Land Title Office on or before the Completion Date.

12. **TIME:** Time will be of the essence hereof, and unless the balance of the cash payment is paid and such formal agreement to pay the balance as may be necessary is entered into on or before the Completion Date, the Seller may, at the Seller's option, terminate this Contract, and, in such event, the amount paid by the Buyer will be absolutely forfeited to the Seller in accordance with the Real Estate Act, on account of damages, without prejudice to the Seller's other remedies.

13. **BUYER FINANCING:** If the Buyer is relying upon a new mortgage to finance the Purchase Price, the Buyer, while still required to pay the Purchase Price on the Completion Date, may wait to pay the Purchase Price to the Seller until after the transfer and new mortgage documents have been lodged for registration in the appropriate Land Title Office, but only if, before such lodging, the Buyer has: (a) made available for tender to the Seller that portion of the Purchase Price not secured by the new mortgage, and (b) fulfilled all the new mortgagee's conditions for funding except lodging the mortgage for registration, and (c) made available to the Seller, a Lawyer's or Notary's undertaking to pay the Purchase Price upon the lodging of the transfer and new mortgage documents and the advance by the mortgagee of the mortgage proceeds.

14. **CLEARING TITLE:** If the Seller has existing financial charges to be cleared from title, the Seller, while still required to clear such charges, may wait to pay and discharge existing financial charges until immediately after receipt of the Purchase Price, but in this event, the Buyer may pay the Purchase Price to a Lawyer or Notary in trust, on the CBA (Real Property Section) standard undertakings to pay out and discharge the financial charges, and remit the balance, if any, to the Seller.

15. **COSTS:** The Buyer will bear all costs of the conveyance and, if applicable, any costs related to arranging a mortgage and the Seller will bear all costs of clearing title.

16. **RISK:** All buildings on the Property and all other items included in the purchase and sale will be, and remain, at the risk of the Seller until 12:01 a.m. on the Completion Date. After that time, the Property and all included items will be at the risk of the Buyer.

17. **PLURAL:** In this Contract, any reference to a party includes that party's heirs, executors, administrators, successors and assigns; singular includes plural and masculine includes feminine.

18. **REPRESENTATIONS & WARRANTIES:** There are no representations, warranties, guarantees, promises or agreements other than those set out in this Contract and the representations contained in the Property Disclosure Statement if incorporated into and forming part of this Contract, all of which will survive the completion of the sale.

19. **AGENCY DISCLOSURE:** The Seller and the Buyer acknowledge having received, read and understood the brochure published by the British Columbia Real Estate Association entitled Working With a Real Estate Agent and acknowledge and confirm as follows:

(a) the Seller has an Agency relationship with   N/A

          AGENT        and       SALESPERSON

          ADDRESS

(b) the Buyer has an Agency relationship with   N/A

          AGENT        and       SALESPERSON

(c) the Buyer and the Seller have consented to a Limited Dual Agency relationship with

        and  N/A

  AGENT       SALESPERSON       SALESPERSON

having signed a Limited Dual Agency agreement dated

If only (a) has been completed, the Buyer is acknowledging no agency relationship. If only (b) has been completed, the Seller is acknowledging no agency

20. **THIS IS A LEGAL DOCUMENT. SEE INFORMATION PAGE. READ THIS ENTIRE DOCUMENT BEFORE YOU SIGN.**

21. **OFFER:** This offer, or counter-offer, will be open for acceptance until    o'clock    m. on    , yr.    and upon acceptance of the offer, or counter-offer, by accepting in writing and notifying the other party of such acceptance, there will be a binding Contract of Purchase and Sale on the terms and conditions set forth.

X_____    _____    ●    _____
(WITNESS)           (BUYER)           SEAL    (PRINT NAME)

X_____    _____    ●    _____
(WITNESS)           (BUYER)           SEAL    (PRINT NAME)

22. **ACCEPTANCE:** The Seller (a) hereby accepts the above offer and agrees to complete the sale upon the terms and conditions set out above, (b) agrees to pay a commission as per the Listing Contract, and (c) authorizes and instructs the Buyer and anyone acting on behalf of the Buyer or Seller to pay the commission out of the cash proceeds of sale and forward copies of the Seller's Statement of Adjustments to the Cooperating/Listing Agent, as requested, forthwith after Seller's acceptance is dated July 14 2003

X_____    _____    ●   SEAL   (PRINT NAME) Nessa Tepper
(WITNESS)           (SELLER)

X_____    _____    ●   SEAL   (PRINT NAME) Tepper
(WITNESS)           (SELLER)

FOR INTERNAL USE ONLY

INITIALS

A035 - REV. JAN/00       COPYRIGHT - BC REAL ESTATE ASSOCIATION AND CANADIAN BAR ASSOCIATION (BC BRANCH)
                       Printed using WaveForms by Viper Software Inc.

# EXHIBIT D

# Jack A. Adelaar Law Corporation

*Suite 1700 Nelson Square, Box 12177 - 808 Nelson Street, Vancouver, British Columbia, V6Z 2H2*
*Telephone (604) 687-8840                    Facsimile (604) 685-8993*

September 22, 2003

**Inessa Tepper**
1939 Drummond Drive
Vancouver, BC
V6T 1B7

Dear Mrs. Tepper:

**Re:  Sale of Remainder 2095 Queens Avenue - West Vancouver, BC**

I an pleased to advise that the Form A-Transfer in this matter was filed for registration in New Westminster Land Title Office on September 15, 2003 under No. BV374873.

I received a cheque in the amount of $260,270.53 from the purchaser's lawyer which I have disbursed to your instructions.  I am enclosing my account as well as a Statement of Trust Monies which I trust sets out the financial transaction that took place surrounding the sale of your interest in 2095 Queens Avenue, West Vancouver, British Columbia.

I am pleased to have been of service to you in this matter and look forward to being of service to you in other matters.

Yours truly,

Jack A. Adelaar Law Corporation

per:

Jack A. Adelaar

JAA:cl

Enclosures

# EXHIBIT E

MAR-22-2004  16:39      VERITASLAW                                    P.02/04

### Porritt & Company
### Barristers & Solicitors
### 1548 Marine Drive
### West Vancouver, BC  V7V 1H8

## Seller's Statement Of Adjustments

**Seller:**  602565 B.C. LTD. and THE DENGIN REALTY SUB TRUST

**Buyer:**  PCORP HOLDINGS LTD.

**Re:**  1621 St. Georges Street, North Vancouver, BC (Civic Address: 1621 St. Georges Street, North Vancouver, BC)

**File Number:**  04-049

**Completion Date:**  March 1, 2004          **Adjustment Date:**  March 1, 2004

|  | DEBIT | CREDIT |
|---|---|---|
| Price of 1621 St. Georges Street, North Vancouver, BC |  | $1,362,500.00 |
| Price of shares of 602565 British Columbia Ltd. |  | $1.00 |
| Amount of Commission Due to Goddard & Smith International Realty Inc. (including GST) | $36,112.50 |  |
| Excess deposit held by Selling Agent to be paid directly to Seller | $13,887.50 |  |
| Seller's Portion of Current Year's Taxes to be Paid by Buyer Based on Last Year's Taxes Plus 5% |  |  |
| $6,428.33  - $0.00 =   $6,428.33   60 / 366  days | $1,053.82 |  |
| Damage Deposits held by Seller | $5,555.00 |  |
| Interest on Damage Deposits (see schedule attached) | $ 22.64 |  |
| Buyer's Portion of 2004 Utilities Paid by Seller |  |  |
| $3965.00    306 / .366  days |  | $3,315.00 |
| Mortgage Assumption Amount including assumption fee of $500.00 | $509,316.92 |  |
| ½ of Insurance Premium paid by Seller |  | $1,393.00 |
| Subtotals | $565,948.38 | $1,367,209.00 |
| Balance Payable to Seller's Solicitor/Notary Public Upon Completion of Registration | $801,260.62 |  |
| Totals | $1,367,209.00 | $1,367,209.00 |

