**<u>Debra Pratum declaration</u>**

Debra Pratum declares:

1.    I am employed as a revenue agent of the Internal Revenue Service in Seattle, Washington in the Large Business and International Division, Withholding and International Individual Compliance Group.

2.    I am over eighteen years of age.

3.    I have been employed by the Internal Revenue Service for over 12 years.

4.    Before working for the IRS, I worked in the private sector in various accounting and related financial positions for over 25 years.

5.    As an IRS revenue agent, my duties include the examination and investigation of federal income-tax returns that have been filed with the IRS or should have been filed with the IRS to assist the IRS in determining the taxpayer's correct tax liability.  In cases where required returns are not filed, I assist the IRS in investigating whether such returns should have been filed and determining the taxpayer's correct tax liability.

6.    In my capacity as a revenue agent, I began auditing George Dengin in about February 2013 regarding his federal tax liabilities for tax years 2006 through 2011.

7.    During the course of my examination, I learned the following information from various sources:

    a. Mr. Dengin is an American citizen permanently residing in Vancouver, Canada, with his wife, Inessa Dengin.

    b. He is also a citizen of Canada.

    c. From 1980 to 1985, Mr. Dengin was a licensed stockbroker and investment advisor in Canada.

    d. In 1985, Mr. Dengin's stockbroker licensed was permanently revoked.

e. In 1987, after appeal, the licensing authority changed the permanent revocation to a five-year suspension, which ended in 1990.

f. From 1990 to 2000, Mr. Dengin worked as a stockbroker for others.

g. In 2000, Mr. Dengin retired but engaged in stock-trading activity for himself.

h. After 2000, Mr. Dengin also invested in real estate.

i. Mr. Dengin derives most, if not all, his income from stock-trading and real-estate activities.

j. In November 2003, Mr. Dengin married Inessa Dengin.

k. Mrs. Dengin is a Canadian citizen.

l. Inessa Dengin was previously married to Ammi Tepper from May 1992 until their divorce in October 2003.

m. Mr. Dengin did not file tax returns for tax years 2006 through 2011 until March 2013, which is after the Internal Revenue Service had already begun its examination of his tax liabilities.

n. The IRS has no record of any tax returns filed by Mr. Dengin before the six tax returns filed in March 2013.

o. In each of the six tax returns filed by Mr. Dengin in March 2013, he reported zero tax liability.

8. In November 2014, I participated in a phone interview with Mr. Dengin in which he said that he has no financial accounts within the United States.

9. Regarding property on Fernald Point Lane, Santa Barbara, California, I learned the following during the course of my examination:

a. In 2010, this property was purchased in cash by an entity named Fernald Point Limited Partnership, a British Columbia Limited Partnership.

b. The partners of the limited partnership at that time were Mrs. Dengin, who had a 98% interest; 08885303 B.C. Ltd., which had a 1% interest; and the Dengin Family Trust, which had a 1% interest.

c. Mrs. Dengin holds 100% of the shares of 08885303 B.C. Ltd.

d. The Dengin Family Trust is a grantor trust of Mr. Dengin.

e. On July 14, 2010, Mr. Dengin in his own name authorized the escrow holder to vest the ownership in Fernald Point Limited Partnership.  Mrs. Dengin also appears to have signed this document as president of 0885303 B.C. Ltd.  She did not sign this document in her own name.

f. On December 31, 2012, the 1% interest in Fernald Point Limited Partnership held by the Dengin Family Trust was transferred without consideration to Mrs. Dengin.

g. On February 9, 2016, the Fernald Point property was listed for sale for $8,250,000.

h. On April 8, 2016, the asking price for the Fernald Point property was reduced to $7,750,000.

i. On May 31, 2016, the asking price for the Fernald Point property was reduced to $6,950,000.

10.    Attached as exhibit 1 is a copy of my report recommending the jeopardy assessment.  Social security numbers and birthdates have been redacted.

1        11.    Attached as exhibit 2 is a copy of Inessa Dengin's June 29, 2012,

2    affidavit.  Portions of this document have been redacted to protect personal

3    information.

4        12.    Attached as exhibit 3 are documents from Chicago Title Company

5    regarding the purchase of the Fernald Point property.  The seller's address

6    has been redacted.

7        13.    To determine a gain or a loss from a stock transaction, the cost

8    basis of the asset is necessary information.

9        14.    During the course of the IRS's audit, Mr. Dengin did not produce

10   documents establishing the actual cost basis of the stocks he traded.

11

12       I declare under penalty of perjury that the above is true and correct.

13

14   Dated:  April 17, 2017

15   Debra Pratum

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 1

**Jeopardy Recommendation Report**



George Dengin   SSN: [              ]        Years: 2006-2011

**George Dengin (Taxpayer),** DOB: [              ] has a Bachelor of Education degree. He is a dual citizen who currently resides in Canada and identifies himself as a Canadian citizen on returns filed with Canada. The Taxpayer was born in San Francisco, CA on [              ] **(Exhibit 17 -MFTRA)** He said his family moved to Canada when he was about 7 years of age. No actions were identified from Government data bases which would indicate the Taxpayer has made any attempt to relinquish his U.S. citizenship. Taxpayer requested and received a social security number from the Social Security Administration in December 2012. **(Exhibit 11 – Letter from SSA)** If Taxpayer had taken any previous action to relinquish his U.S. citizenship, he would not have secured the social security number. As a U.S. citizen, Taxpayer is taxable in the United States on worldwide income.

George married Inessa [              ] in 2003. Inessa is a Canadian citizen who moved to Canada with her family when she was 7 years of age from Russia; therefore, she has no filing requirements in the USA. They reside at 1939 Drummond Drive, Vancouver BC Canada. This property was purchased in 2003 for approximately CDN $3.5-$4 Million. The title of this property is held in the name of the Drummond Drive Property Trust. Inessa was previously married; her divorce from Ammi Tepper was finalized in July 2002. Ammi and Inessa were later involved in a lawsuit regarding Ammi's child support obligations. In June 2012, Inessa filed a sworn affidavit with the Supreme Court of British Columbia that discussed her finances and Taxpayer's financial dealings in detail.

### Business Activity

Since 2000 Taxpayer has been self-employed investing for himself in stocks and real-estate. These investments, along with a small Schedule C, represent his only sources of income. His Schedule C is fee income he earns infrequently for introducing people with ideas or searching for investment opportunities.

As stated by Inessa, Taxpayer earns his income by borrowing funds against the VanCity line of credit and investing these funds in the stock market, or stock market related deals, and paying back the line of credit when he sells the stock. Taxpayer has a number of investment accounts that he manages. For the years under audit, the Taxpayer primarily trades in penny stocks and will often make multiple purchase and sale transactions in the same day, including multiple transactions of the same stock. Taxpayer also purchases private stock (not publically traded) and moves it into one of his investment accounts. The Taxpayer's cost basis is not recorded by the company as stock is contributed so only the current market value of the stock is discernable from the investment company's statements. Besides stocks, Taxpayer also purchased forward future contracts, warrants and real estate (from undeveloped land to luxury condominiums). Taxpayer holds 50% interest in a real estate joint venture, Youbou Lands.

Youbou Lands Joint Venture was formed to purchase a former old sawmill site bordering Cowichan Lake, an hour's drive from Victoria. The plan for the property is to clean it up and develop the property to include 1,950 new housing units, a resort hotel, spa and light industrial park.

**Activity Giving Rise to Jeopardy:**

**Illegal Activities:**

Since Taxpayer did not provide much information about his education and work experience during the interview, IRS Revenue Agent (RA), Debbie Pratum, asked for more information in an Information Document Request (IDR). The response to the IDR was as follows: in 1980 Taxpayer was a licensed stock broker and investment advisor in Canada. Taxpayer worked as a licensed stock broker between 1980 and 1985, where he began investing for his own account. Between 1985 and 1990 his license was suspended due to allegations which were ultimately resolved with a small fine. Published articles stated he had his license permanently revoked for serious trading infractions and appealed in 1990. The sanction was reduced from a permanent revocation to a five year suspension following the appeal. *(Exhibits 8, 9 & 10 – News articles)*

In 1990 Taxpayer resumed work as a licensed stock broker from 1990 through 2000. By 2000, his investment activity had proved lucrative enough for him to retire from being a stock broker and concentrate on personal investments.

A newspaper article in the Vancouver Sun from June 27, 2006 mentions "that Dengin was a former Vancouver stockbroker who had his license permanently revoked in 1987 for serious trading infractions. In 1990, he appealed that suspension and it was reduced to five years. "(*Exhibit 8 – news article*)

An article in a respected Vancouver real estate blog discusses some of Dengin's other activities. *(Exhibit 10 – news article)*

**Transfer of property to put out of the reach of the government:**

1813 Fernald Point Lane, Santa Barbara, CA was purchased in 2010 for $5.1 million in cash under the name of Fernald Point Limited Partnership, A British Columbia Limited Partnership. The L.P was originally owned by Inessa Dengin (wife) - 98%; 08885303 B.C. Ltd – 1% (which is owned 100% by Inessa), and the Dengin Family Trust – 1% (Grantor Trust where George owns 100%). On 12/31/2012 the 1% owned by Dengin Family Trust was gifted to Inessa Dengin to make her the 100% owner. Per Inessa's affidavit, George purchased this property and established the Fernald Point Property L.P. to hold the title of the property. *(Exhibit 1 – Inessa Affidavit)*

There are documents from Chicago Title Company that list George Dengin as the actual buyer of the property and then authorizing the deed to be named in the Fernald Point Limited Partnership. George signed the "Additions and/or Amendment to Escrow Instructions" and all other pages of the purchase

documents with Chicago Title Company.  There are also email correspondences between Chicago Title Company and George Dengin's email.  *(Exhibit 2 - Chicago Title Company)*

George directly and indirectly pays for the expenses associated with this property *(Exhibit 1– Affidavit #38).*

The house is currently listed for sale at $6,950,000.  The house was first listed on February 9, 2016 for $8,250,000.  Price reduced on April 8, 2016 to $7,750,000 and was further reduced on May 31, 2016 to the current price of $6,950,000.  The first listing expired on August 2, 2016 and relisted on the same day, August 2, 2016.  The second listing expired on October 2, 2016 and relisted on October 6, 2016.  The Taxpayer appears to be very motivated to sell his **only** U.S. holding.