SIMPLY CONVEY                                                        E & O E

# EXHIBIT F

## STATEMENT OF TRUST MONIES
### No. 9614

| | |
|---|---:|
| Received from Porrit & Co. | $801,160.62 |
| Received from Goddard & Smith | 13,887.50 |
| Sub-Total | $815,148.12 |
| | |
| Paid to Dengin Family Trust | $450,000.00 |
| Paid to Inessa Tepper | 140,000.00 |
| Paid to George Dengin | 206,157.62 |
| Paid to Peoples Trust Company | 5,103.00 |
| Paid to George Dengin | 9,000.00 |
| Paid to BC Hydro | 69.24 |
| Paid to Terasen Gas | 1,013.17 |
| Paid to George Dengin  *VISA Reimbursement* | 1,391.48 |
| Paid to Jack A. Adelaar Law Corporation | 2,054.85 |
| | |
| Sub-Total | $358.76 |

*Only thing owing is Hilton*

*I think*

# EXHIBIT G

| IA CODE | G E L E | PREFERRED LANGUAGE ☒ ENGLISH ☐ FRENCH ☐ | **NEW CLIENT APPLICATION FORM** |
|---|---|---|---|

☒ NEW ACCOUNT   ☐ UPDATE ACCOUNT   ☐ IA CHANGE     ① ALL QUESTIONS ON THIS PAGE MUST BE COMPLETED

ACCOUNT NUMBER   *98A 31 66 A/B*

**Account Type(s) Requested**

| ☒ CDN CASH | ☐ CDN MARGIN | ☐ CDN SHORT | ☐ CDN OPTION | ☐ LIRA | ☐ SPOUSAL RRSP | ☐ RRIF |
| ☒ US CASH | ☐ US MARGIN | ☐ US SHORT | ☐ US OPTION | ☐ LIF | ☒ RRSP | |

**ACCOUNT INFORMATION**

②

ACCOUNT HOLDER   MR. (MS.) OR   FIRST *Tnessa*   LAST *Tapp??*   SOCIAL INSURANCE NO.
PLEASE PRINT NAME IN FULL   MRS. MISS

CO-ACCOUNT HOLDER   MR. MS. OR   FIRST   LAST   SOCIAL INSURANCE NO.
PLEASE PRINT NAME IN FULL   MRS. MISS

If co-account holder is not the account holder's spouse please submit Second Party Account Supplement with this form.

Account Holder's Residence Address *(Mandatory)*   *1939 Drummond Dr*   Suite, No.   Home Telephone *(604) 737 2446*

City *Vancouver*   Province *BC*   Postal Code *V6T 1B7*   Cellular/MOBILE *(604) 805 4712*

Alternate Address / Company Name

Street No. and Name   Suite No.   Business Telephone ( )

City   Province   Postal Code   Fax ( )

Mail To: ☐ Residence   or   ☐ Alternate Address   E-mail Address

③ **Information Required by Securities Regulators**

**ACCOUNT HOLDER PROFILE** ☐ Single ☒ Married ☐ Divorced ☐ Separated ☐ Widowed   **SPOUSAL PROFILE**

| Date of Birth *4 17 69* | Country of Residence *CDN* | Citizenship | Name of Spouse *GEORGE Deepa?* |

Employer Name and Address *Sell (Perestroika Products) Food*   Type of Business   Date of Birth *Oct 31/54*   Country of Residence *CANADA*   Citizenship

Occupation *Partner*   Years with Employer *10+*   Employer *Self*   Type of Business *Business*

Approximate Annual Income From All Sources *40,000 (fluctuates)*   Occupation *Businessmen*   Years with Employer *4yr*

| ESTIMATED NET LIQUID ASSETS *720,000* (Cash and securities less loans outstanding against securities) | ESTIMATED NET FIXED ASSETS *1 mil* (Fixed assets less liabilities outstanding against fixed assets) | ESTIMATED TOTAL NET WORTH *1 mil* | Approximate Annual Income From All Sources *75000 plus (fluctuates)* |

Number of Dependents

**Bank Reference**

Bank Name *Royal*   Branch *05 400 - 063*   Account Number *501 0064*

Are you a senior officer or director of a company whose shares are traded on an exchange or over the counter? If so please specify the issuer.   *No*

Do you, alone or as part of a group, hold or control any such company? If so, please specify.   *No*

Have you authorized anyone to use discretion in handling your account?   ☒ NO   ☐ YES   If yes, please complete Discretionary Agreement

Does anyone other than the persons named on the account:

(a) have any authority over the account?   ☒ NO   ☐ YES   If yes, state name and include Second Party Account Supplement and Trading Authorization

(b) have any financial interest in the account?   ☒ NO   ☐ YES   If yes, state name and include Second Party Account Supplement and Trading Authorization

(c) guarantee this account?   ☒ NO   ☐ YES   If yes, state name and include Guarantee/Guarantor Agreement

Does the Investment Adviser have a direct or indirect interest in the account other than an interest in commissions?   ☒ NO   ☐ YES   If yes, give details

Are you or your spouse an Employee, Director, Partner or Officer of a securities dealer, or of a stock exchange itself or of the I.D.A.   ☒ NO   ☐ YES   If yes, give details

Do you trade or intend to trade with other investment firms?   ☒ NO   ☐ YES   If yes, give name(s) of firm(s)   *Scott RBC(??) Rosen??*

Do you have any other accounts with   ☐ NO   ☒ YES   Account Number(s)

**Investment Knowledge** (See Guidelines on Reverse)   Sophisticated ☒   Good ☐   Fair ☐   Poor/Nil ☐

Comments

It is the express intention of the undersigned that ownership of this account be vested as: CHECK ONE

## (4) JOINT ACCOUNT AGREEMENT

☐ **Joint Tenants with Rights of Survivorship and not as tenants in common.** (Applicable only to those persons residing and domiciled in jurisdictions permitting beneficiary designations other than WILL) In the event of the death of either or any of the undersigned, the entire interest in the joint account shall be vested in the survivor or survivors on the same terms and conditions as therefore held without in any manner releasing the undersigned or their estates from the liability provided for in the Terms and Conditions Governing Joint Account.

☐ **Tenants in Common.** In the event of the death of either or any of the undersigned, the interest in the tenancy as of the close of business on the date of death of the decedent (or on the following business day if the date of death is not a business day) shall be equal unless otherwise specified immediately below.

If the interests are NOT to be equal, please designate the percentage interest of each tenant.

NAME OF PARTICIPANT ON HIS OR HER ESTATE _____ %     NAME OF PARTICIPANT OR HIS OR HER ESTATE _____ %

But any taxes, costs, expenses or other charges becoming a lien against or payable out of the account as the result of the death of the decedent, or through exercise by his or her estate or creditor of any rights in the account shall, so far as possible, be deducted from the interest of such decedent. This provision shall not release the decedent's estate from the liability provided for in the Terms and Conditions Governing Joint Accounts. Each of the undersigned hereby acknowledges that he/she has received the Joint Account Agreement containing the Terms and Conditions Governing Joint Accounts they have read and understand all of the terms and conditions contained in such Joint Account Agreement and they hereby agree to be bound by all such Terms and Conditions.

## (5) REQUEST FOR MARGIN

The undersigned requests that a Margin Account be opened and agrees to the terms of the Client Account Agreement on the reverse side. It is also understood that a Margin Account involves the borrowing of money for account transactions.

X _____ Date _____     X _____ Date _____
Signed (only if Margin Account Requested)              Signed (only if Margin Account Requested)

## (6) NATIONAL INSTRUMENT 54-101                    CLIENT RESPONSE FORM

To: _____

Account Number: _____

I have read and understand the explanation to clients that you have provided me in connection with this form and the choices indicated by me apply to all of the securities held in the above account(s).

**PART 1 - DISCLOSURE OF BENEFICIAL OWNERSHIP INFORMATION**
Please initial the corresponding box to show whether you DO NOT OBJECT or OBJECT to us disclosing your name, address, electronic mail address, securities holdings and preferred language of communication (English or French) to issuers of securities you hold with us and to other persons or companies in accordance with securities law.

☐ I DO NOT OBJECT TO YOU DISCLOSING THE INFORMATION DESCRIBED ABOVE.

☒ I OBJECT TO YOU DISCLOSING THE INFORMATION DESCRIBED ABOVE.