Without a jeopardy assessment and nominee collection lien on this property, all the proceeds from the sale of this house would be transferred to Canada and be out of the reach of the U.S. government since the Taxpayer does not have any bank accounts or any other interests in the U.S.

FBAR filings by the Taxpayer reflect Canadian Registered Retirement Savings Plan (RRSP) balances at the end of 2010 as CDN $11,335,221. Starting in 2011, the Taxpayer has made the following withdrawals from his RRSP:   2011     $3,548,252 – withdrawals reported on 1040 and Canadian tax returns

       2012     $304,645 - withdrawals reported on 1040 and Canadian tax returns

       2013     $2,448,577 - withdrawals reported on 1040 and Canadian tax returns

       2014     $120,944 - withdrawals reported on 1040 and Canadian tax returns

       2015     US return under extension until 10/15/16

Per the 2015 filed FBAR, Form 114, the balance remaining in the RRSP account is only CDN $254,905. **It appears the Taxpayer may be trying to further liquidate his known assets.**

### Means and Income of Inessa Dengin (wife): (Exhibit 1 - Affidavit)

**Perestroika Products Ltd**: Inessa holds a 25% interest in the family (her parents, her brother and his wife) food manufacturing and distribution company in Vancouver, but she does not take any money from the business. All of her earnings are reinvested in the family business.  Her brother runs the company.

Inessa received a property settlement as a result of her divorce from Ammi Tepper in 2002.  The settlement included funds from an RRSP account of CDN $40,000 and an additional payment of CDN $350,000.  These amounts constituted the entire property settlement and the amounts were corroborated with Ammi Tepper.  The CDN $350,000 was contributed by Inessa to the purchase of the family home (Drummond Drive property).  Inessa deposited the CDN $40,000 into an RRSP account for herself.

Per Inessa's affidavit she states, "I am not otherwise employed and I do not earn a substantial income from another source outside of investment income that I earn from investing in the stock market and in stock market related deals with my husband, George." Inessa and George have a joint bank account

where money is used to invest, pay bills, etc.  Inessa also states, "Throughout my marriage to George, I have had limited involvement in our finances: George has been primarily responsible for our finances."

Inessa has a Union Securities RRSP account with a value approximately $1.8 million and a Vancity TFSA account; George has trading authority over these accounts and has handled every stock transaction within the accounts.  These accounts are recognized as the sole and separate property of Inessa and have not been addressed in the context of the IRS tax audit of the Taxpayer.

**Fernald Point Limited Partnership:** This partnership was formed July 8, 2010 in British Columbia, Canada.  The closing for 1813 Fernald Point, Santa Barbara, CA occurred on July 16, 2010.  It appears this partnership was formed for the specific purpose of holding this property. *(Exhibit 3 – Fernald Point Ltd PS Agreement)*

The partnership agreement states it is a partnership for the purpose of carrying on the businesses of real estate investments, the investment in marketable securities and related and ancillary investments and businesses, including without limitation consulting, the supply of equipment, premises, supplies and personnel to other businesses, which limited partnership will allow for the admission of additional limited partners.  At the time of formation, the ownership interest was as follows:  1%- 0885303 BC Ltd, 1% -Dengin Family Trust, and 98%-Inessa Dengin.  In 2012, Dengin Family Trust gifted its 1% to Inessa. (Note: Dengin Family Trust is a grantor trust with George Dengin owning 100%).

As can be seen in the concealed asset section below, George Dengin has numerous Trusts and LTDs that he forms to put properties into.  A couple of the names correspond directly with the street name of the property that is put into that LTD or trust.

**Concealed Assets:**

*(Exhibit 4 – Dengin Family Trust Summary of Interview by IRS Counsel, Melanie Senick, Nov 19 and Exhibit 5– Deng Interview via GM Slack; and Exhibit 1 - Affidavit) Comments below also include updated information received during audit.*

George Dengin has a history of titling his property/assets under trust names and in other names as nominees.  In Inessa's affidavit, she states she acquired interest in the below at no or little financial cost to her.  George's money was used to make the initial investment in the entities/properties.

*Drummond Drive Property Trust:* 1939 Drummond Drive, Vancouver, BC.  Inessa is the trustee and beneficial owner of the family home.  Inessa contributed $350,000 towards the $3,500,000 purchase price.  Her funds came from her divorce settlement from her first husband, Ammi Tepper.

*Lake Placid Property Trust:* 2215 Lake Placid Road, Whistler, B.C.  Inessa is the trustee and one of the beneficial owners of the trust that holds the family vacation home.  George admits to having paid $2.5 million in cash for this property and putting the legal name either in a trust name or Inessa's name.

**602565 B.C. Ltd:** Inessa is the Director, shareholder, and officer. This held title to "1621 St. Georges Avenue, North Vancouver, B.C. as a nominee of the beneficial owner, but this company never had a beneficial interest in the St. Georges Property." (per the affidavit, Exhibit 1) **NOTE:** In Canada, beneficial ownership (not legal title) determines ownership for federal income tax. This property was sold prior to 2006 so it was not part of the audit and ownership was not verified.

**Vista Crescent Trust:** Inessa is trustee for this trust which owns 5952 Larch Street, Vancouver, B.C. whose beneficial owner is George's niece. **NOTE:** Ownership was not verified.

**Dengin Canadian Partnership:** 99.99% owned by Inessa but George doesn't remember who owns the other .01%.

**0754304 B.C Ltd:** Owned 100% by George Dengin. This LTD owns 50% interest in Youbou Lands Joint Venture which holds undeveloped land on Vancouver Island. When asked about Youbou Lands in an IDR, response was, "none of the land was sold or transferred during the years 2006 through 2011".

**0791106 BC Ltd:** reported as dormant and owned 100% by George Dengin.

**Jameson House Trust:** The entity is treated as a grantor trust with George owning 100%. The trust holds multiple units at the Jameson House building located at 838 West Hastings Street, Vancouver, B.C. Inessa is one of seven beneficiaries. She is listed on the Trust as "Settlor" and she and George are listed as Trustees.

**0917935 BC Ltd:** holds Penthouse 2; George owns 100% of 0917935 BC Ltd, and **0917936 BC Ltd** holds Penthouse 4; George owns 100% of 0917936 BC Ltd. Both LTDs are held in Jameson House Trust and this trust is owned 100% by George.

**0914478 BC Ltd is unit #1703 and 0914474 BC Ltd is unit #1803**, George owns 100% of these units which are also held in Jameson House Trust of which George owns 100%. The condominium units held for rent in the Jameson House are units #1703 and #1803. During the interview, George made no comment when asked why Inessa Dengin signed the rental agreements for these properties. In an IDR response later; "Inessa has signed the lease because she is managing the property on behalf of the Taxpayer".

Taxpayer obscured his ownership of properties and assets by putting the legal titles in the names of trusts and entities and by setting up tiered ownership structures for those trusts and entities. Taxpayer concealed his ownership of properties and assets, and the trusts and entities holding the legal titles, by causing Inessa to be the trustee and beneficial owner of the trusts and the majority member/owner of the entities.

**Failure to cooperate during exam:**

George Dengin was not forthcoming with the IRS during his interviews. He was vague, didn't answer some questions, and some he said he couldn't remember. **(Exhibit 7 – Cover page for 11-17-14)**

The taxpayer provided responses to most of the IDR issued by the Revenue Agent but most all of the information provided was received late (beyond extended due dates) and was not always complete. For example, March 3, 2016 Taxpayer's response stated, "To the extent that any of your requests call for the production of information belonging to Inessa Dengin, Taxpayer objects on the ground that Mrs. Dengin is not the subject of this examination and Taxpayer has no authority to provide her records to the IRS." IRS is accepting Mrs. Dengin's signed sworn statement before the Supreme Court of British Columbia, stating she has no income and the monies used to purchase the investments originated with funds owned and controlled by the Taxpayer. Therefore, with the exception of the RRSP and TSFA accounts held in the name of Inessa Dengin, the investments held under Inessa's name are really the Taxpayer's and the income generated by these investments should be included on his 1040 return. As previously stated, Inessa received CDN $40,000 RRSP monies in her divorce settlement from Ammi Tepper and the IRS accepts Inessa's RRSP account is separate income. The only other monies Inessa received in the divorce settlement was CDN $350,000 in cash. She stated she used this money towards the down payment on their family home located at 1939 Drummond Drive, Vancouver, B.C. Both of these amounts agree with what Ammi Tepper told the IRS. Inessa has no other source of income that she earns independently from George.

IRS never received any schedules or documents to support the holding periods or cost basis of any stocks reported on the filed Form 1040 tax returns. During the August 15, 2016 meeting with the POA and the Taxpayer's accountant, POA agreed with Exam that there were very few long term capital transactions. The POA and accountant also acknowledged they still did not have anything prepared to support which investments were long term nor did they have any documents to support the cost basis and holding periods of the stocks that the Revenue Agent had requested.

**US Federal Tax Returns info:** *(Exhibit 6 - IMFOLTs).*

George Dengin filed his delinquent 2006 – 2011 Form 1040 tax returns on March 15, 2013 while under examination with the IRS. *(Exhibit 12 – US Form 1040s)*

There is no record of Taxpayer filing tax returns for any earlier years. Taxpayer did sign a statute extension for tax years 2006 through 2011 that will expire on 12/31/2016, but he will not sign another one to extend the statute beyond 12/31/2016.