**PART 2. RECEIVING SECURITYHOLDER MATERIALS**
Please initial the corresponding box to show whether you WANT to receive ALL materials sent to beneficial owners of securities or whether you DECLINE to receive all of the following materials:
(a) proxy-related materials for meetings at which only "routine business" is to be conducted;
(b) annual reports and financial statements that are not part of proxy-related materials; and
(c) materials sent to securityholders that are not required by corporate or securities law to be sent.

☒ I WANT TO RECEIVE ALL SECURITYHOLDER MATERIALS SENT TO BENEFICIAL OWNERS OF SECURITIES.

☐ I DECLINE TO RECEIVE ALL OF THE FOLLOWING MATERIALS: (A) PROXY-RELATED MATERIALS THAT ARE SENT IN CONNECTION WITH A SECURITYHOLDER MEETING AT WHICH ONLY "ROUTINE BUSINESS" IS TO BE CONDUCTED; (B) ANNUAL REPORTS AND FINANCIAL STATEMENTS THAT ARE NOT PART OF PROXY-RELATED MATERIALS; AND (C) MATERIALS SENT TO SECURITYHOLDERS THAT ARE NOT REQUIRED BY CORPORATE OR SECURITIES LAW TO BE SENT, (EVEN IF I DECLINE TO.

**RECEIVE THESE TYPES OF MATERIALS, I UNDERSTAND THAT A REPORTING ISSUER OR OTHER PERSON OR COMPANY IS ENTITLED TO SEND THESE MATERIALS TO ME AT ITS EXPENSE.)**
(Note: These instructions do not apply to any specific request you give or may have given to a reporting issuer concerning the sending of interim financial statements of the reporting issuer.)

**PART 3 PREFERRED LANGUAGE OF COMMUNICATION**
Please initial the corresponding box to show your preferred language of communication.

☐ English     ☐ French

I understand that the materials I receive will be in my preferred language of communication if materials are available in that language.

DATE: _Jan 26, 2004_
PRINT NAME: _INESSA TEPPER_
SIGNATURE: _____
E-MAIL ADDRESS: _____

Notes:
* "Routine business" means (i) consideration of the minutes of an earlier meeting, (ii) consideration of the financial statements of the reporting issuer or its auditors' report on such financial statements of the reporting issuer, (iii) election of directors at the reporting issuer, (iv) the setting or changing of number of directors to be elected within a range permitted by company law if no change to a constating documents of the reporting issuer is required in connection with such action, (v) reappointment of an incumbent auditor of the reporting issuer.
* This would include financial statements and annual reports that are proxy-related materials.

## (7) SIGNATURE / VERIFICATION SECTION                    CLIENT ACCOUNT AGREEMENT

I/We, the undersigned certify that the information provided in this application is true and complete and the INTRODUCING BROKER may rely thereon until the undersigned sends written notice of any significant changes. I/We further acknowledge that I/we have received the Client Account Agreement and agree to the terms and conditions set therein. The undersigned requests that the indicated Account opened and agrees to the terms of the Client Account Agreement on the reverse side. It is also understood that a Margin Account involves the borrowing of money for account transactions.

Pursuant to the implementation by the Federal Government of the Proceeds of Crime (Money Laundering) Act (Bill C-9) as of March 28, 1993 we are obligated to verify the signature of any person(s) involved with an account. This includes any individual authorized to give instructions in respect of an account.

Acceptable verification includes a valid driver's license, passport, cheque drawn on client bank account, or a notarized copy of the individual's signature. Unacceptable forms of verification include credit cards, social insurance cards, bank cards and health cards.

To comply with tax treaty rules with the United States Internal Revenue Service (IRS), a photocopy of a driver's license or passport must be included with this application.

| ACCOUNT HOLDER'S NAME (PLEASE PRINT) | JOINT ACCOUNT HOLDER'S NAME (PLEASE PRINT) |
|---|---|
| _INESSA TEPPER_ | |

| DATE | ACCOUNT HOLDER'S SIGNATURE | DATE | JOINT ACCOUNT HOLDER'S SIGNATURE |
|---|---|---|---|
| _Jan 20/2004_ | X _____ | | X |

| VERIFIED AGAINST | NUMBER | VERIFIED BY I.A. | VERIFIED AGAINST | NUMBER | VERIFIED BY |
|---|---|---|---|---|---|
| ☐ PASSPORT | | | ☐ PASSPORT | | |
| ☐ DRIVER'S LICENSE | | | ☐ DRIVER'S LICENSE | | |

## PLEASE DO NOT WRITE BELOW THIS LINE                    INVESTMENT ADVISOR USE ONLY

| How long have you known the client? | _2 YR_ | Have you met the client face to face? | ☒ YES ☐ NO | Is I.A. registered in province in which client resides? | ☒ YES ☐ NO |
|---|---|---|---|---|---|
| CREDIT BUREAU CHECK name of agency | | Bank Reference Verified | ☐ YES ☒ NO | Person Contacted | |

| ON HAND | BEING OBTAINED | ON HAND | BEING OBTAINED | ON HAND | BEING OBTAINED |
|---|---|---|---|---|---|
| ☐ ☐ CORPORATE RESOLUTION | _RISK_ | ☐ ☐ INDEMNITY AGREEMENT | _Bank transfer_ | ☐ ☐ REGISTERED PLAN | |
| ☐ ☐ OPTION AGREEMENT | _W/O BEN_ | ☐ ☐ PROBATED WILL | _cash transfer_ | ☐ ☐ TRADING AUTHORIZATION | |
| ☐ ☐ GUARANTEE | _TREATY_ | ☐ ☐ TRUST DOCUMENTS | | ☐ ☒ OTHER (PLEASE SPECIFY) | |

| I.A. COMMENTS | | I.A. SIGNATURE | | DATE |
|---|---|---|---|---|
| _AWARE OF RISKS_ | _ID Pending_ | _____ | | _Jan 20/04_ |

| BRANCH MANAGER APPROVAL | DATE | COMPLIANCE DEPARTMENT APPROVAL | DATE |
|---|---|---|---|

## NATIONAL INSTRUMENT 54-101

### COMMUNICATION WITH BENEFICIAL OWNERS OF SECURITIES OF A REPORTING ISSUER FORM

### EXPLANATION TO CLIENTS

Based on your instructions, the securities in your account with us are not registered in your name but in our name or the name of another person or company holding your securities on our behalf. The issuers of the securities in your account may not know the identity of the beneficial owner of these securities.

We are required under securities law to obtain your instructions concerning various matters relating to your holding of securities in your account.

**Disclosure of Beneficial Ownership Information**

Securities law permits reporting issuers and other persons and companies to send materials related to the affairs of the reporting issuer directly to beneficial owners of the reporting issuer's securities if the beneficial owner does not object to having information about it disclosed to the reporting issuer or other persons and companies. Part 1 (Section 6) of the client response form allows you to tell us if you OBJECT to the disclosure by us to the reporting issuer or other persons or companies of your beneficial ownership information, consisting of your name, address, electronic mail address, securities holdings and preferred language of communication. Securities legislation restricts the use of your beneficial ownership information to matters relating to the affairs of the reporting issuer.

If you DO NOT OBJECT to the disclosure of your beneficial ownership information, please initial the first box on Part 1 (Section 6) of the form. In those circumstances, you will not be charged with any costs associated with sending securityholder materials to you.

If you OBJECT to the disclosure of your beneficial ownership information by us, please initial the second box in Part 1 (Section 6) of the form. If you do this, all materials to be delivered to you as a beneficial owner of securities will be delivered to us. There may be costs associated with this mailing that will be charged to your account.

**Receiving Securityholder Materials**

For securities that you hold through your account, you have the right to receive proxy-related materials sent by reporting issuers to registered holders of their securities in connection with meetings of such securityholders. Among other things, this permits you to receive the necessary information to allow you to have your securities voted in accordance with your instructions at a securityholder meeting. Objecting beneficial owners will not receive materials unless they or the relevant issuers bear the costs.

In addition, reporting issuers may choose to send other securityholder materials to beneficial owners, although they are not obliged to do so.