Tax return for 2012 was filed on 10/24/2013; 2013 was filed on 10/21/2014; 2014 was filed on 6/30/2015; and 2015 is on extension; 2015 extension date is 10/15/2016.

All the above tax returns show Zero Dollar Tax liability.

Taxpayer hired Michael Cohen as Power of Attorney(POA), and RA received Form 2848 on October 17, 2013. POA told RA there were errors on the original filed returns and new ones were being prepared. POA sent RA <u>unsigned</u> Form 1040 "Draft" returns for tax years 2006 through 2011. POA did not provide any explanation as to what was wrong with the originally filed Forms 1040 other than they were wrong and new ones were being done *(Exhibit 13 – Draft amended returns)*. Changes which were made on these amended returns include the addition of interest income which was omitted, adding Schedule A

deductions, re-computing the At-Risk Carryover for Schedule C, re-calculating the foreign tax credits and changing some year's capital gains/losses. In addition, the Dengin Family Trust and Dengin Family Trust #2 reflected items incorrectly reported on the originally filed returns as well. The Draft amended Form 1040 for 2011 is the only the Taxpayer is showing any US income tax liability, which is $262,565.

Taxpayer did not have a social security number until he was notified that the IRS began an income tax audit. This audit started with a related party in July 2012. The Taxpayer was identified at that time as a non-filer. Taxpayer's accountant informed RA that the Taxpayer would be getting a social security card. Taxpayer received the card in December 2012. The letter to the Taxpayer from the Social Security Office is dated December 28, 2012. (*Exhibit 11 –Letter from SS*)

**Present Financial Condition:**

Per Inessa's affidavit she states, "I am not otherwise employed and I do not earn a substantial income from another source outside of investment income that I earn from investing in the stock market and in stock market related deals with my husband, George." Inessa also states, "Throughout my marriage to George, I have had limited involvement in our finances: George has been primarily responsible for our finances." Based on her statement, it is reasonable to conclude that the gains listed on her Canadian tax returns were earned and/or realized through Taxpayer's talent as a financial broker and investor in stocks and real estate.

**Bank and Investment Accounts: (known accounts identified during the audit - all accounts are Canadian accounts)**

- Union Securities (multiple accounts)
- Jordan Securities
- Vancity – multiple accounts
- Global Securities
- TD Waterhouse – multiple accounts

**Real Estate:**

The family home located at 1939 Drummond Drive, Vancouver, BC, Canada on December 28, 2012 was valued at approximately U.S. $12,708,200.

The Whistler vacation home located at 2215 Lake Placid Road, Whistler, BC, Canada on December 28, 2012 was valued at U.S. $2,335,700.

The California vacation home located at 1813 Fernald Point, Santa Barbara, CA is currently listed for sale at U.S. $6,950,000.

The 2014 Form 1040 tax return is still reporting rental income. Units 1703 and 1803, located at 838 West Hastings Street, Vancouver, BC, Canada are held in the Jameson House Trust and were rented in 2011 so one or both may still be rentals.

**Income Reported on Canadian Tax Returns:**

The Dengin's file their Canadian tax returns regularly, a Summary of some of the tax returns are below. **(Exhibit 14 – Canadian Tax returns).**

**Per George Dengin's filed Canadian tax returns, his reported net income (similar to AGI in US) is as follows:**

| Year | Net Income for George (CDN$) | Stock sales (gross amount realized) | Gains per Canadian returns on stocks | Interest earned | Net Income for Inessa (From George's returns) | Comments |
|------|------|------|------|------|------|------|
| 2006 | (2,417,479.41) | 3,068,859.93 | 694,502.14 | 42,073.44 | 719,294.74 | Marked he is a Canadian Citizen; loss came from a partnership |
| 2007 | 1,865,840.03 | 8,318,580.,80 | 1,339,005.28 | 418,864.04 | 3,157,680.96 | Marked he is a Canadian Citizen (Yes or no question on return); marked he owned "foreign income" more than CN $100K; |
| 2008 | (25,590.34) | 7,308,165.86 | (1,758,729.35) | 2,855.03 | 0 | Marked he is a Canadian Citizen (Yes or no question on return): the negative net income comes from interest expense |
| 2009 | 261,983.41 | 7,274,576.20 | 267,057.89 | 4,414.26 | 37.50 | Marked he is a Canadian |

| Year | | | | | | Citizen (Yes or no question on return) |
|------|------|------|------|------|------|------|
| 2010 | 10,243.15 | 12,639,297.33 | (8,727.96) | 28,363.66 | 3,950.06 | Marked he is a Canadian Citizen (Yes or no question on return); |
| 2011 | 3,467,841.50 | 3,170,017.57 | 215,305.62 | 2,751.15 | 78,669.55 | Marked he is a Canadian Citizen (Yes or no question on return); |

Per the Canadian tax returns filed for Dengin Family Trust which was created 6/01/1995 as a personal trust, George Dengin is the trustee, executor, liquidator, or administrator:

| Year | Net Income | Stock sales | Stock Gains | Comments |
|------|-----------|-------------|-------------|----------|
| 2006 | (69,129.99) | 928,324.85 | 651,959.70 | loss of 393,517 for carrying charges (interest on bank loans) |
| 2007 | 55,519.64 | 660,719.75 | 117,452.27 | |
| 2008 | (47,047.45) | 3,361,303.08 | (295,485.84) | |
| 2009 | (27,151.69) | 2,705.00 | 705.00 | |
| 2010 | 43,437.60 | 101,780.00 | 91,810.20 | |
| 2011 | (1,892.68) | 2,638.00 | 2,174.64 | |

Per the Canadian tax returns filed for Dengin Family Trust #2, which was created 11/14/2000 as a personal trust, George Dengin is the trustee, executor, liquidator, or administrator:

| Year | Net Income | Stock Sales | Stock Gains | Comments |
|------|-----------|-------------|-------------|----------|
| 2006 | (16,366.38) | 354.94 | (18,616.59) | |
| 2007 | 323,193.25 | 2,208,678.38 | 646,386.50 | |
| 2008 | (9,989.38) | 3,741,781.33 | (1,310,771.52) | |
| 2009 | 255,814.62 | 4,164,139.02 | 525,062.24 | |
| 2010 | 967,752.24 | 2,831,187.24 | 1,943,985.77 | |
| 2011 | 59,372.47 | 0 | (113,160.00) | |

Per the Canadian tax returns filed for Fernald Point Limited Partnership, which was created 7/08/2010 as a partnership, in care of Inessa Dengin Rental Property on the house in Santa Barbara, CA:

| Year | Net Income | Comments |
|------|-----------|----------|
| 2010 | (6,264) | |
| 2011 | 0 | It appears the property was not rented this year. |

Based on the above Individual, Trust, and Partnership returns filed with Canada, the Dengin's have a substantial amount of money/assets accumulated over the years; between stocks and real-estate ventures. Also the list of business entities described in the Concealed Assets section (above) which are owned directly or indirectly by George Dengin show that he has a healthy financial status. Of all the items listed, there is only one that is located in the U.S.; all the others are in Canada. The only one that is within the reach of the U.S. Government is the house in Santa Barbara, CA which is currently listed for sale.

**Location and Description of Asset for collection:**

1813 Fernald Point Lane, Santa Barbara, California 93108.
Assessor Parcel No: 007-380-020

Fernald Point Limited Partnership, a British Columbia Limited Partnership.

This is the only known asset in the US; all other assets/monies are in Canada.

**Method of Computation**: *(Exhibit 16; workpapers supporting the adjustments shown on Exhibit 15 - Form 4549-A) A summary document is attached to identify the line item labeled "Capital Gain or Loss" on Form 4549-A since the IRS system aggregates these adjustments into one line item.  Also a separate summary document was prepared for all of the "Chandler adjustments".)*

A large amount of the determined tax liability is due to the stock sales. Taxpayer was unable or unwilling to provide a basis for the stocks sold. POA agreed that almost all of the stock sales were short term sales. Since Taxpayer is not providing the information of the basis or even when the stock was purchased, a calculation will be used reflecting the stock as purchased and sold in the same calendar year.

During the examination period, a stock's purchase price could, and often did, change significantly within a short period of time. Due to the volume and number of trades (both purchases and sales) and the millions of shares of stock traded, it was concluded that a stock basis could not be accurately computed from the limited information available to the RA. Based on this assessment and the desire to provide a reasonable and conservative estimate of cost, the gain or loss has been computed using the values reflected on the Canadian returns filed by Taxpayer, Dengin Family Trust, and Dengin Family Trust #2.

The values have been converted to US dollars using the conversion rate reflected by the Taxpayer on the respective returns. The values used on the Canadian returns appear to be based on an average cost method, a computation method which is not acceptable for individual stock valuations for U.S. tax purposes but has been used nonetheless in computing the gain/loss to provide a conservative amount for the jeopardy assessment. The burden to substantiate basis remains with the taxpayer.

Taxpayer failed to timely file his Forms 1040 and failed to timely make the annual election on Form 8891 to defer taxation on income accumulated in his RRSP. Therefore, Taxpayer's undistributed RRSP earnings are taxable. Since neither the Taxpayer nor his accountant provided cost basis for the numerous stock transactions for the Taxpayer's RRSP Accounts and the IRS has deemed the Taxpayer an "ineligible individual", the IRS has attempted to identify the low and high cost basis for the stocks. Since the prices of the stocks could be volatile, the IRS has used the low cost as a reasonable basis in determining gain or loss. The use of a cost basis built on the high value of the stock would result in an unreasonable calculation of gain or loss due in part to the short term nature of each of the transactions. Further, if each stock was valued at the highest identified cost per share during the year few transactions would generate a gain for the taxpayer as the sales price of the stock would be equal to or less than the cost in most instances. It is unreasonable to assume the taxpayer would participate in stock transactions where he repeatedly breaks even or experiences a loss on the sale.