Securities law permits you to decline to receive three types of securityholder materials. Securities law does not provide for you to decline to receive other types of securityholder materials. The three types of material that you may decline to receive are:

(a) proxy-related materials, including annual reports and financial statements, that are sent in connection with a securityholder meeting at which only 'routine business' is to be conducted;

(b) annual reports and financial statements that are not part of proxy-related materials; and

(c) materials that a reporting issuer or other person or company sends to securityholders that are not required by corporate or securities law to be sent to registered securityholders.

Part 2 of the client response form allows you to receive all materials sent to beneficial owners of securities or to decline to receive the three types of materials referred to above.

If you want to receive ALL materials that are sent to beneficial owners of securities, please initial the first box on Part 2 of the client response form. If you want to DECLINE to receive the three types of materials referred to above, please initial the second box in Part 2 of the form.

(Note: Even if you decline to receive the three types of materials referred to above, a reporting issuer or other person or company is entitled to deliver these materials to you, provided that the reporting issuer or other person or company pays all costs associated with the sending of these materials. These materials would be delivered to you through your intermediary if you have objected to the disclosure of your beneficial ownership information to reporting issuers.)

**Preferred Language of Communication**

Part 3 of the client response form allows you to tell us your preferred language of communication (English or French). You will receive materials in your preferred language of communication if the materials are available in that language.

**Electronic Delivery of Documents**

Securities law permits us to deliver some documents by electronic means if the consent of the recipient to the means of delivery has been obtained.

**CONTACT**

If you have any questions or want to change your instructions in the future, please contact your Investment Advisor.

## STATEMENT OF POLICIES

### (All Provinces and Territories in Canada)

The INTRODUCING BROKER is an investment dealer and a member of the Investment Dealers Association of Canada.

It is the policy, as well as the duty of the INTRODUCING BROKER to deal fairly, honestly and in good faith with its customers and clients. It is also the policy of the INTRODUCING BROKER with respect to securities of our related issuers or connected issuers to decide on a security by security basis whether there is any reason why we should limit the range of services which we provide to our customers and clients. As to the related issuers or connected issuers, we do not restrict the range of our services.

In the course of our activities, the INTRODUCING BROKER may from time to time trade in respect of securities of corporations, general partnerships, limited partnerships, trusts or other forms of issuers which may be considered to be related issuers or connected issuers to the INTRODUCING BROKER within the meaning of the securities laws of certain jurisdictions in Canada. If the INTRODUCING BROKER does trade or act as an agent or underwriter for the purchase or sale of securities of related issuers or connected issuers, it will provide full disclosure of said relationships in writing to purchasers of such securities and comply with all requirements of the securities laws of certain jurisdictions in Canada.

The securities legislation of certain jurisdictions in Canada require securities dealers and advisors, when they trade in or advise with respect to their own securities or securities of certain other issuers to which they, or certain other parties related to them, are related or connected, to do so only in accordance with particular disclosure and other rules. In certain provinces or territories, these rules require dealers and advisors, prior to trading with or advising their customers or clients, to inform them of the relevant relationships and connections with the issuer of the securities. Clients and customers should refer to the applicable provisions of these securities laws for the particulars of these rules and their rights or consult with a legal advisor. The foregoing Statement of Policies is provided as a requirement of the Securities Legislation of certain jurisdictions in Canada.

## INVESTMENT OBJECTIVE AND RISK TOLERANCE

**Please read this section carefully before you complete it. The information you provide here will assist your Investment Advisor in determining what investments to recommend for your account(s).**

· The approximate percentage of assets held in my accounts with your firm which are relatively low risk, income-producing securities which may include, but is not limited to government Treasury Bills, Canada Savings Bonds, Money Market Mutual Funds, and other higher quality, income-producing securities, with little or no reliance on margin: ........................
_____ % - Lower-risk, income-producing securities.

· The approximate percentage of assets held in my accounts with your firm which are income producing securities which bear higher risk than those described above, which may include, but is not limited to, moderate quality bonds and preferred shares, income trust units, and high-yielding, blue chip common stock, without relying extensively on the use of margin:..............
_____ % - Moderate to higher-risk, income-producing securities.

· The approximate percentage of assets held in my accounts with your firm which are moderate-risk securities, which may include, but is not limited to, non-speculative, growth-oriented common stock or mutual funds, without relying extensively on the use of margin:.........................
_____ % - Moderate-risk, growth-oriented securities.

· The approximate percentage of assets held in my accounts with your firm which are speculative, higher risk securities, which may include, but is not limited to, penny stock, higher risk mutual funds, options, rights or warrants. This may also include any trading activity which utilizes a significant degree of margin, short selling and convertible hedging, or any strategy which encourages, aggressive short-term trading in any security: .........................
_100_ % - Higher-risk, speculative securities and trading strategies
Percentages must total 100

_100%_

✱ _Signature_ _[signature]_



Suite 301, 2031 McCallum Road
Abbotsford, B.C, V2S 3N5
Tel: 604-850-5333
Fax: 604-850-5332

MEMBER
INVESTMENT DEALERS ASSOCIATION OF CANADA



# Statement of Account
### For the period ending  December 31, 2004

INESSA DENGIN
1939 DRUMMOND DR
VANCOUVER BC  V6T 1B7

## Contact Information

FRAME/WONG                604-294-2444
Direct Fax                   604-294-2403

## Total Consolidated Assets
## In Canadian Funds  $ 617,061.65
Exchange Rate: $1US = $1.1965CAD

Total Consolidated Assets Previous Statement Period
In Canadian Funds $ 557,732.55

**543 Granville Street**
**Suite 1100**
**Vancouver B C**
**V6C 1X8**
**604-294-2444**

## Your Portfolio Summary

|  | Previous Month End Market Value | Current Market Value | Percent of Assets |
|---|---|---|---|
| **Investment Account 08A-5166-A** | | | |
| Cash | | 0.00 | 0.0% |
| Common Shares | | 467,884.00 | 100.0% |
| **Total Assets** | **$ 438,777.94** | **$ 467,884.00** | **100.0%** |
| **Investment Account (US Funds) 08A-5166-B** | | | |
| Cash | | 85.03 DR | −0.3% |
| Common Shares | | 25,240.00 | 100.3% |
| **Total Assets** | **$ 21,637.91** | **$ 25,154.97** | **100.0%** |
| **RRSP Account 08A-5166-S** | | | |
| Cash | | 325.73 | 0.3% |
| Common Shares | | 118,754.00 | 99.7% |
| **Total Assets** | **$ 93,339.66** | **$ 119,079.73** | **100.0%** |

*Page 1*

E & OE  GELE  1109

*Statement for the period ending  December 31, 2004*

## Your Registered Plan Summary

**RRSP Account 08A-5166-S**

*Beneficiary:*   GEORGE DENGIN

| | First 60 Days | Remainder of Year |
|---|---|---|
| Contributions to Date | $0.00 | $23,400.00 |

**Foreign Content**      0.00%

## Your Statement of Income

| | This Period | Year to Date |
|---|---|---|
| **Investment Account 08A-5166-A** | | |
| Total Dividends | 0.00 | 0.00 |
| Total Interest | 0.00 | 937.14DR |
| **Total Income** | **$ 0.00** | **$ 937.14DR** |
| **Investment Account (US Funds) 08A-5166-B** | | |
| Total Dividends | 0.00 | 0.00 |
| Total Interest | 85.03DR | 344.81DR |
| **Total Income** | **$ 85.03DR** | **$ 344.81DR** |
| **RRSP Account 08A-5166-S** | | |
| Total Dividends | 0.00 | 0.00 |
| Total Interest | 0.07 | 0.75 |
| **Total Income** | **$ 0.07** | **$ 0.75** |

E & OE  GELE  1110



Suite 301, 2031 McCallum Road
Abbotsford, B.C. V2S 3N5
Tel: 604-850-5333
Fax: 604-850-5332

MEMBER
INVESTMENT DEALERS ASSOCIATION OF CANADA



*Statement for the period ending December 31, 2004*

## Your Account Activity Details

| Date | Activity | Quantity | Description | Price | Amount |
|------|----------|----------|-------------|-------|--------|