In addition to gains reported by the Taxpayer and the grantor trusts, the gain or loss reported by Inessa Dengin on returns filed in Canada have also been included in the computation for each year's 2006 - 2011. Per her sworn affidavit (**Exhibit 1)**, Inessa said Taxpayer had trading authority over her accounts, that Taxpayer was responsible for the stock trades in her accounts, and that she did not have any money of her own other than that previously identified from her divorce settlement. The gains reported by Inessa were generated by Taxpayer's stock trading in her accounts. Taxpayer has a history of concealing his property and assets through the use of nominees, as explained above in the "Transfer of property to put out of the reach of the government" and "Concealed Assets" sections. Based on the foregoing, the stock trade gains reported by Inessa have been included in Taxpayer's taxable income. Also stated above, in the "Failure to Cooperate" section of this document, the Taxpayer has refused to provide any information regarding Inessa's assets or income. Without any supporting documentation to the contrary, the capital gain reported by the Inessa Dengin will be reflected as belonging to the Taxpayer.

The method of determining the examination adjustment for the other issues reflected on the Revenue Agent Report was varied. "Taxable interest" and "additional taxable interest – Inessa" were determined primarily from information reported on the filed Canadian tax returns. The ordinary dividends, the Form 4797 adjustment in 2006, and the disallowance of Schedule C expenses are adjustments generated by applying the proper tax treatment to the disposition of the taxpayer's interest in a partnership and the resulting installment sale, repossession, and subsequent sale of property received by the taxpayer in the transaction.

Itemized deductions replace the standard deduction for 2006, 2008, and 2009 as the Taxpayer provided draft returns which reflect significant Schedule A deductions. These items were not examined so including them in the computation allows the Taxpayer the benefit of all itemized deductions he

identified during the examination.   Additionally, the Taxpayer is allowed additional investment interest expense not reflected on submitted Schedule A based on the examination adjustments for the 2006, 2008, and 2009 tax years.   Adjustments to increase itemized deductions in tax years 2007, 2010 and 2011 are also attributable to the allowance of deductions reflected on the draft returns submitted by the Taxpayer, and any change to investment interest expense which resulted from other examination adjustments.   As in the other years, the Schedule A amounts were not examined and have been accepted as reported.

The exemption adjustment is statutorily computed due to the increased adjusted gross income determined on the report.

The net operating loss generated by the examination adjustments to the 2009 tax year has been carried back to tax year 2007 pursuant to IRC Section 172.  The Taxpayer did not make any elections which would affect the normal two-year carryback period.

No Self-Employment tax was computed on income reported on Schedule C.  The U.S. and Canada have a totalization agreement in place to eliminate any potential double taxation with respect to social security taxes.  The Taxpayer reported the earned income to Canada and as a resident of Canada it is that country which has the right to assert any employment tax on the earnings.

Foreign taxes paid to Canada, as on the Canadian tax returns filed by George Dengin, Inessa Dengin, and/or the grantor trusts were considered by the agent and allowed on George Dengin's Form 1040 as a foreign tax credit.   Foreign taxes paid in 2009 have been carried forward to 2010 and the corresponding Foreign Tax Credit allowed in tax year 2010.

**Tax, Interest, and Penalty to be assessed under jeopardy assessment procedures by year: (Exhibit 15)**

| Year | Tax | Penalty | Interest (as of 10/28/2016) | Total |
|------|-----|---------|-----------------------------|-------|
| 2006 | 4,257,926 | 1,916,067 | 2,898,791 | 9,072,784 |
| 2007 | 1,338,515 | 602,332 | 700,308 | 2,641,155 |
| 2008 | 822 | 370 | 345 | 1,537 |
| 2009 | 0 | 0 | 0 | 0 |
| 2010 | 798,767 | 359,445 | 223,553 | 1,381,765 |
| 2011 | 49,208 | 22,144 | 10,872 | 82,224 |
| TOTAL | 6,445,238 | 2,900,358 | 3,833,869 | 13,179,465 |

**Index of Exhibits:**

1 – Inessa Affidavit

2 – Chicago Title Company: purchase of house at 1813 Fernald Point, Santa Barbara, CA

3 – Fernald Point Ltd Partnership Agreement; Canadian partnership that owns house in Santa Barbara, CA.

4 – Dengin Family Trust- Summary of Interview written by IRS Counsel Melanie Senick. Interview was with George Dengin, POA Michael Cohen, and chartered accountant, Brad Allen, conducted on November 17, 2014.

5 – DENG Interview summary of telephone interview with the George Dengin, Michael Cohen, and Brad Allen written by IRS GM Kim Slack.

6 – IMOLI, IMOLTs 2006-2015

7 – Cover page for 11-17-14 Interview, comments by RA Debra Pratum

8 – Vancouver Sun, June 27, 2006; Partnership dissolved into acrimony, litigation

9 – Vancouver Sun, July 12, 2008; business news

10 – Vancouver Condo Info, June 2006; Condos, crime and calling it quits

11 - Copy of letter from Social Security Administration

12 – 2006 through 2011 delinquent filed 1040 tax returns

13 – 2006 through 2011 unsigned 1040 "Draft" tax returns

14 – 2006 through 2011 Canadian Tax Returns:

      A:  George Dengin,

      B:  Dengin Family Trust #1

      C:  Dengin Family Trust #2

      D: Fernald Point LTD

      E: Inessa Dengin

15 – Form 4549-A Income Tax Examination Changes; includes tax, penalties, and interest

16 – Form 886-A for audit adjustments on Form 4549-A

    A. Additional Interest Income - Inessa
    B. Schedule E – Trust Adjustment
    C. Interest Income
    D. Foreign Tax Credit
    E. Schedule D Capital Gain/Loss (aggregate amount reported on Form 4549-A)
        a. Sales from Disregarded RRSP Account
            i. RRSP Low High Cost Basis of Stock
        b. Capital Gain/Loss; refer to Short Term Capital Gain Adjustment
        c. Schedule C; refer to Schedule D – Short Term Capital Gain Adjustment
    F. Schedule of Chandler Adjustments
        a. Overview page
        b. Part A
            i. Schedule C – Other Expenses
            ii. Schedule D – Capital Gain
        c. Part B – Schedule E – Dividend
        d. Part C – Other Gains from 4797 – Installment Sale Gain
        e. Part D – Gain on Repossession and Loss from Subsequent 2009 Sale

17 – MFTRA Report

18 – 2009 NOLD

Exhibit 2

*Form F30 (Rule 10-4(2) and (7))*

This is the 3rd affidavit
of Inessa Dengin, also known as Inessa Tepper in this case
and was made on 29/Jun/2012

Court File No.: E023112
Court Registry: Vancouver

**In the Supreme Court of British Columbia**

Claimant:     Inessa Tepper

Respondent:   Ammi Tepper, Amiable Industries, Empty Holdings Ltd., and Sea to Sky Ford Sales
              Ltd.

**AFFIDAVIT**
*[Rule 21-1 of the Supreme Court Family Rules applies to all forms.]*

I, Inessa Dengin, also known as Inessa Tepper, of 1939 Drummond Drive, Vancouver, British
Columbia, homemaker, SWEAR THAT:

1.  I am the Claimant in these proceedings and as such has personal knowledge of the facts and
    matters hereinafter deposed to, save and except where same are said to be based on
    information and belief and where so stated I verily believe them to be true.

2.  I have read the Affidavit #1 of the personal respondent, Ammi Tepper (the "Respondent"), and
    unless expressly admitted to in this affidavit, I deny the allegations made.  I also provide
    evidence in this affidavit in support of my Notice of Application.

**Background**

3.  The Respondent and I married on May 3, 1992, and we separated on July 2, 2002.  There are
    two children of the marriage:

    and

    (together, the "Children").

4.  I was born on            and am 43 years old.  The Respondent was born on
          and is 50 years old.

5.  The Respondent and I were divorced by order entered on October 20, 2003.  Now produced
    and shown to me and attached as **Exhibit "A"** to this my affidavit is a true copy of the order
    for divorce.

6.  On November 22, 2003, I married my current husband, George Dengin ("George"). George is a successful businessman. We reside in Vancouver. George has two children from his previous marriage, aged ⬛⬛⬛ one of whom resides with us approximately 50% of the time. George's other child resides with us approximately 50% of the time when she is home from boarding school in ⬛⬛⬛

7.  During my marriage to the Respondent, I used the surname "Tepper." Upon my marriage to George, I assumed the surname "Dengin." I primarily utilize the surname "Dengin."

8.  For the last four years of my marriage to the Respondent, I was a homemaker and was not employed. I continue to be a homemaker.

9.  Throughout our marriage, and after, the Respondent was financially successful. Until 2009, he owned and operated Sea to Sky Ford Sales Ltd., a car dealership business in Squamish, which business I understand he sold in 2009. Throughout our marriage and after, the Respondent was also a real estate investor.

10. In response to paragraphs 5 – 6 of the Affidavit, the consent order dated June 10, 2003, attached to the Affidavit as Exhibit A, constituted the settlement of the corollary matters in our divorce proceedings (the "Consent Order").

11. In further response to paragraph 5 and 6 of the Affidavit, I swore a child support affidavit in support of the divorce order, which affidavit is attached as Exhibit B to the Affidavit. In the child support affidavit, I deposed that the Guideline support amount payable by the Respondent to me was $2,538 for two children at the time of the Consent Order, but that the Respondent and I had agreed that the monthly payments were to be $4,000 per month, which were to include payments for the Children's section 7 expenses.

12. In addition, the amount that we had agreed upon for child support was in partial consideration of my not receiving spousal support, and the fact that I was receiving less than one-half of the total family assets.

13. Since we entered into the Consent Order, the Respondent made only a few payments of $4,000, between June to September, 2003. The Consent Order also provides that I have sole custody of the Children, and the Respondent and I share joint guardianship of the Children. I oppose the Respondent's claim that the current custody order should be varied to a shared custody order.