**Investment Account 08A-5166-A**

| Date | Activity | Quantity | Description | Price | Amount |
|------|----------|----------|-------------|-------|--------|
| 12/01 | | | **Opening Balance** | | $   19.24 |
| 12/17 | Journal | | FM 08A–5166–B @1.2275 | | 17,718.31 |
| 12/17 | Cheque | | 00000452 BAL OF A/C | | 17,737.55DR |
| 12/31 | | | **Closing Balance** | | $   0.00 |

**Investment Account (US Funds) 08A-5166-B**

| Date | Activity | Quantity | Description | Price | Amount |
|------|----------|----------|-------------|-------|--------|
| 12/01 | | | **Opening Balance** | | $   44.59DR |
| 12/08 | Buy | 140,000 | IQ POWER AG NAMEN–AKT | .35 | 49,245.00DR |
| 12/13 | Sell | (41,000) | IQ POWER AG NAMEN–AKT | .45 | 18,269.57 |
| 12/13 | Buy | 41,000 | IQ POWER AG NAMEN–AKT | .45 | 18,450.00DR |
| 12/13 | Sell | (41,000) | IQ POWER AG NAMEN–AKT | .45 | 18,269.57 |
| 12/14 | Sell | (40,000) | IQ POWER AG NAMEN–AKT | .435 | 17,225.59 |
| 12/15 | Sell | (21,000) | IQ POWER AG NAMEN–AKT | .51 | 10,604.75 |
| 12/16 | Monthly Int | | INTEREST TO 12/16 | | 85.03DR |
| 12/16 | Sell | (29,000) | IQ POWER AG NAMEN–AKT | .62 | 17,804.58 |
| 12/17 | Journal | | TO 08A–5166–A @1.2275 | | 14,434.47DR |
| 12/31 | | | **Closing Balance** | | $   85.03DR |

**RRSP Account 08A-5166-S**

| Date | Activity | Quantity | Description | Price | Amount |
|------|----------|----------|-------------|-------|--------|
| 12/01 | | | **Opening Balance** | | $   325.66 |
| 12/16 | Monthly Int | | INTEREST TO 12/16 | | 0.07 |
| 12/31 | | | **Closing Balance** | | $   325.73 |

E & OE GELE  1111

Statement for the period ending  December 31, 2004

## Your Portfolio Holdings

| | Quantity | | Book Value | Current Price | Accrued Interest | Current Value |
|---|---|---|---|---|---|---|

**Investment Account** 08A-5166-A

**Cash**        $    0.00

**Common Shares**

| | Quantity | | Book Value | Current Price | | Current Value |
|---|---|---|---|---|---|---|
| BANKERS PETROLEUM LTD | 291,500 | seg | 0.671 | .520 | | 151,580.00 |
| KOBEX RESOURCES LTD | 61,900 | seg | No Cost | 1.030 | | 63,757.00 |
| LATIN AMERICAN MINERALS INC | 22,000 | seg | 0.100 | .325 | | 7,150.00 |
| PKI INNOVATIONS CANADA INC | 147,940 | seg | 0.066 | .050 | | 7,397.00 |
| QUICKSILVER VENTURES INC | 280,000 | seg | 0.943 | .850 | | 238,000.00 |
| **Market Value of Common Shares** | | | | | | $   467,884.00 |

**Investment Account (US Funds)** 08A-5166-B

**Cash**        $    (85.03)

**Common Shares**

| | Quantity | | Book Value | Current Price | | Current Value |
|---|---|---|---|---|---|---|
| NEWTECH RESOURCE LTD | 1032,500 | seg | 0.020 | .020 | | 20,650.00 |
| IQ POWER AG NAMEN–AKT | 9,000 | seg | 0:381 | .510 | | 4,590.00 |
| **Market Value of Common Shares** | | | | | | $   25,240.00 |

**RRSP Account** 08A-5166-S

**Cash**        $    325.73

**Common Shares**

| | Quantity | | Book Value | Current Price | | Current Value |
|---|---|---|---|---|---|---|
| KOBEX RESOURCES LTD | 46,800 | seg | 0.500 | 1.030 | | 48,204.00 |
| QUICKSILVER VENTURES INC | 83,000 | seg | 0.223 | .850 | | 70,550.00 |
| **Market Value of Common Shares** | | | | | | $   118,754.00 |

*Page 4*

E & OE  GELE  1112

# EXHIBIT H



Form F8 (Rule 5-1 and 7-1(8), 10) and (11))

This is the 4th affidavit of Inessa Dengin, also known as Inessa Tepper in this case
and was made on 29/Jun/2012

Court File No.: E023112
Court Registry: Vancouver

### In the Supreme Court of British Columbia

Claimant:      Inessa Tepper

Respondent:   Ammi Tepper, Amiable Industries, Empty Holdings Ltd., and Sea to Sky Ford Sales Ltd.

## FINANCIAL STATEMENT

### INSTRUCTIONS FOR COMPLETION

You do not need to complete this form if ALL of the following apply:

    (a) you are applying for child support but are making no claim for any other kind of support;
    (b) you are not applying for special expenses under section 7 of the child support guidelines;
    (c) the child support is for children who are not stepchildren;
    (d) none of the children for whom child support is claimed is 19 years of age or older;
    (e) there is no application for a shared custody order;
    (f) the income of the party being asked to pay child support is under $150 000 per year;
    (g) there is no application for a split custody order;
    (h) you are not making a claim based on undue hardship under section 10 of the child support guidelines.

*Unless ALL of the conditions above apply, you must swear the following affidavit and complete the Parts of this Form that the following chart indicates apply to you.*

This Form has 6 Parts. You may not have to complete all Parts. Which Parts you have to complete depends on which categories of application apply to you as set out in the following chart.

**Please check off each of the items, 1 through 10, that apply to you and then complete the Parts that are noted for those items. Each required Part need be completed only once regardless of the number of applicable Items for which it is required.**

| Item | | Category | Part(s) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 | 6 |
| 1 | ☐ | I am applying for spousal or parental support. | ● | ● | ● | | | |
| 2 | ☐ | I am being asked to pay spousal or parental support. | ● | ● | ● | | | |
| 3 | ☐ | I am being asked to pay child support and all of the following conditions apply:<br>(a) there is no claim for special expenses under section 7 of the child support guidelines;<br>(b) the child support is only for children who are not stepchildren;<br>(c) none of the children for whom child support is claimed is 19 years of age or older;<br>(d) there is no application for a shared custody order;<br>(e) my income is under $150,000 per year;<br>(f) there is no claim based on undue hardship under section 10 of the child support guidelines. | ● | | | | | |
| 4 | ☐ | I am applying for or being asked to pay child support and one or more of the following conditions may apply:<br>(a) one or more of the children is a stepchild;<br>(b) one or more of the children for whom child support is claimed is 19 years of age or older;<br>(c) there is an application for shared custody;<br>(d) the income of the party being asked to pay child support is more than $150,000 per year. | ● | ● | ● | | | |

Form F8 – Financial Statement

| Item | | Category | Part(s) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 | 6 |
| 5 | ☐ | I am being asked to pay child support and I intend to make a hardship claim under the child support guidelines. | ● | ● | ● | | ● | ● |
| 6 | ☐ | I am applying for child support and the opposite party intends to make a hardship claim under the child support guidelines. | ● | ● | ● | | | ● |
| 7 | ☐ | Either I claim child support or I am being asked to pay child support and there is a claim for special expenses under section 7 of the child support guidelines. | ● | ● | ● | ● | | |
| 8 | ☐ | I am making or responding to a property claim under Part 5 of the *Family Relations Act*. | | | ● | | | |
| Include parts | | | | | | | | |

I, Inessa Dengin, also known as Inessa Tepper, of 1939 Drummond Drive, Vancouver, BC, SWEAR THAT:

1. The information set out in this financial statement is true and complete to the best of my knowledge.

*[Check whichever of the following boxes is correct and complete any required information.]*

2. [ ] I do not anticipate any significant changes in the information set out in this financial statement.

[x] I anticipate the following significant changes in the information set out in this financial statement:

There are fluctuations in my income and my husband George's income, and, therefore, there are fluctuations in my expenses.