**Past Child Support and Means of the Respondent**

14. Since we entered into the Consent Order, the Respondent has provided few payments to me in any amount for the support of the Children. Since approximately October, 2003, I have verbally requested that the Respondent pay me child support in accordance with the Consent Order, and he has refused, often saying to me "You are rich" and that I can afford to support the Children. On the occasions that I have received child support from the Respondent, he would often provide the cheques to the Children instead of to me, and he would tell the Children to give the cheque to me. He would also remind the Children that he was supporting them, which was embarrassing for me and confusing for the Children. Any time that I broached the subject of child support with the Respondent, he would get angry at me and insult me. I quickly learned that if I did not discuss the issue with him at all, there was less stress on the Children. However, I would often remind the Respondent that I required child support when I felt as though the Respondent was in an approachable mood.

15. I am seeking an order for retroactive basic child support from January 1, 2008 until present, as well as ongoing basic child support payable by the Respondent to me. I am also seeking an order for retroactive s. 7 expenses paid by me, as well as for ongoing s. 7 expenses of the Children.

16. In response to paragraph 8 of the Affidavit, it is not true that neither of us have adhered to the Consent Order since it was entered into; the Respondent has not paid child support to me in accordance with the Consent Order since approximately September, 2003. Further, the Respondent did not transfer ownership of a vehicle worth $30,000, or provide me with $30,000, in accordance with paragraph 17 of the Consent Order. In further response to paragraph 8, while it is true that in approximately October, 2003, the Respondent advised me that he could not afford the $4,000 monthly payments for child support, he did not provide any information or documentation to me showing that his income had declined drastically. I do not believe that the income available to the Respondent had declined in this period.

17. In general response to the Respondent's allegations in the Affidavit that his income has "declined drastically" from approximately October 2003 to present, I respond as follows. The Respondent carried on his successful car dealership until 2009, when it was sold. I understand that the Respondent was a shareholder of a number of inter-related companies during this period. I believe that the Respondent was able to make the child support payments pursuant to the terms of the Consent Order at that time. The Respondent had control of various companies, and control of the income that was paid out to him from the

various companies. Further, I believe that the Respondent had the companies pay some of his personal expenses. I also understand that the Respondent was able to utilize the vehicles in his dealership for personal purposes.

18. The above factors were taken into consideration for the purposes of determining the Respondent's income of $233,000 at the time of the Consent Order. The Respondent's 2002 and 2003 income, according to his Notice of Assessment for those years, was $47,762 and $68,347, whereas we agreed in the Consent Order that the Respondent's true income, available to him from all sources, was $233,000.

19. I believe that the Respondent may have, or may have had a direct or indirect interest in the following companies / trusts / partnerships / ventures, or that he is currently involved with these entities / ventures, and / or that he may earn an income from his involvement with these entities / ventures:

a. Amiable Industries Inc.: I understand from the Respondent's Financial Statement, sworn on March 14, 2012 (the "Respondent's Financial Statement"), that he owns 100% this company. Now produced and shown to me and attached hereto as **Exhibit "B"** to this my Affidavit is a true copy of the corporate search for this company. I understand that this company owns real property in Squamish. Now produced and shown to me and attached hereto as **Exhibit "C"** to this my affidavit is a true copy of a land title search of Amiable Industries Inc. Now produced and shown to me and attached hereto as **Exhibit "D"** to this my affidavit is a 2012 BC Assessment for the property owned by this company, PID number 006-965-440. This document ascribes a value of $325,000 for this property.

b. Empty Holdings Ltd.: I understand from the Respondent's Financial Statement that the Respondent owns 100% of the shares in this company. Now produced and shown to me and attached hereto as **Exhibit "E"** to this my affidavit is a true copy of the corporate search for this company. I understand that this company also owns real property located in Squamish. Now produced and shown to me and attached hereto as **Exhibit "F"** to this my affidavit is a true copy of the land title search of Empty Holdings Ltd. Now produced and shown to me and attached hereto as **Exhibit "G"** to this my affidavit is a true copy of the 2012 BC Assessment for the property owned by this company, PID number 002-662-728. This document ascribes a value of $1,453,000.00 for this property.

I believe that the Respondent may have only sold the franchise of his Sea to Sky car dealership in 2009. I understand that the dealership continues to be operated as Sea To

Sky Ford Sales Ltd. under the new ownership.  I further believe that the Respondent continues to own the land on which the dealership is located, and that he receives lease payments from Sea To Sky Ford Sales Ltd., a source of income for the Respondent.  Now produced and shown to me and attached hereto as **Exhibit "H"** to this my affidavit is a true copy of an internet webpage for the Sea To Sky Ford Sales Ltd. dealership, obtained by my counsel.  The dealership's address is 1180 Hunter Place, Squamish, B.C., V8B 0B7, the same address as the parcel of land owned by Empty Holdings Ltd.  Although the Respondent has not disclosed any particulars of the sale of the car dealership franchise, I recall that in approximately 2000 or 2001, the Respondent advised me that he was offered approximately $1,500,000 from Jim Pattison for the purchase of the business.  I believe that the Respondent may have received at least this amount upon the sale in 2009.

c.  Asee Investments Ltd.:  I believe that the Respondent may have an interest in this company as well.  Now produced and shown to me and attached hereto as **Exhibit "I"** to this my affidavit is a true copy of a corporate search for this company, which shows that the company is active and that the Respondent is a Director and an Officer of this company, along with his partner, Edward Vernon.  I do not know if this company owns property, nor do I know how much property this company owns.  I understand that the Respondent continues to do business with Edward Vernon.

d.  Sea-to-Sky Automotive Leasing Ltd.:  I understand from the Respondent's Financial Statement that he continues to own the shares in this company.  Now produced and shown to me and attached hereto as **Exhibit "J"** to this my affidavit is a true copy of the corporate search for this company, which document shows that the Respondent is the Director and Officer of this company.  I do not know what assets this company owns.

e.  Sea-to-Sky Marina Ltd.:  I believe that the Respondent also owns shares in this company.  Now produced and shown to me and attached hereto as **Exhibit "K"** to this my affidavit is a true copy of the corporate search for this company, which shows that, as at March 20, 2012, the Respondent was a director and officer of this company.  Now produced and shown to me and attached hereto as **Exhibit "L"** to this my affidavit is a true copy of a land title search, showing that this company owns 50% of a property located in Squamish, and the Edward Vernon owns the other 50% of this property.  Now produced and shown to me attached hereto as **Exhibit "M"** to this my affidavit is a true copy of the 2012 Tax Assessment for the property owned by Sea to Sky Marina Ltd. and Mr. Vernon, which shows a value of $46,500 for this property.

f. MBAK Investments LLC: I believe that the Respondent may have or may have had some involvement in this company, which is located in Florida. Now produced and shown to me and attached hereto as **Exhibit "N"** to this my affidavit is a true copy of a corporate search of this company, acquired on March 28, 2012. This document shows that the Respondent is the registered agent for this company.

A search of the registered address for this company on the Florida land title registry shows the mailing address to be                  Cape Coral, FL,      and that this land is owned by a Rogowski Izhak, who I understand is a long time business partner and friend of the Respondent. Now produced and shown to me and attached hereto as **Exhibit "O"** to this my affidavit is a true copy of the land title search for the aforementioned property, conducted on March 19, 2012.

g.        Investments Ltd.: I understand that the Respondent started this company, which is an abbreviation of our Children's names,            (the Respondent and I sometimes call          as a nick name). Now produced and shown to me and attached hereto as **Exhibit "P"** to this my affidavit is a true copy of the corporate search for this company, which shows that the Respondent and Mr. Edward Vernon are the Directors and Officers of this company.

Now produced and shown to me and attached hereto as **Exhibit "Q"** to this my affidavit are true copies of four land title searches of        Investments Ltd. as the registered owner of these properties. Now produced and shown to me and attached hereto as **Exhibit "R"** to this my affidavit are true copies of the 2012 BC Assessments for these four properties, including PID No. 012-022-225, 012-022-217, 012-022-373, and 012-022-161. According to these documents, the properties with PID No. 012-022-161, 012-022-225, and 012-022-217 have a current combined value of $1,985,000.00, and the property with PID No. 012-022-373 has a current value of $862,000.00. These assessments also show that these properties are used as stores and offices. Now produced and shown to me and attached hereto as **Exhibit "S"** to this my affidavit is a true copy of the share register of this company, which I obtained on June 25, 2012. I believe that this company may be a source of income for the Respondent.

h. Power Development Industries, LLC: The Respondent has advised me and the Children on many occasions that he owns the real property, which he frequently visits in Palm Springs, California. I understand that he undertook an extensive and costly renovation on

this property over the course of 2010 to approximately 2011. During that time, he was travelling to Palm Springs at least five times per year, sometimes for up to one month. I believe that this property is owned by a company called Power Development Industries, LLC, which I believe may be owned by the Respondent. Now produced and shown to me and attached hereto as **Exhibit "T"** to this my affidavit is a true copy of a business search of Power Development Industries, LLC, obtained on March 28, 2012. The Respondent is the agent for service of this company.

Now produced and shown to me and attached hereto as **Exhibit "U"** to this my affidavit is a true copy of a property search of a property located at 74790 N. Cove Dr., Indian Wells, California, 92210. This document shows that this property is owned by "Power Dev Industries," which has a mailing address at No. 17533 - 1202 Pender Street in Vancouver, B.C., which I believe may be the Respondent's P.O. Box address.

i. Ammi Tepper Family Trust No. 1: I understand that the Respondent is or was a Trustee of the Ammi Tepper Family Trust No. 1. Now produced and shown to me and attached hereto as **Exhibit "V"** to this my affidavit is a true copy of the Ammi Tepper Family Trust No. 1, dated November 8, 2004.