SWORN/AFFIRMED BEFORE ME at
Vancouver
British Columbia
on 29/Jun/2012

A Commissioner for taking affidavits for British Columbia

**MICHELLE R. ADAMS**
*Barrister & Solicitor*
FARRIS, VAUGHAN, WILLS & MURPHY LLP
2500-700 West Georgia Street
P.O. Box 10026, Pacific Centre
Vancouver, BC  V7Y 1B3

Inessa Dengin

Form F8 – Financial Statement

## PART 1 – INCOME

**A.** **Employer information:**

[ ]    I am employed by [name and address of employer]

[ ]    I am self employed as [trade or occupation]

[ ]    I operate an unincorporated business, the name and address of which is [name and address of business]

**B.** **Documentation supplied:**

I have attached to this statement or serve with it a copy of each of the following applicable income documents:

[x]    every personal income tax return, including all attachments, that I have filed for each of the 3 most recent taxation years **(2008, 2009, 2010);**

[x]    every income tax notice of assessment or reassessment I have received for each of the 3 most recent taxation years **(2008, 2009, 2010);**

[ ]    *(if you are an employee)* my most recent statement of earnings indicating the total earnings paid in the year to date, including overtime, or, if such a statement is not provided by my employer, a letter from my employer setting out that information, including my rate of annual salary or remuneration;

[ ]    *(if you are receiving Employment Insurance benefits)* my 3 most recent EI benefit statements;

[ ]    *(if you are receiving Workers' Compensation benefits)* my 3 most recent WCB benefit statements;

[ ]    *(if you are receiving social assistance)* a statement confirming the amount of social assistance that I receive;

[ ]    *(if you are self-employed)* for the 3 most recent taxation years

   (i)    the financial statements of my business or professional practice, other than a partnership, and

   (ii)   a statement showing a breakdown of all salaries, wages, management fees or other payments or benefits paid to, or on behalf of, persons or corporations with whom I do not deal at arm's length;

[x]    *(if you are a partner in a partnership)* confirmation of my income and draw from, and capital in, the partnership for its 3 most recent taxation years; **(2010 and 2011 Income Tax Returns for Fernald Point LP)**

[ ]    *(if you control a corporation)* for the corporation's 3 most recent taxation years **(I do not have any Financial Statements prepared for my holding company, nor has my holding company filed any income tax returns since it was incorporated in 2010)**

   (i)    the financial statements of the corporation and its subsidiaries, and

   (ii)   a statement showing a breakdown of all salaries, wages, management fees or other payments or benefits paid to, or on behalf of, persons or corporations with whom the corporation and every related corporation does not deal at arm's length;

[x]    *(if you are a beneficiary under a trust)* the trust settlement agreement and the trust's 3 most recent financial statements; **(none of the trusts in which I am a beneficiary file income tax returns or financial statements)**

[ ]    *(if you own or have an interest in real property)* the most recent assessment notice issued from an assessment authority for the property.

Form F8 – Financial Statement

## C.  ANNUAL INCOME

*If line 150 (total income) of your most recent federal income tax return sets out what you expect your income will be for this year and you are not obliged under Note 1 below to complete Schedule A of this Form, ignore lines 1 to 7 below and record the number from line 150 of your most recent federal income tax return at line 8 below. Otherwise, record what you expect your income for this year to be from each of the following sources of income that applies to you. Record gross annual amounts.*

| LINE | GUIDELINE INCOME FOR BASIC CHILD SUPPORT CLAIM | | |
|---|---|---|---|
| | **Sources and amounts of annual income** | | |
| 1 | Employment income          paid: ☐monthly  ☐twice each month  ☐every 2 weeks  ☐weekly  ☐annually | + | $0.00 |
| 2 | Employment insurance benefits | + | |
| 3 | Workers' compensation benefits | + | |
| 4 | Interest and investment income | + | $10,089.18 |
| 5 | Pension income | + | |
| 6 | Social assistance income relating to self | + | |
| 7 | Other income (attach Schedule A) – see Note 1 | + | $0.00 |
| 8 | **Child support guidelines income before adjustments** *(If you are required to complete lines 1 through 7 above, total the amounts of those lines here. Otherwise, record the number from line 150 of your most recent federal income tax return)* *Line 150 income (if applicable)* | = | $10,089.18 |
| | **Adjustments to income** | | |
| 9 | Subtract union and professional dues | - | |
| 10 | Adjustments in accordance with Schedule III of the Guidelines per line 8 of Schedule B (attached) – see Note 2 | + | $0.00 |
| 11 | **Child support guidelines income for basic child support** *(line 8 as adjusted by lines 9 and 10)* | = | $10,089.18** |

**Based on 2010 Income Tax Return, excluding the rental income loss of ($6,139.12), which was a onetime loss.  As my only source of income is investments, my income fluctuates from year to year.

| | CHILD SUPPORT GUIDELINE INCOME TO DETERMINE SPECIAL EXPENSES | | |
|---|---|---|---|
| | Child support guideline income (from line 11 of this table) | + | $10,089.18 |
| 12 | Add spousal support received from the other party to the family law case | + | |
| 13 | Subtract spousal support paid to the other party to the family law case | - | |
| 14 | Add Universal Child Care Benefits relating to children for whom special or extraordinary expenses are sought | + | |
| 15 | **Child support guidelines income to determine special expenses** *(line 11 as adjusted by lines 12, 13 and 14)* | = | $10,089.18 |

| | INCOME TO BE INCLUDED FOR SPOUSAL OR PARENTAL SUPPORT CLAIM | | |
|---|---|---|---|
| | Child support guideline income (from line 11 of this table) | + | $10,089.18 |
| 16 | Total child support received | + | |
| 17 | Social assistance received for other members of household | + | |
| 18 | Child Tax Benefit and BC Family Bonus | + | |
| 19 | **Total income to be used for a spousal or parental support claim** *(line 11 plus lines 16, 17 and 18)* | = | $10,089.18 |

Note:   1.   *You must complete Schedule A of this Form and include, at line 7 above, the total income recorded at line 11 of Schedule A, if you expect to receive income this year from any of the following sources:*

     (a)   *taxable dividends from Canadian corporations;*          (e)   *registered retirement savings income;*
     (b)   *net partnership income (limited or non-active*          (f)   *self-employment income;*
            *partners only);*                                      (g)   *any other taxable income that is not included in*
     (c)   *rental income;*                                              *paragraphs (a) to (f) or in lines 1 to 5 of Schedule A.*
     (d)   *taxable capital gains;*

      2.   *If there are adjustments as set out in Schedule III of the child support guidelines that apply to you, you must*
     (a)   *complete Schedule B of this Form, and*
     (b)   *include at line 10 above, the amount recorded at line 8 of that completed Schedule B.*

Form F8 – Financial Statement

Page 5

## SCHEDULE A – OTHER INCOME

| LINE | OTHER SOURCES OF INCOME | | |
|------|------------------------|---|---|
| 1 | Self employment income: Gross =           Net = *Note: Provide financial statements of the business, including any statement of business activities filed as part of your income tax return* | + | |
| 2 | Other employment income | + | |
| 3 | Net partnership income: limited or non-active partners only | + | |
| 4 | Rental income: Gross =           Net = | + | |
| 5 | Total amount of dividends from Taxable Canadian Corporations | + | |
| 6 | Total capital gains  minus total capital losses                                       = | + | $0.00 |
| 7 | Spousal support from another relationship or marriage | + | |
| 8 | Registered retirement savings plan income | + | |
| 9 | Net federal supplements | + | |
| 10 | Any other income | + | |
| 11 | Total of lines 1 through 10 | = | $0.00 |

## SCHEDULE B – ADJUSTMENTS TO INCOME

| LINE | DEDUCTIONS | | |
|------|-----------|---|---|
| 1 | Employment expenses, other than union or professional dues, claimed under Schedule III of the Child Support Guidelines *(list)*                                                                     Total | - | $0.00 |
| 2 | Actual business investment losses during the year | - | |
| 3 | Carrying charges and interest expenses paid and deductible under *the Income Tax Act* (Canada): *(list)*                                                                     Total | - | $0.00 |
| 4 | Prior period earnings  minus reserves                                       = | - | $0.00 |
| 5 | Portion of partnership and sole proprietorship income required to be reinvested | - | |
|  | **ADDITIONS** | | |
| 6 | Capital cost allowance for real property | + | |
| 7 | Employee stock options in Canadian-controlled private corporations exercised: value of shares when options exercised  minus amount paid for shares  minus amount paid to acquire option                                       = | + | $0.00 |
| 8 | Total adjustments | | $0.00 |