I do not know if the Respondent has been or is a beneficiary of this Trust since it was settled in 2004, nor do I know what property this Trust owns. I do not know if and / or           are beneficiaries of this Trust.

j. Floating Homes Project in Squamish: I conducted an internet search of "Ammi Tepper" and "Squamish" on www.google.ca, and found a blog written by Johnny Stork on August 9, 2011, stating the Respondent has submitted a proposal to the District of Squamish to initiate the development of floating homes in Squamish. Now produced and shown to me and attached hereto as **Exhibit "W"** to this my affidavit is a true copy of the blog, entitled "Floating Homes in Squamish: Good Idea or Bad Idea?" written by Johnny Stork, and dated August 9, 2011. I do not know if this project has been accepted, nor do I know if the Respondent or one of his companies / business ventures is involved in this project. I have been advised by an employee at the Squamish municipality that the Respondent is the principal behind this project.

20. I further believe that the Respondent has had other significant sources of income available to him throughout the years that his income has allegedly "declined drastically." For example, I believe that in 2006 and 2007, the Respondent made approximately $1.5 million in non-

taxable gains from the sale of two principal residences.  The first of these two properties is a property located at                                           West Vancouver, B.C., with PID No.

Now produced and shown to me and attached hereto as **Exhibit "X"** to this my affidavit is a true copy of a Form A transfer of property with PID No.                      which shows that, on September 15, 2003, I transferred this property to the Respondent for a payment of $205,000. Now produced and shown to me and attached hereto as **Exhibit "Y"** to this my affidavit is a true copy of a Form B Mortgage, dated April 8, 2004, showing that the Respondent was able to borrow $1,500,000.00 against this property in order to build a house on said property.

21. Now produced and shown to me and attached hereto as **Exhibit "Z"** to this my affidavit is a true copy of a Form A transfer of this same property by the Respondent, showing that he sold this property on June 27, 2006 for $2,625,000.  I understand that this property was the Respondent's principal residence.

22. The second of the two properties that the Respondent purchased and sold in 2006 and 2007 was located at 5850 Cartier Street, Vancouver, B.C., with PID No. 007-979-355.  The Respondent purchased this property on February 22, 2007 for $2,160,000, and, despite his allegations that in the years his income "declined drastically," he was able to borrow the entire purchase price of this property, which was secured by a mortgage in favour of the Royal Bank of Canada.

23. Now produced and shown to me and attached hereto as **Exhibit "AA"** to this my affidavit are true copies of the Form A transfer for this property dated February 22, 2007 as well as a land title search for this property as at February 26, 2007.  Now produced and shown to me and attached hereto as **Exhibit "BB"** to this my affidavit is a true copy of the Form B Mortgage registered against this property, dated February 24, 2007.  The Respondent sold this property on October 25, 2007 for $2,468,000.  Now produced and shown to me and attached hereto as **Exhibit "CC"** to this my affidavit is a true copy of the Form A transfer for this property, dated October 25, 2007.

24. In addition, the Respondent was able to purchase a $250,000.00, 53 foot boat in approximately 2009, which boat he still owns.  I understand that, since he purchased this boat, it has been moored in Coal Harbour, Vancouver, B.C.  I further understand from doing my own research that the monthly moorage fee for a boat of this size at that location is approximately $1,000 per month, and that the approximate maintenance and gas costs for a boat of this size is approximately $5,000 per year.  I also believe that the Respondent is a member of the Royal Vancouver Yacht Club, which membership dues and minimum spending requirement I

understand to be approximately $400 per month. I do not believe that the Respondent has disclosed either of the above expenses in the Respondent's Financial Statement.

25. Further, the Respondent has been able to retire at the age of 49 years old, and I understand that he pays rent in the amount of $4,000.00 per month for his three bedroom house, which is located in Kerrisdale. In addition, currently, and during the period that the Respondent's income had allegedly "declined drastically," he has travelled frequently and extensively. I understand that the Respondent takes several trips a year to Palm Springs, Florida, and Las Vegas. I am also aware that, over the years, the Respondent has been on trips to Europe, Australia, Hong Kong, Israel on two occasions, and Hawaii, to name a few. Further, the Respondent frequents his Palm Springs residence several times a year for weeks at a time: in total, I believe that the Respondent spends approximately five to six months per year in Palm Springs. Further, as previously stated in this my affidavit, in 2010, the Respondent had the financial means to conduct an extensive and costly renovation of his Palm Springs residence.

26. In response to paragraph 11 of the Affidavit, it is not true that I agreed to accept $3,000 per month in child support indefinitely. Although I did draft the letter attached as Exhibit E to the Affidavit, I do not believe I signed this letter. In any event, since the time of this alleged agreement, the Respondent has not paid any child support payments in the amount of $3,000 to me.

27. In response to paragraphs 12 and 13 of the Affidavit, while I did enter into the agreement attached at Exhibit F to the Affidavit (the "Agreement"), the Respondent misrepresents the Agreement reached in the Affidavit and the Respondent did not perform in accordance with the terms of this Agreement. In November 2004, I agreed to accept a 2005 Lincoln Aviator vehicle, as well as a further $500 per month from the Respondent in lieu of the Respondent's child support payments for a period of three years, commencing on December 1, 2004, and ending on December 1, 2007. At the time, the Respondent advised me that he would lease this vehicle, so that he could write it off for tax purposes. Further, it is not true that the value of the vehicle was $80,000. Just prior to the time we entered into the Agreement, I went to other car dealerships and inquired as to the value of the vehicle. I was advised that the value was approximately $65,000 at that time.

28. In further response to paragraph 12 and 13, I believe that immediately after entering into the Agreement, the Respondent may have made approximately two or three of the $500 payments to me, as stipulated by the Agreement, however, I did not receive any of the $500 payments after these initial payments. Also, the Agreement stipulated that the vehicle was to

become my sole property free and clear as at December 1, 2007. However, I now understand from the Respondent's evidence that this vehicle was not paid off until mid-way through 2009, and that the Respondent is now attempting to include all of the lease payments he made on this vehicle as a credit towards his child support obligations. This was not the Agreement reached between me and the Respondent.

29. In response to paragraphs 14, 16, 17, and 21, and 36, I do not believe that the incomes the Respondent claims in these paragraphs are representative of the true income available to the Respondent in these years. I believe that, as a shareholder in many companies, the Respondent had access to pre-tax corporate income of these companies, and that the Respondent had, and continues to have many personal expenses paid for by the businesses. Further, as a shareholder of these corporations, I believe that the Respondent was and still is able to draw as much or as little income from the companies as he desires, for income tax purposes.

30. I believe that there may have been and continues to be, income available to the Respondent from his companies and that an amount should be imputed to the Respondent for income purposes. As an example, in 2010, the Respondent made a $2,000 payment to                                   for               2011 tuition deposit by cheque. This cheque was from 'Amiable Industries Inc.' Now produced and shown to me and attached hereto as **Exhibit "DD"** to this my affidavit is a true copy of this cancelled cheque, dated March 1, 2010, which I acquired from                                   I am also aware that the Respondent has paid for some of                               horseback riding lessons with cheques from Amiable Industries Inc.

31. In further response to paragraph 21, the Respondent has not provided any information or documentation in relation to the sale of the dealership. In further response to paragraph 21 and 34, I do not believe that it is reasonable that the Respondent retired at the age of 49 years old. I believe that the Respondent is fully capable of working at this time, especially as he has the obligation to support his Children. Further, I do not think that it is reasonable that the Respondent has not sought further employment since he sold his business in 2009 in order to support his children, nor do I think it is reasonable that the Respondent has retired from working altogether.

32. As previously stated in this, my affidavit, I believe that the Respondent has other assets and means which have not been disclosed in the Respondent's Financial Statement, sworn on March 14, 2012. In addition to the assets that I have referenced in paragraph 19, above, I understand that the Respondent owns three vehicles, a newer model Mercedes E350 (which

vehicle I saw parked outside of the Respondent's Vancouver home on June 19, 2012) and a Jeep, which I believe are primarily located in Palm Springs, and his vehicle that he owns here is a late model Jaguar. I believe that the value of the Jaguar is at least $30,000 not $10,000 as deposed by the Respondent. Further, with respect to the Respondent's watch collection as disclosed in the Respondent's Financial Statement, I believe that this collection is worth approximately $50,000, not the $10,000 that he deposes.

33. In approximately November, 2011, I enrolled with Family Maintenance Enforcement Program in order to enforce the child support payable by the Respondent to me in the Consent Order.

**My Means and Income**

34. Since 1991, I have owned 25% of a company called Perestroika Products Ltd., which is my family's food manufacturing and distribution business in Vancouver. My brother owns 25% of this business, his wife owns 25% of this business, and our parents own 25% of this business. Our company distributes our products to stores in the Greater Vancouver area, such as IGA and Whole Foods. Although I do participate in the operation of this company from time to time, I do not earn an income from this company, nor have I since approximately 2002. My brother is active in this company, and works in this company on a daily basis, and he draws his income from this source. Any excess funds are reinvested in the business.

35. I am not otherwise employed and I do not earn a substantial income from another source outside of investment income that I earn from investing in the stock market and in stock market related deals with my husband, George.