Form F8 – Financial Statement

## PART 2 – EXPENSES*

*My husband, George, is the primary contributor to all of the expenses listed below. Expenses include the costs of our household, which includes George's two children, from time to time. I personally contribute to our expenses to the extent of the income that I earn in a tax year.

| | Monthly | |
|---|---|---|
| **Compulsory deductions** | | |
| CPP contributions | $0.00 | |
| EI premiums | $0.00 | |
| Income Taxes (based on 2010 ITR) | $0.00 | |
| Employee pension contributions | | |
| Other (specify) | | |
| | | |
| **Compulsory Deductions Sub-total** | | $0.00 |
| **Housing** | | |
| Rent or mortgage (amount fluctuates greatly) (Drummond Drive Property) | $4,193.32 | |
| Property taxes (Drummond Drive Property) | $2,345.80 | |
| Property insurance (Drummond Drive Property) | $1,412.00 | |
| Water, sewer, garbage (Drummond Drive Property) | $110.88 | |
| Strata fees | | |
| House repairs and maintenance (approximate) (Drummond Drive Property) | $500.00 | |
| Other (specify) Gardening, pool cleaning (expenses fluctuate) (Drummond Drive Property) | $800.00 | |
| Costs associated with maintaining Whistler Property (approx. $1,500 per month); Santa Barbara Property (approx. $6,000 per month); Jameson House Trust properties (approx. $6,000 per month) | $13,500.00 | |
| **Housing Sub-total** | | $22,862.83 |
| **Utilities** | | |
| Heat and electricity (Drummond Drive Property) | $2,000.00 | |
| Telephone and Cable TV (Drummond Drive Property) | $200.00 | |
| Other (specify) | | |
| **Utilities Sub-total** | | $2,200.00 |
| **Household expenses** | | |
| Food | $1,000.00 | |
| Household supplies | $80.00 | |
| Meals outside the home | $500.00 | |
| Furnishings and equipment | $500.00 | |
| Other (specify) | | |
| **Household expenses Sub-total** | | $2,080.00 |
| **Transportation** (For my Aviator only. There are 2 other vehicles registered in George's name and used primarily by George) | | |
| Public transit, taxis | $20.00 | |
| Gas and oil | $300.00 | |
| Car insurance and license | $200.00 | |
| Parking | $30.00 | |
| Repairs and maintenance | $300.00 | |
| Lease payments | | |
| Other (specify) | | |
| **Transportation Sub-total** | | $850.00 |
| **Other** | | |
| Charitable donations | | |

Form F8 – Financial Statement

| | |
|---|---|
| Vacation (this expense varies greatly from year to year, and is the portion that I believe to be the approximate expense for Michelle, Adelle, and I) | $2,000.00 |
| Pet care | |
| Newspapers, publications | $70.00 |
| Other (specify) | $50.00 |
| **Health**        Other Sub-total | **$2,120.00** |
| MSP premiums (for me, George, Adelle and Michelle) | |
| Extended health premiums | $128.00 |
| Dental plan premiums | |
| Health care (net of coverage) (Adelle and Michelle are covered 80% under Ammi's girlfriend's extended health and dental plan;  this is approximate amount that I pay for Adelle and Michelle, as well as my expense) | $50.00 |
| Drugs (net of coverage) | |
| Dental care (net of coverage) | $50.00 |
| Other (specify) | $50.00 |
| **Personal**        Health Sub-total | **$278.00** |
| Clothing | |
| Hair care | $500.00 |
| Toiletries, cosmetics | $100.00 |
| Education (specify) | $100.00 |
| Life insurance | |
| Dry cleaning/laundry | |
| Entertainment/recreation | $50.00 |
| Gifts | $500.00 |
| Other (specify) | $200.00 |
| **Children**        Personal Sub-total | **$1,450.00** |
| Child care | |
| Clothing | $300.00 |
| Hair care | $70.00 |
| School fees and supplies (approximate, includes: Michelle: WPGA tuition $16,000 / yr; uniforms approx. $300/yr; hot meals approx. $1,000/yr; tutoring approx. $3,000/yr; Adelle: UBC tuition approx. $6,000/yr; apartment rent for 10 mos per year approx. $6,500/yr (the Respondent has provided post-dated cheques for this expense for the 2012/13 year); allowance for meals and other living expenses approx. $3,500/yr; and books / equipment and misc. school fees, including sorority fee (approx. $800 next year) approx. $2,000/yr) | $3,191.67 |
| Entertainment/recreation | $100.00 |
| Activities and lessons (includes the following expenses for Michelle: skating and equipment costs, approx. $250/mo – note that I am unaware at this time as to whether Michelle is going to skate this year; horse lease and associated expenses, currently paid for by George - $1,000 / mo – as of September, 2012, I anticipate that we will have to lease a new horse, which should cost approximately $300 per month) | $550.00 |
| Gifts | |
| Other (specify) | $100.00 |
| **Savings**        Children Sub-total | **$4,311.67** |
| RRSP (our contributions vary from year to year, based on our incomes and stock market success – have not contributed in last couple of years) | |
| RESP (approximate, our contributions for Michelle only at this time) | $200.00 |
| Other (specify) TFSA (approximate, based on last year; varies from year to year) | $420.00 |

Form F8 – Financial Statement

Page 8

| | | |
|---|---|---|
| Support payments to others *(specify)* | Savings Sub-total | $620.00 |
| | Support payments to others Sub-total | $0.00 |
| Debt payments *(specify)* | | |
| BMO Loan payments (commencing July 1, 2012) | $8,600.00 | |
| | Debt payments Sub-total | $8,600.00 |
| | TOTAL MONTHLY EXPENSES | $45,372.50 |
| | TOTAL ANNUAL EXPENSES<br>*(multiply TOTAL MONTHLY EXPENSES BY 12)* | $544,470.00 |

## PART 3 – PROPERTY

### ASSETS

**1. Real Estate**
- *Attach a copy of the most recent assessment notice for any property that you own or in which you have an interest.*
- *Provide details, including address or legal description and nature of interest, of any interest you have in land, including leasehold interests and mortgages, whether or not you are registered as owner.*
- *Record the estimated market value of your interest without deducting encumbrances or costs of disposition. (Record encumbrances under DEBTS below.)*

| Details | Date Acquired | Value |
|---|---|---|
| See "Business Interests," below | | |
| | | |
| | Real estate Sub-total | $0.00 |

**2. Vehicles**
- *List cars, trucks, motorcycles, trailers, motor homes, boats, etc.*

| | | |
|---|---|---|
| Lincoln Navigator vehicle, registered in my sole name, approximate value | | $12,000.00 |
| | Vehicles Sub-total | $12,000.00 |

**3. Financial assets**
- *List savings and chequing accounts, term deposits, GIC's, stocks, bonds, Canada Savings Bonds, mutual funds, insurance policies (indicate beneficiaries), accounts receivable, etc.*
- *Record account number and name of institution where accounts are held.*

| | | |
|---|---|---|
| TD Waterhouse TFSA, in my sole name (market value as at mid-June, 2012) | | $450,000.00 |
| TD RESP (approximate market value), held in joint names with my husband George in trust for George's two children, as well as for Michelle and Adelle (George and I have contributed solely to this RESP) | | $33,000.00 |
| Union Securities RESP, held in my sole name in trust for Michelle and Adelle (approximate market value as at June 15, 2012) | | $20,000.00 |
| Canada Trust Savings / Chequing account, held jointly with George, approximate balance as at June 20, 2012 | | $1,500.00 |
| | Financial assets Sub-total | $504,500.00 |