36. In response to paragraph 10 of the Affidavit, it is not true that I have an interest in all of the assets as stipulated by the Respondent in his Exhibit D to the Affidavit. In this respect, I refer to my Financial Statement, sworn on June 29, 2012. With respect to pages 28 and 29 of Exhibit D of the Affidavit, I am unaware as to the source of these documents, and do not know who has prepared these documents. I respond as follows with respect to Exhibit K of the Affidavit:

   a.  1939 Drummond Drive, Vancouver, B.C., V6T 1B7 (the "Drummond Drive Property"): I am a Trustee and one of the five beneficiaries of the 2005 Drummond Drive Property Trust, which trust owns the Drummond Drive Property, which property is where I reside with George, my Children, and George's children. The trust deed for this trust is attached at p. 128 to my Financial Statement, sworn on June 29, 2012. My name appears on title to the Drummond Drive Property, as one of the trustees. To date, I have not received any funds

from my beneficial interest in the 2005 Drummond Drive Property Trust, nor do I expect to earn any income from this source in the future.

b. 2215 Lake Placid Road, Whistler, B.C., V0N 1B2 (the "Lake Placid Property"): The circumstances of my holding legal title to this property are exactly as is the case with the Drummond Drive property, discussed above. I am a Trustee and one of the five beneficiaries of the 2005 Lake Placid Property Trust, which trust owns the Lake Placid Property. The trust deed for this trust is attached at p. 88 to my Financial Statement, sworn on June 29, 2012. As with the Drummond Drive Property, my name appears on title as one of the trustees, but this property is the property of the 2005 Lake Placid Property Trust. To date, I have not received any funds from my beneficial interest in the 2005 Lake Placid Property Trust, nor do I expect to earn any income from this source in the future.

c. 1813 Fernald Point, Santa Barbara, California (the "Fernald Point Property"): I am the sole shareholder in a numbered holding company, 0885303 B.C. Ltd. ("My Holding Company"), incorporated in July, 2010. My Holding Company is a general partner in the Fernald Point Limited Partnership (the "Fernald LP"), and owns 1% of the partnership units in the Fernald LP. I personally hold 4,998,000 limited partnership units in the Fernald LP, representing 98% of the Fernald LP, and the Dengin Family Trust (I am not a beneficiary of this trust) owns the other 1% of the Fernald LP.

The Fernald LP owns the Fernald Point Property. George purchased this property for $5,100,000 ,and established the Fernald LP, and My Holding Company, in July, 2010. When the Fernald Point Property was purchased, we inherited a tenant with the property, whom we could not have removed until approximately September, 2010. This resulted in a rental income loss recorded in my tax return in 2010. We will not have another tenant in this property. I do not expect to earn any income from this source in the future, as the Fernald LP has been structured so as not to incur an income.

d. 8626 Joffre Avenue: As previously mentioned, I own 25% of my family company, Perestroika Products Ltd., from which I do not earn an income. This company owns a property located at 8626 Joffre Avenue, which is the building from which our business is conducted. Since approximately 2002, I have not received any funds from Perestroika Products Ltd.

e. 602565 B.C. Ltd.: Although I was a Director of this company, I am not, nor have I been, a

shareholder, or an officer.  Further, this company was sold in March, 2004.  From 2001 to March, 2004, this company held legal title to a property located at 1621 St. Georges Avenue, North Vancouver, B.C. (the "St. Georges Property") as a nominee of the beneficial owner, but this company never had a beneficial interest in the St. Georges Property.  The St. George's Property was ultimately sold by the property's beneficial owner to an arm's length purchaser.



f.      _____ Vancouver, B.C. (the _____ Property"): I am one of three trustees of the Vista Crescent Trust, a trust established for the benefit of George's niece and nephew when their father, George's brother, passed away.  The Vista Crescent Trust legally owns the _____ Property in its entirety.  I am not and have not been a beneficiary of the Vista Crescent Trust, nor do I or have I had an interest in the _____ Property.

g.      In addition, I am also a Trustee and one of seven discretionary beneficiaries of the Jameson House Trust, which trust is the beneficial owner of two penthouses located at 838 West Hastings Street, Vancouver, British Columbia. The trust deed for this trust is attached at p. 108 to my Financial Statement, sworn on June 29, 2012.  To date, I have not received any funds from my beneficial interest in the Jameson House Trust, nor do I expect to earn any income from this source in the future.

37. Throughout my marriage to George, I have had limited involvement in our finances: George has been primarily responsible for our finances.

38. I acquired my beneficial interest in the 2005 Drummond Drive Property Trust, the 2005 Lake Placid Trust, the Jameson House Trust, and the Fernald LP through George, at no direct financial cost to me.  I was added as a beneficiary to the 2005 Drummond Drive Property Trust and the 2005 Lake Placid Trust in 2005, and was added as a beneficiary to the Jameson House Trust in 2011.  The funds used to acquire the properties owned by the 2005 Lake Placid Trust, the Jameson House Trust, and the Fernald LP came primarily from George, and George directly and indirectly pays for the expenses associated with these properties from our joint VanCity line of credit, which is the account that George and I utilize for our day to day expenses.  With respect to the Drummond Drive Property, I contributed approximately $350,000 towards the $3,500,000 purchase price for this property, with funds from my divorce from the Respondent.  George paid for the remaining amount of the purchase price of this property.  I have not directly or indirectly contributed to the purchase price of the properties owned by the 2005 Lake Placid Trust, the Jameson House Trust, and the Fernald LP.

39. I have in my sole name a Union Securities RRSP, which has a current market value of approximately $1,800,000.00. George has trading authority over this account, and has handled every stock transaction in this account, and through his efforts, has increased the value of this RRSP from approximately $40,000 in around 2004 to its current value. In addition, I have a Vancity TFSA with a current balance of approximately $450,000. George has trading authority over this account, and has handed every stock transaction in this account as well, and has increased its value from approximately $5,000 in 2008 to its current value.

40. George earns his income by borrowing funds against our joint VanCity line of credit and investing these funds in the stock market, or stock market related deals, and paying back the borrowed amounts onto the VanCity Line of Credit when he sells the stock. My income is earned in the same manner, and is handled entirely by George.

**Past and Ongoing Parenting Time / Custody of the Children**

41. Throughout the Affidavit, the Respondent alleges that he has had more parenting time with the Children over the years than is and has been the reality. In response to paragraphs 17, 20, 23, and 26 of the Affidavit, with regard to the parenting time of the Children from the date of the Consent Order until approximately August, 2011, while the Respondent did have reasonable parenting time of the Children throughout these years, he did not have parenting time of the Children as much as 40% or 50%. Since the date of the Consent Order, the following has been the approximate parenting schedule of the Children:

a. In 2003, the Respondent resided in West Vancouver and worked in Squamish. The parenting schedule at that time was that the Respondent had parenting time of the children every second weekend. Every other Friday, after the children's school day, I would drive the children to the downtown Safeway parking lot on Denman and Robson Street in downtown Vancouver to drop the Children off to the Respondent, and he would take them back to his West Vancouver residence. If the Respondent needed to be at work early on Monday morning, I would pick up the Children from him on Sunday evenings, often after I returned from my weekend stay in Whistler. On some occasions, the Respondent would have parenting time of the Children until Monday after school instead of Sunday evening.

In addition to every other weekend, the Respondent would sometimes have parenting time on occasions during the week when he would take them to dinner or out for ice

cream. This evening visit would often occur on Wednesdays, being the day that the Respondent did not go to Squamish for work. On these evenings, the Respondent would pick up the Children from my house for a visit, and would return them back to my house later that evening.

b. From approximately 2004 to the summer of 2006, the above schedule applied, however, the Respondent got increasingly busier at this time, as he was building a property, and he had an increasingly busy personal life, which included a considerable amount of travel. Although our parenting schedule was at all times flexible, the amount of parenting time the Respondent spent with the Children in this period was similar to the above.

c. From the summer of 2006 until 2007, the Respondent had parenting time of the Children in accordance with the above schedule, with the exception that his parenting time expanded to every other week, from Thursdays until Monday mornings. I remember this schedule clearly, as George had parenting time of his children on alternate Thursdays to Mondays during this time as well.

However, there were many occasions when the Respondent could not have parenting time of the Children because of his work, travel, or personal life. In the summer of 2006, the Respondent sold his West Vancouver residence and moved to Vancouver. In this time period, I drove          to                          on an almost daily basis, and George would driv          to school at                          on an almost daily basis. On some rare occasions, my mother would take          to school. In 2006 and 2007,          would spend an occasional night at the Respondent's house during the school week in addition to the alternate Thursday to Monday, as the Respondent's Vancouver residence was close to her high school.

d. From 2008 to approximately 2010, the above schedule continued, from Thursday afternoon to Monday morning every second weekend, although there were occasional nights when the Children would stay with the Respondent in addition to the schedule. In this time period, the Respondent was in the process of selling his Sea to Sky Dealership, and was therefore increasingly busy. Even after he sold the dealership business, the Respondent continued to be involved with the dealership, and started travelling even more, in order to buy properties in the United States.

In this time period, I believe he acquired at least two properties, and spent considerable time remodelling his property in Palm Springs, which, as previously stated in this my

affidavit, required him to be in that area for weeks, sometimes a month at a time. During this period, I would often receive telephone calls from the Respondent during his parenting time of the Children, requesting that I pick the Children up early, as the Respondent had plans, or had other things to do.

e. Commencing in early 2011,          resided at my residence approximately 80% of the time.          moved into a dormitory for her attendance at          n September, 2011, and, as at May, 2012, she moved into an apartment on campus, which she has sublet for July and August, 2012.          will be primarily residing with me for July and August this year. At this time, I anticipate that          will likely reside with me in her summers. In approximately September, 2011,          began to spend more time with the Respondent, as the Respondent applied further pressure on          to spend time in his residence. Since approximately September, 2011, the Respondent has insisted that          spend time with him on an increased basis, which, I suspect, is for the purpose of lessening his child support obligation. As the Respondent travels frequently, he is unable to have a set schedule in place.