**4. Pensions and RRSP's**
- *Record name of institution where accounts are held, name and address of pension plan and pension details.*

| | | |
|---|---|---|
| Union Securities RRSP, in my sole name (market value as at mid-June, 2012) | $1,800,000.00 | |
| | Pensions and RRSP's Sub-total | $1,800,000.00 |

Form F8 – Financial Statement
Page 9

| 5. Business Interests | | |
|---|---|---|
| • List any interest you hold, directly or indirectly, in any unincorporated business, including partnerships, trusts and joint ventures.<br>• List any interests you hold in incorporated businesses.<br>• Record the name and address of the company. | | |
| 25% share in Perestroika Products Ltd.* (approximate value – company not formally valued) | 1990 | $400,000.00 |
| Discretionary beneficiary of 2005 Lake Placid Property Trust (I am one of 5 beneficiaries of this Trust, and am also a Trustee of this Trust)** | August 2, 2005 | Undetermined |
| Discretionary beneficiary of 2005 Drummond Drive Property Trust (I am one of 5 beneficiaries of this Trust, and am also a Trustee of this Trust)*** | August 2, 2005 | Undetermined |
| Discretionary beneficiary of Jameson House Trust (I am one of 7 beneficiaries of this Trust, and am also a Trustee of this Trust)^ | September 16, 2011 | Undetermined |
| 100% shares in 0885303 B.C. Ltd.^^ (approximate value) | July, 2010 | $50,000.00 |
| 4,998,000 limited partnership units in Fernald Point Limited Partnership, representing 98% of LP^^^ (approximate value) | July, 2010 | $4,950,000.00 |
| | **Business Interests Sub-total** | **$5,400,000.00** |

*Company owns property located at 8626 Joffre Avenue, Burnaby, B.C., which has a 2012 Tax Assessed value of $1,284,000.

**Trust owns 2215 Lake Placid Road, Whistler, B.C., which has a 2012 Tax Assessed value of $2,618,000.

*** Trust owns property located at 1939 Drummond Drive, Vancouver, B.C., which has a 2012 Tax Assessed value of $7,758,000

^Trust owns beneficial interest in two penthouses located at 838 West Hastings Street, although legal title to these two properties is held by two numbered companies, in which I have no interest. These properties, together, have 2012 Tax Assessed values of $7,025,000

^^Company is a general partner of the Fernald Point Limited Partnership, and owns 1% of the LP. Company also has VanCity Bank account with a balance of approximately $2,000 as at May 31, 2012.

^^^ LP owns 1813 Fernald Point, Santa Barbara, California, which was purchased for $5,100,000.00 in July, 2010. The value of this property has decreased to approximately $5,000,000 since its purchase. LP also has a VanCity bank account with a balance of approximately $15,000 as at June 28, 2012.

| 6. Other | | |
|---|---|---|
| • Include precious metals, collections, works of art and any jewellery or household items of extraordinary value.<br>• Include location of safety deposit boxes. | | |
| Various jewellery, approximate value | | $100,000.00 |
| Art and collectibles owned by me and George | | Undetermined |
| | **Other Sub-total** | **$100,000.00** |
| | **TOTAL** | **$7,816,500.00** |

## DEBTS

*Show your debts & other liabilities, whether arising from personal or business dealings, by category, such as mortgages, charges, liens, notes, credit cards, accounts payable and tax arrears. Include contingent liabilities such as guarantees and indicate that they are contingent.*

| Secured Debt Details<br>(list mortgages and other secured debts) | Date Incurred | Amount |
|---|---|---|
| VanCity Line of Credit, registered against the Drummond Drive Property, held in joint names with George, approximate value as at June 11, 2012 | | $1,700,000.00 |
| BMO Bank Loan, held in joint names with George, approximate value as at June 11, 2012, registered against the Jameson House Trust properties | | $3,100,000.00 |

Form F8 – Financial Statement                                                                 Page 10

| | Secured debts Sub-total | $4,800,000.00 |
|---|---|---|
| **Unsecured Debt Details** <br> *(list bank loans, personal loans, credit cards and other unsecured debts)* | | |
| | Unsecured debts Sub-total | $0.00 |
| | TOTAL | $4,800,000.00 |

## DISPOSAL OF PROPERTY*

*(List all property disposed of during the 2 years preceding this statement or, if the parties married within that 2 year period, since the date of marriage.)*

| Description <br> *(describe the property disposed of)* | Date of Disposal <br> *(month, day, year)* | Value |
|---|---|---|
| Withdrawal of $450,000 from TFSA, placed onto VanCity LOC to pay down this debt | | $450,000.00 |
| Various withdrawals from RRSP since 2011, approximate | | $40,000.00 |
| | Total | $490,000.00 |

**\* As deposed in my affidavit, sworn on June 29, 2012, George has trading authority on my TFSA and RRSP accounts, and makes the necessary stock market transactions on my behalf. George earns his income, and my income on my behalf, by buying and selling stocks and stock market related deals, which are fluid. There are far too many transactions in this regard over the last 2 years to account for, but my assets, income tax returns, and liabilities reflected in and / or attached to this Financial Statement give an accurate portrait of the result of these many transactions..**

## PART 4 – SPECIAL OR EXTRAORDINARY EXPENSES

*Note:*
1.  *Provide a separate statement under this Part 4 for each child for whom a claim is made.*
2.  *To calculate a net amount, subtract, from the gross amount, subsidies, benefits, income tax deductions or credits relating to the expense.*

| Name of child: <br> ADELLE TEPPER | Annual Gross | Annual Net | Monthly Gross | Monthly Net |
|---|---|---|---|---|
| Child care expense | | | | |
| Medical/dental insurance premiums attributable to child (1/4 of MSP premium) | $384.00 | | | |
| Health related expenses that exceed insurance reimbursement by at least $100 | | | | |
| Extraordinary expenses for primary or secondary school | | | | |
| Post secondary education expenses (includes tuition, approximately $6,000.00; apartment rent approx. $6,500 / yr ($650 for 10 months; the Respondent provided post-dated cheques for this expense for the 2012/13 year); allowance for meals and other living expenses approx. $3,500 / yr; books / equipment costs approx. $2,000 / yr) | $18,000.00 | | | |
| Extraordinary extracurricular expenses *(list)* | | | | |
| | | | | |
| | | | | |
| Subtract contributions from child | | | | |
| Total | $18,384.00 | $0.00 | $0.00 | $0.00 |

| Name of child: <br> MICHELLE TEPPER | Annual Gross | Annual Net | Monthly Gross | Monthly Net |
|---|---|---|---|---|
| Child care expense | | | | |

Financial Statement                                                                     Page 11

| | | | | |
|---|---|---|---|---|
| Medical/dental insurance premiums attributable to child (1/4 of MSP premium) | $384.00 | | | |
| Health related expenses that exceed insurance reimbursement by at least $100 | | | | |
| Extraordinary expenses for primary or secondary school (WPGA tuition approx. $16,000 / yr; tutoring approx. $3,000/yr; hot meals costs approx. $1,000 / yr; uniforms approximately $300/yr) | $20,300.00 | | | |
| Post secondary education expenses | | | | |
| Extraordinary extracurricular expenses *(list)* | | | | |
| Skating, including equipment, approximate (I am unsure as to whether Michelle will be continuing skating this next year) | $3,000.00 | | | |
| Horse lease (approximate anticipated expense, commencing in September, 2012) (Total cost for equestrian lessons, horse shows, equipment, etc. approximately $6,000 / year) | $3,600.00 | | | |
| Subtract contributions from child | | | | |
| **Total** | $27,284.00 | $0.00 | $0.00 | $0.00 |

| | | |
|---|---|---|
| Total Gross Annual Special or Extraordinary Expenses for all children | A | $45,668.00 |
| Total annual change in value of applicable subsidies and/or benefits *(including Canada Child Tax Benefit and B.C. Family Bonus)* related to the Special or Extraordinary Expenses | -B | |
| Total annual change in income tax deductions and/or credits related to the Special or Extraordinary Expenses | -C | |
| **Total Net Annual Special or Extraordinary Expenses for all children  (A-B-C)** | = | $45,668.00 |
| **Total Net Monthly Special or Extraordinary Expenses for all children  (Annual / 12)** | | $3,805.67 |