42. Since approximately September, 2011, when the Respondent is in Vancouver, he will often call          and demand that she go to his house to spend time with him on very short notice. I am content with          spending as much time with her father as she wishes. However, she is     years old, and therefore has school commitments, and social activities, and her home base is with me. I oppose the Respondent's claim to vary the Consent Order, which provides that I have sole custody o          I do not believe that it is in          best interest to vary the Consent Order to provide for shared custody o

43. A shared custody arrangement is not reflective of our parenting arrangements for          as, due to the Respondent's continual inconsistency with regard to his parenting time of          she continues to spend the majority of her time with me. I do not believe that shared custody o          is workable, given the fact that the Respondent spends approximately five to six months per year in Palm Springs. In fact, the Respondent will likely increase his time spent in Palm Springs in the next couple of years, as he has advised me that he is in the process of making arrangements to spend increased time in the United States. Further, the Respondent does not have a set schedule for his travel, and often leaves Vancouver for Palm Springs sporadically and at the last minute. He does not communicate with me as to when he is leaving town or when we can expect him to return; I often find out through the Children, or I find out after he has left town. When he arrives back in Vancouver, he will call          and expect her to spend time with him upon his request. This arrangement, or lack thereof, is

difficult not only on me, but on ▆▆▆▆▆ as there is no consistency.  Often, I cannot make plans for me and ▆▆▆▆▆ because of the uncertainty of when her father is or is not going to be in Vancouver.

44.  In further response to paragraphs 23 and 26, I did not "dictate" the parenting schedule to the Respondent.  Rather, the Respondent has always demanded that the Children spend time with him, usually on short notice, or whenever it is convenient for him.  There has rarely ever been a 'regular' schedule in place, as the Respondent frequently travels and often cancels his parenting time.  Despite this, I have at all times remained encouraging of the Children's relationship with their father, and I have been very flexible with the parenting schedule in order to meet his requests as a result of his travelling and his personal life.

45.  In response to paragraph 27 of the Affidavit, in approximately September 2010, the Respondent approached me, stating that he required me to sign a letter so that he could produce it to customs agents at the U.S. Border, as he was making frequent trips to the U.S. since he purchased his property in Palm Springs.  Therefore, I signed the letter attached at Exhibit G of the Affidavit, which letter was drafted by the Respondent.  I did not indicate in this letter that we shared 'equal' or '50-50' parenting time with the Children, as we did not.  Rather, I stated we both share the Children on a regular basis, which was true, as the Respondent did have parenting time of the Children in accordance with paragraph 41 of this affidavit.

**Past and Ongoing S. 7 Expenses of the Children**

Affidavit                                                                        Page 18

Affidavit

Affidavit

**Affidavit**

**Means**

**Affidavit**

Affidavit                                                                                    Page 23

SWORN BEFORE ME at
Vancouver
British Columbia,
on 29/Jun/2012

A commissioner for taking
affidavits for British Columbia

INESSA DENGIN

MICHELLE R. ADAMS
*Barrister & Solicitor*
FARRIS, VAUGHAN, WILLS & MURPHY LLP
2500-700 West Georgia Street
P.O. Box 10026, Pacific Centre
Vancouver, BC  V7Y 1B3

Exhibit 3

 **Chicago Title Company**

1127 Coast Village Road, Santa Barbara, CA 93108
805 695-0449 • FAX 805 695-0140

DATE: ~~June 14,~~ **July 14**, 2010

ESCROW NO.: 10-**88500325**-CF
LOCATE NO.: CACT17742-7742-4685-0088500325
TITLE NO.: 10-**88500325**-TD

YOU AS ESCROW HOLDER ARE AUTHORIZED TO SHOW VESTING ON THE GRANT DEED TO RECORD AS
FOLLOWS:

Names: _____

PLEASE MARK APPROPRIATE CHOICE FOR STATUS:

| | |
|---|---|
| _____ | Husband and Wife |
| _____ | Wife and Husband |
| _____ | A Married Couple |
| _____ | A Single Man (never married) |
| _____ | A Single Woman (never married) |
| _____ | A Single Person (never married) |
| _____ | A Married Man (as his sole and separate property)* |
| _____ | A Married Woman (as her sole and separate property)* |
| _____ | A Married Person (as his/her sole and separate property)* |
| | * Please indicate name of spouse so interspousal deed may be drawn: |
| _____ | An Unmarried Man (divorced) |
| _____ | An Unmarried Woman (divorced) |
| _____ | An Unmarried Person (divorced) |
| _____ | A Widow (spouse deceased) |
| _____ | A Widower (spouse deceased) |
| _____ | Registered Domestic Partners |

PLEASE MARK APPROPRIATE CHOICE FOR VESTING:

| | |
|---|---|
| _____ | Community Property |
| _____ | Community Property with Right of Survivorship |
| _____ | Joint Tenants |
| _____ | Tenants in Common (Please Give Interest Amounts) |
| _____ | Sole and Separate Property (If Married or Domestic Partnership, an Interspousal Grant Deed, A Quitclaim Deed, Statement Of Information and Appropriate Instructions Will Need To Be Submitted.) |
| ✓ | Partnership (Limited Or General)   FERNALD POINT LIMITED PARTNERSHIP |
| _____ | Corporation (California Or Other State) _____ |
| _____ | A Trust (attach copy of Trust Agreement) |
| _____ | Other _____ |

Escrow Holder advises the parties hereto to seek legal counsel with their attorney and/or accountant as to
how they should hold title.

_____
George Dangla

0885303 B.C. Ltd., general partner of
Fernald Point Limited Partnership, A
British Columbia Limited Partnership,
by its authorized signatory:

_____
President

Vesting Information (vest)(07-08)



# Chicago Title Company

1127 Coast Village Road, Santa Barbara, CA 93108
805 695-0449 • FAX 805 695-0140

## OPEN ORDER SHEET
**Date:** June 9, 2010  **Time:** 12:59 PM

| | |
|---|---|
| Escrow No.: | **10-88500325-CF** |
| Locate No.: | **CACTI7742-7742-4885-0088500325** |
| Escrow Officer: | **Carol Friedrichs** |
| Taken By: | **Carol.Friedrichs** |
| Opened Date: | **June 9, 2010** |
| Due Date: | |
| Received Date: | **June 9, 2009** |

| | |
|---|---|
| Title No.: | **10-88500325-TD** |
| Title Officer: | **TJ Dwire** |
| County: | **Santa Barbara** |
| Order Type: | **Title and Escrow** |
| Est. Closing Date: | |
| Sales Rep 1: | |
| Sales Rep 2: | |
| Sales Rep 3: | |
| Loan No.: | |

| Customer: | **Sotheby's International Realty** | Customer ID: | **245029** |
|---|---|---|---|

**Property Type:** Single Family
**Property Address:** **1813 Fernald Point Lane, Santa Barbara, CA  93108**
**Assessor's Parcel No(s):** **007-380-020**
**Short Legal Description:**

| | | | |
|---|---|---|---|
| Title Product: | Full Insurance Product | Sales Price: | $5,400,000.00 |
| Transaction Type: | Sale/Re-Sale | Loan Amount: | $ |

## *PROPOSED POLICY INFORMATION*

| Type | Liability | Est. Premium |
|---|---|---|
| **02-ALTA Homeowner's 1-4 Res.** | **$5,400,000.00** | **$5,917.00** |

*SPECIAL INSTRUCTIONS/COMMENTS:* 3 SETS OF UNDERLYING DOCUMENTS, 3 SETS OF EASEMENTS PLOTTED, NEED PRELIM BY 6-11

**LEGAL AND VESTING, PLEASE :)**

### *DISTRIBUTION*

**BUYER:**
George Dengin
*f f*

**OWNER:**                                                                    7 Pre Delivery / 3 CCR Delivery
John Marwood Cleese  and Alyce Faye Cleese
Santa Barbara, CA

**LISTING BROKER:**
Sotheby's International Realty
ATTN: Bob Lamborn & Lisa Lolacono
1106 Coast Village Road, Ste. C, Santa Barbara, CA 93108
Phone: 805-969-9993  Fax: 805-969-9376
eMail: bob.lamborn@sothebysrealty.com

Sotheby's International Realty
ATTN: Vivienne Leebosh
1106 Coast Village Road, Ste. C, Santa Barbara, CA 93108
Phone: 805-969-9993  Fax: 805-969-9376

**SELLING BROKER:**                                                          1 Pre Delivery / 1 CCR Delivery
Prudential California Realty
ATTN: Natalie Brand
3868 State Street, Santa Barbara, CA 93105
Phone: 805-687-2666  Fax: 805-563-0053

**CLOSING LOCATION:**

(ordersh) (10-03) (Rev. 12-09)

# Chicago Title Company

1127 Coast Village Road, Santa Barbara, CA 93108
805 695-0449 • FAX 805 695-0140

**DATE:** July 16, 2010
**ESCROW NO.:** 10-BB500325-CF
**LOCATE NO.:** CACTJ7742-7742-4885-0088500325
**ESCROW OFFICER:** Carol Friedrichs

**TIME:** 10:21 AM

**CLOSING DATE:** July 16, 2010

## BUYER FINAL CLOSING STATEMENT

**SELLER:** John Cleese  and Alyce Faye Eichelberger
**BUYER:** Fernald Point Limited Partnership, A British Columbia Limited Partnership
**PROPERTY:** 1813 Fernald Point Lane, Santa Barbara, CA  93108

| | $ DEBITS | $ CREDITS |
|---|---|---|
| **FINANCIAL:** | | |
| Total Consideration | 5,100,000.00 | |
| Deposit - Mr Dengin George | | 162,000.00 |
| Deposit - Fernald Point Limited Partenship | | 5,082,460.00 |
| **PRORATIONS/ADJUSTMENTS:** | | |
| Prepaid County Taxes at $8,369.86 Semi-Annual from 7/1/2010 to 7/16/2010 | | 697.49 |
| Rents at $13,150.00 Monthly from 7/16/2010 to 8/1/2010 | | 6,575.00 |
| security deposit | | 12,650.00 |
| **TITLE CHARGES:** | | |
| Recording Deed | 42.00 | |
| Monument Survey | 10.00 | |
| **ESCROW CHARGES:** | | |
| Escrow Fee to Chicago Title | 1,817.50 | |
| BUYERS REFUND | $162,512.99 | |
| TOTALS | $5,264,382.49 | $5,264,382.49 |

### SAVE THIS STATEMENT FOR INCOME TAX PURPOSES

(clsstmtfb)(07-02)

225